Jennifer R. Schwartz, (OSB #072978)
Law Office of Jennifer R. Schwartz
2521 SW Hamilton Court
Portland, Oregon 97239
Tel: 503-780-8281
Email: jenniferroseschwartz@gmail.com

Nicholas S. Cady (OSB # 113463)
Cascadia Wildlands
P.O. Box 10455
Eugene, Oregon 97440
Tel:  541-434-1463
Email: nick@cascwild.org

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF OREGON

# EUGENE DIVISION

| | |
|---|---|
| **CASCADIA WILDLANDS AND OREGON WILD,**<br><br>　　　　　　　　Plaintiffs,<br><br>　　v.<br><br>**BUREAU OF LAND MANAGEMENT**, a federal agency,<br><br>　　　　　　　　Defendant. | Case No.:<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**<br><br>(Violations of Federal Land Policy and Management Act; National Environmental Policy Act; Administrative Procedure Act) |

## INTRODUCTION

1.　　Plaintiffs, Cascadia Wildlands and Oregon Wild, (collectively "Plaintiffs"), bring this

civil action, arising under the Administrative Procedure Act (APA), 5 U.S.C. §§ 701 *et seq*.,

1 - COMPLAINT

challenging the United States Bureau of Land Management's (BLM) issuance of the Thurston Hills Non-Motorized Trails and Forest Management Project ("Thurston Hills Project") Environmental Assessment (EA)/Finding of No Significant Impact (FONSI) and Decision Record for violations of federal laws and regulations intended to protect the public's natural resources and ensure informed, well-reasoned decision-making.

2.     This action seeks: 1) a declaration that the BLM violated the Federal Land Policy and Management Act (FLPMA), 43 U.S.C. §§ 302 *et seq.* by authorizing regeneration harvesting (akin to clearcutting) on 100 acres of the Willamalane Non-Motorized Trails Extensive Recreation Management Area; 2) a declaration that BLM violated the National Environmental Policy Act (NEPA), 42 U.S.C. §§ 4321 *et seq.*, and its implementing regulations by a) proceeding under an unreasonably narrow purpose and need, b) failing to develop and analyze reasonable and feasible alternatives to the proposed action, and c) by otherwise failing to take the requisite 'hard look' at the Project's potential environmental impacts; and 3) the vacatur and remand of the Project to the BLM.

3.     The requested relief is necessary to preserve the status quo, to prevent illegal agency action, and to forestall irreparable injury to the environment.

4.     If Plaintiffs are the prevailing party in this action, they will seek an award of fees and costs pursuant to the Equal Access to Justice Act (EAJA), 28 U.S.C. § 2412.

## JURISDICTION AND VENUE

5.     Jurisdiction is proper in this Court pursuant to 28 U.S.C. §§ 1331 (federal question), 2201 (injunctive relief), 2202 (declaratory relief), and 28 U.S.C. § 1346 (United States as a defendant). This cause of action arises under the laws of the United States, including the Administrative Procedure Act (APA), 5 U.S.C. §§ 701 *et seq.*; the Federal Land Policy and Management Act

("FLPMA"), 43 U.S.C. §§ 302 *et seq*.; and the National Environmental Policy Act (NEPA), 42 U.S.C. §§ 4321 *et seq*. An actual, justiciable controversy exists between Plaintiffs and Defendant, and the requested relief is therefore proper under 28 U.S.C. §§ 2201-02 and 5 U.S.C. §§ 701-06.

6.  Venue in this court is proper under 26 U.S.C. § 1391 because all or a substantial part of the events or omissions giving rise to the claims herein occurred within this judicial district, Plaintiffs and Defendant reside in this district, and the public lands and resources at issue are located in this district. The BLM official who authorized this decision is headquartered in Springfield, Oregon, which is located within this district. This case is filed properly in Eugene, Oregon pursuant to Local Rules 3.3 and 3.4 because the Thurston Hills timber sale is located within Lane County, Oregon.

**PARTIES**

7.  Plaintiff CASCADIA WILDLANDS is a non-profit corporation headquartered in Eugene, Oregon, with approximately 10,000 members and supporters throughout the United States. Cascadia Wildlands educates, agitates, and inspires a movement to protect and restore wild ecosystems in the Cascadia Bioregion, extending from Northern California up into Alaska. Cascadia Wildlands envisions vast old-growth forests, rivers full of salmon, wolves howling in the backcountry, and vibrant communities sustained by the unique landscapes of the Cascadia Bioregion.

20.  Cascadia Wildlands' members and supporters have used and will continue to use the Thurston Hills Project area for activities such as hiking, bird watching, and other recreational and professional pursuits. Our members and supporters also own property that adjoins the Thurston Hills Project area.

8.      Plaintiff OREGON WILD is a non-profit corporation with approximately 20,000 members and supporters throughout the state of Oregon and the Pacific Northwest.  Oregon Wild and its members are dedicated to protecting and restoring Oregon's wild lands, wildlife, and waters as an enduring legacy.

9.      Oregon Wild's staff and members regularly visit the Thurston Hills area and surrounding federal lands and seek to ensure that the BLM faithfully and fully implements and complies with federal law in managing the natural resources of the Project area as a means of protecting their interests.  Oregon Wild's staff and members hike, bike, photograph scenery and wildlife, use, and engage in other vocational, scientific, and recreational activities in and around the Thurston Hills Project area.  Oregon Wild's staff and members derive recreational, inspirational, scientific, and aesthetic benefit from their activities within the Thurston Hills Project area.  Oregon Wild's staff and members intend to continue to use and enjoy the Thurston Hills Project area and surrounding forested lands, waters, and trails frequently and on an ongoing basis in the future.

21.     All Plaintiffs have organizational interests in the proper and lawful management of the Northwest District of the Bureau of Land Management's public lands.  Plaintiffs' aesthetic, recreational, scientific, economic and religious interests have been and will be adversely affected and irreparably injured if Defendant engages in activities detrimental to forest ecosystems and late-successional habitat in the Project area.  Plaintiffs' and their members use and enjoyment the Thurston Hills area will be degraded and impaired if the Thurston Hills Project is implemented as planned with aggressive logging.  . Plaintiffs' members and supporters that own adjoining property to the Thurston Hills Project area will suffer aesthetic damages, increased wildfire hazard for the next forty years, and potential decreases in property value.  Plaintiffs' injuries are also predicated on unlawful BLM actions that have diminished the trust between BLM,

Springfield residents, and the conservation community; facilitated the risk of unsupported and uninformed management and decision-making; increased the risk of actual, threatened, and imminent environmental harm and public safety risks; and created actual, concrete injuries to Plaintiffs and their interests.  Because Plaintiffs seek to ensure informed decision-making, compliance with federal law, and the prevention of unacceptable harm to the Project area, the City of Springfield and the specific residences adjoining the Project area, Plaintiffs' injuries would be redressed by the relief sought.

22.     Plaintiffs submitted timely written comments, formal protest letters, and administratively appealed the Thurston Hills Project, alleging, among other issues, that the BLM's failure to proceed under a reasonable purpose and need, adequately analyze the impacts of, or explore alternatives to, this timber sale and its failure to comply with the substantive requirements of FLPMA violated federal law.  Plaintiffs have since dismissed their IBLA appeal to pursue this action.

23.     Defendant BUREAU OF LAND MANAGEMENT is an agency or instrumentality of the United States and is charged with managing public lands and resources in accordance and compliance with federal laws and regulations.

## STATEMENT OF LAW

Administrative Procedures Act

10.     The APA confers a right of judicial review on any person that is adversely affected by agency action.  5 U.S.C. § 702.  Upon review, the court shall "hold unlawful and set aside agency actions…found to be arbitrary, capricious, an abuse of discretion or otherwise not in accordance with the law."  5 U.S.C. § 706(2)(A).

Federal Land Management and Policy Act

11.     Pursuant to the Federal Land Policy and Management Act ("FLPMA"), 43 U.S.C. § 1732(a) and its implementing regulations, 43 C.F.R. § 1610.5-3(a), BLM must ensure that a site-specific project conforms to the Resource Management Plan (RMP) including any alterations or amendments thereto. The FLPMA requires that all BLM lands be managed for multiple uses and to protect a wide range of natural resource values. *See, e.g.,* 43 U.S.C. § 1701; *see generally id.* §§ 1701–1782.

12.     The Thurston Hills Project was developed under the 2016 Northwestern and Coastal Oregon Record of Decision and Resource Management Plan. Pursuant to direction to "provide a diversity of quality recreational opportunities," the RMP designates a number of recreation areas including Extensive Recreation Management Areas ("ERMA"). Each designated ERMA must be managed in accordance with its specific planning framework.

National Environmental Policy Act

13.     Congress enacted the National Environmental Policy Act (NEPA) in 1969, directing all federal agencies to assess the environmental impacts of proposed actions that have the potential to significantly affect the quality of the environment. 42 U.S.C. § 4332(2)(C). NEPA's disclosure goals are two-fold: (1) to ensure that the agency has carefully and fully contemplated the environmental effects of its action, and (2) to ensure that the public has sufficient information to meaningfully participate in the decision-making process.

14.     The Council on Environmental Quality (CEQ) promulgated uniform regulations implementing NEPA that are binding on all federal agencies. 42 U.S.C. § 4342, 40 C.F.R. §§ 1500 *et. seq.*

15. NEPA requires federal agencies to prepare, consider, and approve an adequate Environmental Impact Statement (EIS) for "any major federal action significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(c); 40 C.F.R. § 1501.4(a)(1).

16. To determine whether an action requires an EIS as required by NEPA, an action agency may prepare an Environmental Assessment (EA). 40 C.F.R. § 1501.4(b). An EA should be a concise public document that briefly describes the proposal, examines reasonable alternatives, considers environmental impacts, and provides a listing of individuals and agencies consulted. 40 C.F.R. § 1508.9. If the agency decides that an EIS is not needed, it must undertake a thorough environmental analysis and supply a convincing statement of reasons that explains why a project's impacts are not significant.

17. To make a supportable determination of non-significance, NEPA documents must consider the direct, indirect, and cumulative environmental impacts of a proposed action. 40 C.F.R. § 1508.8. Direct effects are caused by the action and occur at the same time and place as the proposed project. *Id.* § 1508.8(a). Indirect effects are caused by the action and are later in time or farther removed in distances but are still reasonably foreseeable. *Id.* § 1508.8(b). Both types of impacts include "effects on natural resources and on the components, structures, and functioning of affected ecosystems," as well as "aesthetic, historic, cultural, economic, social or health [effects]." *Id.* § 1508. Cumulative impact results when the "incremental impact of the action [is] added to other past, present, and reasonably foreseeable future actions" undertaken by any person or agency. *Id.* § 1508.7.

18. NEPA requires that environmental information be available to public officials and citizens before agency decisions are made and before any actions occur to implement the proposed project. 40 C.F.R. § 1500.1(b). The information released must be of high quality and

sufficient to allow the public to question the agency rationale and understand the agency's decision-making process. *Id.*

19.     NEPA also requires agencies to consider a range of alternatives to each proposed action. The agency's analysis must consider the underlying "purpose and need" for the proposed action, and "rigorously explore and objectively evaluate" the environmental impacts of "all reasonable alternatives" to the proposed action. 40 C.F.R. §§ 1502.13, 1502.14.  The alternatives analysis is "the heart" of the NEPA process because it "present[s] the environmental impacts of the proposal and the alternatives in comparative form, thus sharply defining the issues and providing a clear basis for choice among options by the decisionmaker and the public." *Id*. § 1502.14.  This requirement is critical to serving NEPA's primary purposes of ensuring fully informed decisions and providing for meaningful public participation in environmental analyses and decision-making. *Id*. § 1500.1(b), (c).

## STATEMENT OF FACTS

**The Willamalane Non-Motorized Trails Extensive Recreation Management Area**

20.     The Willamalane Park and Recreation District ("Willamalane") maintains and operates five recreation facilities and 46 parks and natural areas totaling nearly 1,500 acres around the City of Springfield.  On November 6, 2012, Willamalane's Bond Measure 20-199 was approved. The $20 million bond measure highlighted ten priority projects for Willamalane, one of which was acquisition of the Thurston Hills Ridgeline.  The project was described as acquiring property in Springfield to preserve natural areas and develop a hiking and biking trail along the south Thurston Hills Ridgeline, roughly from Bob Straub Parkway to 79th and Main Street for the dual reasons of nature conservation and outdoor recreation.

21.    The BLM also manages federal public land on the Thurston Hills Ridgeline area that borders both Springfield residences and Willamalane's acquisition.  Willamalane approached the BLM to coordinate on a connected trail system given the high demand for recreation and natural amenities and the nearby location of BLM managed sections.  The BLM recognized the public demand and recreational benefits of the proposal.

22.    As the BLM was developing its new Northwestern and Coastal Oregon Record of Decision and Resource Management Plan ("RMP") in 2015, it also completed a spatial analysis of recreational needs that supported the agency's collaboration with Willamalane.  Based on the recognized demand for new hiking and mountain biking opportunities, the regional RMP designated the Willamalane Non-Motorized Trails Extensive Recreation Management Area ("ERMA") and identified the partnership with Willamalane in the development of hiking and mountain biking trails.

23.    According to BLM's planning framework for the Willamalane Non-Motorized Trails ERMA, this area is intended for recreational development consistent with Willamalane's proposal to preserve views; enhance wildlife habitat and sensitive natural areas; and provide walking, hiking, and mountain biking opportunities.  While the ERMA was designed to be commensurate with the management of other resources and resource uses, it requires specific management considerations in order to address recreational use, demand, visitor experiences and related program investments.  The BLM must manage ERMAs to support and sustain the principal recreation activities and the associated qualities and conditions for which each ERMA was designated.

24.    To these ends, the BLM's planning framework sets forth management actions and allowable use restrictions specific to the Willamalane Non-Motorized Trails ERMA.

9 - COMPLAINT

Accordingly, fuel treatments or other vegetation modifications are allowed in this ERMA only *if* such actions are compatible with meeting recreation objectives, do not interfere with recreation opportunities, and do not alter the scenic setting characteristics of the area.

25.     The BLM is also required to designate a Recreation Management Zone (RMZ) around trails in the ERMA.  Timber harvest within the RMZ is only allowed to the extent it is needed to protect/maintain recreation setting characteristics and/or to achieve recreation objectives.

**BLM's Thurston Hills Non-Motorized Trails and Forest Management Project**

26.     In 2016, following the finalization of the BLM's new RMP, Willamalane approached the BLM about initiating NEPA review for a trail building project that would fulfill the vision for "a premier regional destination for nature observation and outdoor recreation (focused on hiking and mountain biking) that is greatly needed in the Eugene-Springfield area."

27.     On March 17, 2017, the BLM issued its public "scoping" notice for the Thurston Hills Project.  The scoping notice contemplated "forest management activities including sustainable-yield timber harvest and fuels-reduction" to the extent such harvest was in "harmony" with the non-motorized trail system being proposed in coordination with Willamalane.

28.     Willamalane requested to be a member of the interdisciplinary team that would develop the EA in order to better harmonize the proposed Project with its adjoining parcel.  The BLM, however, denied this request.

29.     At the public scoping meetings about the proposed Project and in numerous scoping comments submitted to the BLM, concerns were raised about the effects of timber harvest on the recreation opportunities and increased fire hazard in the area given its immediate proximity to homes within the City of Springfield.  The BLM had a list of 341 addresses within and surrounding the Project area.

10 - COMPLAINT

30. The specter of timber harvest caused neighboring landowners interviewed by the BLM to oppose the Project and even consider selling their homes.

31. Following the public scoping period, BLM increased its attention toward coupling the development of the non-motorized trails system with a timber sale that would generate substantial timber volume. The focus of the Project began to shift toward how the BLM would design the trails to facilitate long-term timber harvest and where the BLM could plan additional timber harvest within the next 10 years.

32. The BLM also developed its proposal under the assumption that any logging that retained more than 15% live trees in the Project area would not be allowed.

33. On April 12, 2018, the BLM issued its first Thurston Hills Non-Motorized Trails and Forest Management Project EA. The EA considered a No Action Alternative (as required by NEPA's regulations at 40 C.F.R. § 1502.14(d))) and four Action Alternatives: Alternative 2 – Trail Development only; Alternative 3 – Trail Development and a 155-Acre Regeneration Harvest; Alternative 4 – Trail Development and a 105-Acre Regeneration Harvest; and Alternative 5 – 155-Acre Regeneration Harvest only. None of the alternatives considered the possibility of harmonizing goals related to recreation, timber production and fire hazard by thinning instead of regeneration logging.

34. Many public comments expressed concern that the proposed regeneration harvest would degrade the recreational experience. The mountain biking community specifically requested the BLM proceed with no logging and simply construct the trails.

35. Numerous public comments also raised concerns that regeneration logging will increase fire hazard and urged the BLM to thoroughly evaluate in the Project EA how the regeneration harvesting would increase fire risk to adjacent homes and communities.

36. On May 30, 2018 the BLM issued a revised EA to allegedly provide additional context for some of the issues raised in public comments. While acknowledging that the proposed logging would increase fire hazard and risk in the surrounding areas for the next 40 years, this final EA did not provide a site-specific detailed analysis of this issue. Rather, the final EA states that the BLM sufficiently analyzed fire risk in the programmatic-level Environmental Impact Statement for developing the new regional RMP, to which the Thurston Hills Project EA tiers.

37. Public comments pointed to the current, relevant science on how different types of logging prescriptions can influence fire risk. Specifically, regeneration harvesting 85 to 90% of live trees from roughly 100-150 acres, as BLM's proposal called for, would remove thousands of trees with thick bark and high canopies (characteristics that make forests less prone to severe fire), replacing forest stands currently on a trajectory to become older, larger and more resilient to wildfire, with a dense young plantation consisting of continuous dense fuels close to the ground (fuel characteristics that make forests more prone to severe fire).

38. On May 30, 2018, the BLM also simultaneously issued its Finding of No Significant Impact ("FONSI") for the Thurston Hills Project. The agency selected Alternative 3, which included a 155-acre regeneration harvest that would directly overlay the proposed trail network and border many residences in the Project vicinity.

39. Plaintiffs, other recreationists, landowners, Willamalane, the City of Springfield, and Congressmen Peter DeFazio all expressed concerns over the selected alternative. The BLM subsequently decided to withdraw its FONSI and associated Decision Record.

40. On August 15, 2018, without preparing a new EA or considering any additional alternatives, the BLM issued another FONSI, instead selecting a modified Alternative 4. This Alternative results in a 100-acre regeneration harvest within the ERMA, which would still

directly overlay the proposed trail network but would retain more trees along the border with Willamalane's property.

41. All Plaintiff organizations filed timely protests and an appeal with the Interior Board of Land Appeals (IBLA).

42. Plaintiffs' protest letters raised numerous concerns, chief among them being that the BLM's stated "purpose and need" to conduct regeneration harvest was unreasonably narrow, precluding consideration of a thinning alternative that would have been consistent with the agency's own RMP directives concerning fire hazard and risk around adjacent communities.

43. Plaintiffs and several other interested stakeholders also administratively challenged the regeneration harvest due to its negative effects on recreation, namely hiking and mountain biking opportunities. The BLM responded that logging will not conflict with recreation goals for the ERMA, because BLM plans to log first and before building the trails.

44. Plaintiffs made numerous attempts to meet with the BLM and the prospective timber sale purchaser, Seneca Sawmill Company, to resolve differences over the sale, but the parties were unable to reach a resolution.

45. The BLM denied Plaintiffs' protests on October 5, 2018.

46. The BLM notified Plaintiffs, in response to their inquiries, that the agency intended to award the timber sale to the high bidder, Seneca Sawmill, on February 5, 2019. The BLM further indicated that the purchaser plans to begin logging operations this spring.

The BLM's proposed regeneration harvest will negatively impact the proposed mountain biking/hiking trails and the scenic and recreational experience of many visitors. The BLM's proposed regeneration harvest negatively affects the durability and longevity of the trails by greatly increasing their exposure to the elements. The BLM's proposed regeneration harvest will

substantially degrade the ERMA's setting characteristics. Currently, the setting characteristics in the Willamalane Non-Motorized Trails ERMA is "Front Country." Post-logging, the setting would no longer meet the characteristics of "Front Country." Regeneration harvest generally reduces an area's setting characteristics from "Front Country" to "Rural" – with "Rural" considered the least "natural" setting. The BLM's Thurston Hills Project EA did not analyze changes to the setting characteristics in the Willamalane Non-Motorized Trails ERMA.

47.   Plaintiffs hereby incorporate by reference all preceding paragraphs. Pursuant to the Federal Land Policy and Management Act ("FLPMA"), 43 U.S.C. § 1732(a) and its implementing regulations, 43 C.F.R. § 1610.5-3(a), BLM must ensure that a site-specific project conforms to the governing Resource Management Plan (RMP). The Thurston Hills Project was developed under the 2016 Northwestern and Coastal Oregon RMP. Pursuant to direction to "provide a diversity of quality recreational opportunities," the RMP designates several Extensive Recreation Management Areas. Each designated ERMA must be managed in accordance with its specific planning framework.

48.   The Thurston Hills Project is planned within the Willamalane Non-Motorized Trails Extensive Recreation Management Area. The planning framework for this ERMA includes a description of the recreation values, what type of visitors are targeted, the outcome objectives, the recreation setting characteristics, and the applicable management actions and allowable use restrictions.

49.   According to the 2016 Recreation Management Area (RMA) Framework for the Eugene District the Willamalane Non-Motorized Trails ERMA was designated to be consistent with Willamalane's proposal to preserve views; enhance wildlife habitat and sensitive natural areas; and provide walking, hiking, and mountain biking opportunities.

14 - COMPLAINT

50. The RMA Framework says that vegetation management, including any timber harvest, is only allowed within the ERMA to the extent it is compatible with meeting recreation objectives, not interfering with recreation opportunities, and maintaining setting characteristics.

51. The RMP describes setting characteristics by degrees of naturalness along a continuum from Primitive to Rural. This ERMA's setting characteristic is "Front Country." Timber management activities would affect the naturalness aspects of the recreation setting (i.e., mid-seral forest ecosystems will be converted into piles of logging slash and stumps, followed by replanting that will result in a homogenous tree plantation). The proposed regeneration harvest would convert the current "Front Country" setting to "Rural" – characterized as the lowest naturalness setting. Under the RMP, thinning "Front Country" forest stands, in contrast to regeneration harvesting, would uplist the area designation to "Middle Country" by creating age-class diversity within the stands rather than removing them entirely.

52. The RMA Framework for the Willamalane Non-Motorized Trails ERMA requires the BLM to designate a Recreation Management Zone (RMZ) around any designated trails. Specifically, within these zones, timber harvest is only permitted to protect/maintain recreation setting characteristics and/or to achieve recreation objectives.

53. The Thurston Hills Project designates trails. The Thurston Hills Project, however, does not designate an RMZ around these trails. The BLM internally considered designating an RMZ around the trails, but ultimately decided not to do so. The proposed logging associated with the Thurston Hills Project does not protect or maintain recreation setting characteristics or achieve recreation objectives. The proposed logging associated with the Thurston Hills Project is not compatible with meeting recreation objectives, interferes with recreation opportunities, and degrades setting characteristics.

15 - COMPLAINT

54.     The BLM's failure to develop a Project in accordance with the direction and allowable uses in the Willamalane Non-Motorized Trails ERMA is a violation of FLPMA and is arbitrary and capricious.  5 U.S.C. § 706(2)(A).

## SECOND CLAIM FOR RELIEF

### (Violation of NEPA and 5 U.S.C. § 706(2)(A))

55.     Plaintiffs reallege and incorporate by reference the preceding paragraphs.

56.     NEPA and its implementing regulations require federal agencies to take a hard look at the environmental consequences of proposed actions and the reasonable alternatives that would avoid or minimize such impacts or enhance the quality of the human environment.  *See* 42 U.S.C. § 4332(2)(C)(i); 40 C.F.R. Parts 1502 and 1508.

57.     An EA must provide sufficient information for determining whether to prepare an EIS or issue a Finding of No Significant Impact.  40 C.F.R. § 1508.9(a).  The information presented in the EA must be of "high quality," and include "accurate scientific analysis."  40 C.F.R. 1500.1(b). The agency must adequately explain its decision not to prepare an EIS by supplying a convincing statement of reasons why potential effects are insignificant.

58.     In both an EA and EIS, NEPA requires the agency to "study, develop and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources." 42 U.S.C. § 102(2)(E). Further, agencies "shall rigorously explore and objectively evaluate all reasonable alternatives, and for alternatives, which were eliminated from detailed study, briefly discuss the reasons for their having been eliminated." 40 C.F.R. § 1502.14(a).

59.     A Project's purpose and need must not be unreasonably narrow as to preclude the consideration of reasonable alternatives.  *Muckleshoot Indian Tribe v. United States Forest*

16 - COMPLAINT

*Service*, 177 F.3d 800, 811 (9th Cir. 1999) (citing 40 C.F.R. § 1502 .13).

60.    BLM has violated NEPA and its implementing regulations through issuance of the Thurston Hills Non-Motorized Trails and Forest Management EA/FONSI and Decision Record. These violations include, but are not limited to:

a) Proceeding under an unreasonably narrow purpose and need for the Project;

b) Failing to thoroughly consider and objectively evaluate an adequate range of reasonable alternatives, including an alternative that would meet timber objectives by commercially thinning instead of regeneration harvesting the forests within this specially designated ERMA.  A thinning alternative is feasible and would harmonize the diverse goals for the public lands in this project area by producing some timber volume while significantly reducing the adverse impacts to aesthetics (i.e. setting characteristics) and the recreational experience that would result from a clear-cut style of timber harvest, and would avoid or mitigate the negative fire hazard and risk implications associated with aggressive regeneration harvesting that removes 85% of all live trees (whereas a thinning alternative instead offers the possibility of lowering fire risk in this area);

c) Otherwise failing to take the requisite hard look at the Project's impacts, particularly on the fire hazard and risk and the ability of the Willamalane Non-Motorized ERMA to fulfill its objectives.

67.    BLM's decision to implement and proceed with the proposed action under an unreasonably narrow purpose and need, without first analyzing an adequate range of alternatives, and failing to take the requisite hard look at the Project's potential environmental consequences is arbitrary, capricious, and not in compliance with NEPA, the statute's implementing

17 - COMPLAINT

regulations, and therefore must be reversed and remanded for the reasons identified above. 5 U.S.C. § 706(2)(A).

61.     These violations of NEPA are arbitrary, capricious, an abuse of discretion, and not in accordance with law under the APA, which has caused or threatens serious prejudice and injury to Plaintiffs' rights and interests.

## PLAINTIFFS' PRAYER FOR RELIEF

Plaintiffs respectfully request that this Court:

a. Adjudge and declare that the Defendants' approval of the Thurston Hills Project violates FLPMA, NEPA, those statutes' implementing regulations, and thus are arbitrary, capricious, an abuse of discretion, and contrary to law under the judicial review standards of the APA, 5 U.S.C. § 706(2);

b. Vacate and set aside the Decision Record, FONSI and EA for the Thurston Hills Project, and order the Defendants to withdraw the DR, FONSI and EA and any associated contracts until such time as Defendants demonstrate that they have complied with the law;

c. Remand the decision to Defendants so it may revise the Project in line with the requirements of FLPMA and NEPA;

d. Enjoin Defendants and their contractors, assigns, and other agents from proceeding with commercial logging prescriptions unless and until the violations of federal law set forth herein have been corrected;

e. Enter such other declaratory relief, and temporary, preliminary, or permanent injunctive relief as may be prayed for hereafter by Plaintiffs;

f. Award Plaintiffs their costs of suit, reasonable expenses and attorney fees pursuant to the

Equal Access to Justice Act, 28 U.S.C. § 2412; and

g.  Grant such further relief as the Court deems just and equitable in order to provide Plaintiffs with relief and protect the public interest.

Respectfully submitted this 19th day of February, 2019.

/s/  Jennifer Schwartz_____
Jennifer R. Schwartz, (OSB #072978)

/s/ Nicholas Cady_____
Nicholas S. Cady (OSB #113463)

Attorneys for Plaintiffs

## CORPORATE DISCLOSURE STATEMENT

Pursuant to FRCP 7.1, Plaintiffs disclose that they do not have parent corporations, nor do the Plaintiff organizations have stock.