Jennifer R. Schwartz, OSB #072978
Law Office of Jennifer R. Schwartz
2521 SW Hamilton Court
Portland, Oregon 97239
Tel: 503-780-8281
Email: jenniferroseschwartz@gmail.com

Nicholas S. Cady (OSB # 113463)
Cascadia Wildlands
P.O. Box 10455
Eugene, Oregon 97440
Tel: 541-434-1463
Email: nick@cascwild.org

        Attorneys for Plaintiffs


            IN THE UNITED STATES DISTRICT COURT

                FOR DISTRICT OF OREGON

                    EUGENE DIVISION


**CASCADIA WILDLANDS**, an Oregon          Case Number:  6:19-cv-00247-MC
nonprofit corporation,
and **OREGON WILD**, an Oregon nonprofit
corporation,
                                           **PLAINTIFFS' MOTION FOR**
        Plaintiffs,                        **SUMMARY JUDGMENT AND**
                                           **MEMORANDUM IN SUPPORT**

            v.


**BUREAU OF LAND MANAGEMENT**, a           Oral Argument Requested
federal agency,

        Defendant,

    and


**SENECA SAWMILL COMPANY**, an Oregon
corporation,

        Defendant-Intervenor.

Pursuant to Federal Rule of Civil Procedure 56 and Local Rule 56-1, Plaintiffs Cascadia Wildlands and Oregon Wild, respectfully request that this Court grant summary judgment and relief in Plaintiffs' favor in the above-captioned action.  Pursuant to Local Rule 7-1, the undersigned hereby certifies that the parties have conferred and have been unable to reach an agreement on the subject matter of this motion.

Plaintiffs seek declaratory relief finding that the Pedal Power timber sale as authorized by the United States Bureau of Land Management (BLM) under the Thurston Hills Non-Motorized Trails and Forest Management Project ("Thurston Hills Project") Decision Record and Finding of No Significant Impact (FONSI) violates the Federal Land Management and Policy Act ("FLPMA"), the National Environmental Policy Act ("NEPA") and the Administrative Procedure Act ("APA").  Because Defendant-Intervenor, the timber sale purchaser Seneca Sawmill Company, has indicated that it intends to begin logging operations challenged hereunder as early as mid-August 2019, Plaintiffs further respectfully request that the Court immediately vacate and set aside the Decision Record and remand the matter to the agency to correct its FLPMA and/or NEPA violations.

In support of this motion, Plaintiffs refer the Court to the Memorandum in Support of Plaintiffs' Motion for Summary Judgment, the administrative record lodged by Federal Defendant with this Court, Plaintiffs' Complaint, and such other and further matters as may be presented to the Court before the decision hereon.

## JURISDICTION AND STANDING

BLM's Thurston Hills Project Decision Record and associated Finding of No Significant Impact (FONSI) are final agency actions as defined by the Administrative Procedure Act (APA), 5 U.S.C. § 551(13).  This challenge is brought pursuant to the APA's judicial review provisions,

5 U.S.C. §§ 701-706.  This Court has jurisdiction under 28 U.S.C. §§ 1331 (federal question) and 2201 (declaratory relief).

Plaintiffs' standing to pursue this action is set forth in Plaintiffs' Complaint at ¶¶7-22, as well as in the attached standing declarations of Kebrhea Cuellar, Noah Zitzer, and Gabriel Scott.

## CERTIFICATE OF COMPLIANCE

Pursuant to Local Rule 7-2(b)(2), the undersigned hereby certifies that the following memorandum contains 10,957 words including headings, footnotes, and quotations, but excluding the caption, table of contents, table of cases and authorities, signature block, exhibits, and any certificates of counsel.

# SUPPORTING MEMORANDUM

# TABLE OF CONTENTS

Table of Authorities ...................................................................................................... ii

List of Acronyms ........................................................................................................... iii


**INTRODUCTION** ................................................................................................. 1

**FACTUAL BACKGROUND** ............................................................................... 3

    A.  Increasing Demand for High-Quality Outdoor Recreational Experiences ....... 3

    B.  The Willamalane Non-Motorized Trails Extensive Recreation
        Management Area ................................................................................. 5

    C.  Thurston Hills Non-Motorized Trails Project and Pedal Power
        Timber Sale ........................................................................................ 6

    D.  Regeneration Logging Increases Fire Hazard and Risk to
        Adjacent Communities ........................................................................ 12

    E.  Regeneration Logging Will Degrade the Scenic Quality and
        Recreational Experience of the Willamalane ERMA ........................... 15

**STANDARD OF REVIEW** ................................................................................. 18

**ARGUMENT** ....................................................................................................... 19

  I.    **BLM VIOLATED THE FEDERAL LAND POLICY &
       MANAGEMENT ACT** ........................................................................ 19

  II.   **BLM VIOLATED THE NATIONAL ENVIRONMENTAL
       POLICY ACT** ..................................................................................... 24

    A.  BLM Failed to Take the Requisite Hard Look ...................................... 26

        1.  Increased Fire Hazard and Risk .................................................. 26
        2.  Degrading Scenic Quality and the Recreational Experience .................... 30

    B.  BLM Failed to Analyze Reasonable Alternatives ................................. 33

**CONCLUSION** ................................................................................................... 38

# TABLE OF AUTHORITIES

**Cases**

*Anaheim Mem'l Hosp. v. Shalala*,
   130 F.3d 845 (9th Cir. 1997) ..................................................................... 19

*Anderson v. Evans*,
   314 F.3d 1006 (9th Cir. 2002)…………………………………………………….25

*Bob Marshall Alliance v. Hodel*,
   852 F.2d 1223 (9th Cir. 1988)…………………………………………………..33

*Blue Mtns. Biodiversity Project v. Blackwood*,
   161 F.3d 1208 (9th Cir. 1998) ......................................................... 25, 29-30

*Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*,
   538 F.3d 1172 (9th Cir. 2008)…………………………………………………….33

*Citizens Against Burlington v. Busey*,
   938 F.2d 190 (D.C. Cir. 1991)…………………………………………………….34

*City of Carmel by the Sea v. U.S. Dept. of Trans.*,
   123 F.3d 1142 (9th Cir. 1997)…………………………………………………..34

*Idaho Sporting Congress v. Thomas*,
   137 F.3d 1146 (9th Cir. 1998) ..................................................................... 26

*Klamath-Siskiyou Wildlands Ctr. v. Bureau of Land Mgmt.*,
   387 F.3d 989 (9th Cir. 2004) ......................................................... 24, 26, 29

*League of Wilderness Defenders/Blue Mtns. Biodiversity Project v. Connaughton ("LOWD")*,
   752 F.3d 755 (9th Cir. 2014)…………………………………………………….26

*LOWD v. Marquis-Brong*.
   259 F. Supp. 2d 1115 (D. Or. 2003)…………………………………………37-38

*Marsh v. Or. Natural Res. Council*,
   490 U.S. 360, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989) .............................. 18

*Metcalf v. Daley*,
   214 F.3d 1135 (9th Cir. 2000)…………………………………………………..25

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
   463 U.S. 29, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983) ...................... 19, 31, 33

*Muckleshoot Indian Tribe v. Forest Serv.*,
    177 F.3d 800 (9th Cir.1999)……………………………………………………………………………29

*Nat'l Parks & Conservation Ass'n v. BLM ("NPCA")*,
    606 F.3d 1058 (9th Cir. 2009)……………………………………………………………………36, 38

*Native Ecosystems Council v. Forest Serv.*,
    418 F.3d 953 (9th Cir. 2005) .................................................................................. 20

*Neighbors of Cuddy Mtn. v. Forest Serv.*,
    137 F.3d 1372 (9th Cir. 1998) .................................................................................. 29

*Northwest. Coalition for Alternatives to Pesticides v. EPA*,
    544 F.3d 1043 (9th Cir. 2008) .................................................................................. 18

*Ocean Advocates v. U.S. Army Corps of Engineers*,
    361 F.3d 1108 (9th Cir., 2004)……………………………………………………………………24

*Oregon Natural Resource Council v. Brong*,
    492 F.3d 1120 (9th Cir. 2007) ........................................................... 19, 22, 24-25, 28

*Pac. Coast Fed'n of Fishermen's Ass'n v. Nat'l Marine Fisheries Serv.*,
    265 F.3d 1028 (9th Cir. 2001)……………………………………………………………………27

*Pacific Rivers Council v. Forest Serv.*,
    689 F.3d 1012 (9th Cir. 2012)……………………………………………………………………30

*Robertson v. Methow Valley Citizens*,
    490 U.S. 332, 109 S.Ct. 1835, 104 L.Ed.2d 351 (1989) ......................................... 24-25

*Simmons v. U.S. Army Corps of Eng'rs*,
    120 F.3d 664 (7th Cir. 1997)……………………………………………………………………...34

*Western Watersheds Proj. v. Abbey*,
    719 F.3d 1035 (9th Cir. 2013) .................................................................................. 33

**Statutes**

5 U.S.C. § 706(2)(A) ................................................................................................ 18

42 U.S.C. § 4321 ...................................................................................................... 24

42 U.S.C. § 4331 ...................................................................................................... 24

42 U.S.C. § 4332 ...................................................................................................... 33

iii – MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR
SUMMARY JUDGMENT

42 U.S.C. § 4342 ................................................................................................ 25

43 U.S.C. § 1701 ................................................................................................ 19

43 U.S.C. § 1712 ................................................................................................ 19

43 U.S.C. § 1732(a) ............................................................................................ 19

**Regulations**

40 C.F.R. §1500.1 ........................................................................................ 26, 33

40 C.F.R. §1500.2 .............................................................................................. 26

40 C.F.R. §1501.1 .............................................................................................. 24

40 C.F.R. §1502.14 ............................................................................................ 33

40 C.F.R. §1502.16 ............................................................................................ 26

40 C.F.R. §1508.7 .............................................................................................. 26

40 C.F.R. §1508.8 .............................................................................................. 26

40 C.F.R. § 1508.9 ........................................................................................ 25, 33

40 C.F.R. § 1508.27 ........................................................................................... 25

43 C.F.R. § 1601.0-5(b) ..................................................................................... 19

43 C.F.R. § 1610.5-3(a) ..................................................................................... 19

## LIST OF ACRONYMS

APA                Administrative Procedure Act

ASQ                Allowable Sale Quantity

BLM                Bureau of Land Management

DR                 Decision Record

EA                 Environmental Assessment

EIS                Environmental Impact Statement

ERMA               Extensive Recreation Management Area

FEIS               Final Environmental Impact Statement

FLPMA              Federal Land Policy and Management Act

FONSI              Finding of No Significant Impacts

HLB                Harvest Land Base

LSR                Late-Successional Reserve

NEPA               National Environmental Policy Act

PRMP               Proposed Resource Management Plan

RMA                Recreation Management Area

RMP                Resource Management Plan

ROD                Record of Decision

THNA               Thurston Hills Natural Area

WPRD               Willamalane Parks and Recreation District

WUI                Wildland Urban Interface

## INTRODUCTION

This is a civil action against the United States Bureau of Land Management (BLM), a federal agency of the Department of Interior.  Plaintiffs Cascadia Wildlands and Oregon Wild ("Plaintiffs") allege BLM violated the Federal Land Policy and Management Act (FLPMA), National Environmental Policy Act (NEPA), and Administrative Procedure Act (APA) when it issued a Decision Record and Finding of No Significant Impact approving the Pedal Power timber sale under the Thurston Hills Non-Motorized Trails and Forest Management Project ("Project") on the Upper Willamette Resource Area of BLM's Northwest Oregon District.

The impetus for the Thurston Hills Project was to meet the rising demand for outdoor recreation opportunities close to some of western Oregon's most populated communities, filling a void of quality hiking and mountain biking trail systems in the Springfield-Eugene region.  But the vision for a premier regional destination for nature observation and outdoor recreation was soon spoiled by BLM's plan to heavily log the very same area the agency specially designated for a new hiking/biking trails network.  High-quality outdoor recreation in a natural, scenic setting took a back seat to high-volume timber targets, and reasonable alternatives that would fulfill all the agency's overarching management objectives, none to the detriment of others, were dismissed without due consideration.  Ultimately the agency chose to combine the creation of a new hiking/biking trails system with intensive regeneration logging (i.e. plantation forestry practices akin to clear-cutting).

//

//

//

//





AR10169-70 (Photos of a recent regeneration harvest in the foreground with a 20% retention prescription on BLM's Roseburg District).

Because the manner, extent and location of the approved logging will knowingly increase fire hazard levels to adjacent communities (where fire hazard is already considered moderate to high), substantially degrade the area's scenic quality and diminish the opportunity for high-quality outdoor recreational experiences, Plaintiffs seek an order vacating BLM's flawed environmental analysis and decision, remanding the matter back to the agency so it can meet its hard look obligation.

## FACTUAL BACKGROUND

### A.  Increasing Demand for High-Quality Outdoor Recreational Experiences

High-quality outdoor recreation is a defining characteristic of western Oregon; a fundamental amenity and major source of revenue for the region.  AR3404-40.  Recognizing this, BLM conducted a spatial analysis to identify areas where the agency could develop or enhance recreational opportunities close to western Oregon's most populated communities. AR3398-440 (*Outdoor Recreation Scarcity and Abundance in Western Oregon: A Spatial Analysis* (April 2015).  This analysis confirmed both the burgeoning demand for quality outdoor recreation, the social and economic benefits of creating and enhancing those experiences, and where such opportunities are most scarce.  *Id*.  For instance, on BLM's Eugene District alone, outdoor recreation is estimated to provide 546 jobs, $16.8 million in annual wages, and a consumer surplus value of $75 million, with over 1 million annual visits.  AR3437-38. Participation growth in nature-based activities (e.g. viewing wildlife and appreciating natural scenery), hiking, and mountain biking is particularly strong.   AR3408, 3414; 14483-85. Currently, however, there are no trail systems that are designed and maintained for the mountain biking and hiking communities in BLM's Upper Willamette Resource Area.  AR2407.

BLM used the data from its spatial analysis to inform the agency's designation of various Recreation Management Areas (RMAs) under its newly adopted Northwestern and Coastal Oregon Record of Decision (ROD) and Resource Management Plan (RMP) (2016), which provides management direction for approximately 1.3 million acres of BLM-administered lands in the Coos Bay, Eugene, Salem, and Roseburg Districts.[1]  AR14480 (Draft RMP/Environmental Impact Statement (EIS)), 11638-49 (ROD/RMP).  BLM assumed the designation of Special Recreation Management Areas (SRMAs) and Extensive Recreation Management Areas (ERMAs), which vary in size and purpose, would increase the agency's ability to protect and enhance the targeted recreational activities, quality of experiences, and desired scenery ("setting characteristics") of these areas on a long-term basis.  AR14476; 11641-42.  To these ends, the RMP directs BLM to manage all RMAs in accordance with their specific planning frameworks, each of which include a description of the recreation values, types of visitors targeted, objectives, applicable management actions and allowable use restrictions.  AR11475, 11245.

The Northwestern and Coastal Oregon RMP also established the following five basic land allocations and set forth management direction specific to each area: (1) Congressionally Reserved Lands and National Conservation Lands, (2) District-Designated Reserves, (3) Harvest Land Base, (4) Late-Successional Reserves, and (5) Riparian Reserves.  AR11430.  RMAs are special designations that overlap these land use allocations.  AR11475 (RMP management direction for Recreation and Visitor Services); 11638 (defining terms); 14476-88 (Draft RMP/EIS describing background and purpose of RMA designations); 12670-99 (Final EIS/Proposed RMP on management for Recreation and Visitor Services).

    //

---

[1] The 2016 ROD/RMP revised and replaced BLM's 1995 RMPs for these Districts.  AR11389.

**B.  The Willamalane Non-Motorized Trails Extensive Recreation Management Area**

The Willamalane Parks and Recreation District (WPRD) maintains and operates several recreation facilities, parks and natural areas around the City of Springfield.  AR1551-52.  WPRD recognized that a natural area along the Thurston Hills ridgeline would provide for a diverse park and recreation opportunity, allow the public to enjoy nature, promote well-being, health and wellness, preserve high value ecological areas, and align with the regional vision for parks and open space.  AR1553-56 (WPRD's Thurston Hills Management Plan), 3373-75 (meeting notes).  In November 2012, voters approved a $20 million bond measure highlighting ten priority projects for WPRD, one of which was acquisition of the Thurston Hills ridgeline.  *Id.*  The project was described as acquiring property in Springfield to preserve natural areas and develop a hiking and biking trail along the south Thurston Hills ridgeline, roughly from Bob Straub Parkway to 79th and Main Street.  *Id.*

Following its acquisition of the 665-acre Thurston Hills Natural Area (THNA), for dual reasons of nature conservation and outdoor recreation, WPRD approached BLM to coordinate on a connected trail system.  AR1546-48 (map and description of THNA); 0974 (WPRD letter to BLM).  BLM manages federal land parcels immediately adjacent to THNA that also border Springfield residences.  *Id.*, AR2407-09.  BLM, recognizing the opportunity to meet public demand for quality outdoor recreation close to the Eugene-Springfield region, AR1516, agreed to formally collaborate with WPRD over this endeavor and officially designated the 1,058-acre Willamalane Non-Motorized Trails Extensive Recreation Management Area in its 2016 RMP for this purpose.  AR1190-96 (MOU between BLM and WPRD); 11245-46, 11374-75 (Willamalane ERMA Planning Framework); 11641-42, 11475 (RMP directing BLM to develop and maintain

partnerships with recreation-based organizations to leverage resources for planning,

implementing and monitoring RMAs); 3959-60 (EA providing background information).

According to BLM's planning framework for the Willamalane ERMA, this area is

intended for recreational development consistent with WPRD's proposal to preserve views;

enhance wildlife habitat and sensitive natural areas; and provide walking, hiking, and mountain

biking opportunities.  AR11374-76; 1556 (describing public benefits of THNA).  While the

ERMA was designed to be commensurate with the management of other resources and resource

uses, its designation status requires specific management consideration in order to address

recreational use, demand, visitor experiences and related program investments.  AR11638

(RMP).  The BLM must manage ERMAs to support and sustain the principal recreation activities

and the associated qualities and conditions for which each ERMA was designated.  *Id.*

Though roughly 55% of the Willamalane ERMA overlaps lands allocated to the Harvest

Land Base (HLB), AR3960, its planning framework only allows "vegetation modifications"

within this ERMA *if* such actions are *compatible* with meeting recreation objectives, do not

interfere with recreation opportunities, and do not alter the scenic setting characteristics of the

area.  AR11376.  Last, the framework also instructs BLM to establish a Recreation Management

Zone (RMZ) for all designated trails in the ERMA.  *Id.*  Timber harvest within the RMZ is only

allowed to the extent it is needed to protect/maintain recreation setting characteristics and/or to

achieve recreation objectives.  *Id.*

### C.  Thurston Hills Non-Motorized Trails Project and Pedal Power Timber Sale

In August 2016, after the new RMP was adopted, WPRD sent BLM a letter requesting

that it initiate the NEPA planning and review process for the connected trail system in the

Thurston Hills area.  AR0974-81 (letter and map of conceptual trail system).  WPRD told BLM

that the objectives outlined in the Willamalane ERMA planning framework were "a great match for what [WPRD] is seeking on the Thurston Hills site" and reiterated its vision for "a premier regional destination for nature observation and outdoor recreation (focused on hiking and mountain biking) that is greatly needed in the Eugene-Springfield area." *Id.*

In early 2017, BLM began its internal planning process for developing a proposal that would couple the development of a non-motorized trail network with a timber sale in the Willamalane ERMA.  AR1533-40 (January 2017 description and maps of existing conditions and potential trails), 1511-12 (January 2017 maps of timber harvest proposal), 1514-18 (Project Initiation Letter).  This internal "Project Initiation Letter" described the "purpose and need" of the proposal as: "formulat[ing] a trail development plan for the Willamalane ERMA in partnership with the [WPRD] and a coordinated forest management plan supportive of recreational values, fuels management, and sustainable timber production into the future."  *Id.*

Because the Willamalane ERMA abuts private Springfield residences, and is within the wildland urban interface (WUI) where fire risk to the community is high, BLM's planning official highlighted the "important need" for the proposal to reduce fire hazard and manage the public forests on these parcels for fuels reduction.  AR1515-16; 2284, 2287; 0751; 8052 (Eugene-Springfield Natural Hazard Mitigation Plan and Lane County Community Wildfire Protection Plan classify the Thurston Hills area as a moderate to high fire hazard area).  In fact, BLM recently partnered with the City of Eugene and WPRD on a hazardous fuels reduction project to remove dense shrubs and small trees from city parklands, including the WPRD's Thurston Hills property.  AR1515; 5901-49 (*South Ridgeline/Thurston Hills WUI Fuels Reduction Project EA* (June 2016) ("SRTH WUI Project"); 2291.  The SRTH WUI Project, however, did not include fuels reduction activities on adjacent BLM lands.  AR1515.  As BLM's

planning official noted, the Thurston Hills Project was originally intended to cover this "gap" in fuels management with reduction actions in the ERMA. *Id*., 1516 (further stating that "[t]he inclusion of fuel reduction/management will reduce the long-term risk to people, property, and critical infrastructure from wildfire hazards.")

In March 2017, BLM issued its public "scoping" notice for the Thurston Hills Project. AR0949-51; 0748-51 (maps and description of types of potential fuels reduction treatments). The scoping notice announced the development of a connected trail system in partnership with WPRD that would be "in harmony with long-term forest management activities including sustainable-yield timber harvest and fuels-reduction." AR0949-51. BLM's interdisciplinary team (IDT) for the Project was instructed to discuss options for different types of timber harvest (e.g. thinning versus regeneration logging) and other types of management to "compliment" trails, as well as the need for, and types of, fuels reduction actions at the agency's public scoping meeting in April 2017. AR1508-09. The public-facing scoping notice did not, however, discuss the possibility that controversial regeneration logging practices would be used in the ERMA even though regeneration logging appears to have been the agency's primary focus for "forest management" since the Project's inception. AR0949-51; 1511-12 (January 2017 proposal).[2]

Plaintiffs submitted scoping comments, noting the ambiguity in BLM's public notice with regards to potential timber harvest, and urging the agency not to employ aggressive commercial logging for fuels reduction and to avoid regeneration logging. AR0658-69. Plaintiffs explained that commercial logging was unnecessary, and often counterproductive to, managing forests for fuels reduction. *Id*. As their comments detail, removing medium to large

---

[2] Regeneration logging resembles clearcutting in that it removes most trees from a particular site, but retains a certain percentage, e.g. 5-15%, as individually dispersed trees or grouped in patches ("aggregate retention"). AR11403-04, 11450; 10169-70 (photos of recent regeneration harvest).

commercial size trees can actually *increase* fuel hazard by removing canopy cover (overstory trees) that keep forests cool, shaded, and buffered from winds (i.e. making the forest hotter, drier, and windier), by increasing sunlight to the forest floor stimulating the growth of new "surface and ladder fuels" (brush and dense young trees) and drying out surface fuels, and by producing large amounts of logging "slash." *Id*. As Plaintiffs contend, fuels reduction efforts should instead focus on thinning overly dense, small diameter trees. *Id*.

Plaintiffs also outlined many potentially adverse effects of regeneration logging, including the concern that such harvest results in dense, young, homogenous tree plantations that represent very hazardous fuel conditions, especially when compared to mature forests. *Id*.

In November 2017, BLM held an open house to provide additional information about the proposal and solicit further public feedback. AR0358-64. The open house displays indicated that BLM would be exploring a range of timber harvest levels and designs consistent with its management direction in the 2016 RMP. *Id*. BLM also reiterated that a variety of actions to reduce fuels would be a key component of the Project. *Id*.; AR0395.

Following the public scoping period, BLM increased its attention toward combining the development of the trail system with a high-volume timber sale. AR1282-83, 1459-61, 2532. Internally, BLM acknowledged that developing and maintaining trails in a heavily logged area would substantially increase costs and diminish the quality of the recreation experience, but nevertheless chose to design the trail network to facilitate repeated, overlapping timber harvest into the future. AR2353-54; 2414-24. BLM also developed its proposal under the assumption that only regeneration logging (with a maximum of 15% tree retention) would meet the management directives of the new 2016 RMP. AR1459-61.

In April 2018, BLM issued its first Thurston Hills Non-Motorized Trails and Forest

Management Project Environmental Assessment (EA).  AR3957-4019.  The Thurston Hills Project area is located within Springfield city limits in the forested hills of the Willamette Valley in Lane County, proximal to the Mckenzie Highway corridor.  AR2407; 0029-32 (Google Earth views).  The proposed trails and regeneration logging would occur on two individual parcels as depicted in the maps at AR3961, 4010-13.  Parcel 1 is approximately 270 acres consisting primarily of mid-seral to mature conifer forests ("second- and third- growth conifers"), has two drainages and provides access to several private properties.  AR2407-08.  Parcel 2 is roughly 123 acres with public access via an easement over the southwest property corner.  *Id*.[3]

Despite BLM recognizing the "important need" to reduce hazardous fuels as part of the Thurston Hills Project throughout the public scoping period, given its location within the Springfield city limit and WUI and the gap in fuels management on these particular BLM lands, AR1515, the draft EA omitted fuels reduction from the stated "purpose and need" for the Project.  AR3962-65.  Instead, the Project was now intended to: (1) use regeneration logging "to adjust the age class distribution in each sustained yield unit" (SYU) and (2) generate timber volume to contribute to the Eugene SYU's annual Allowable Sale Quantity (ASQ) of 53 million board feet (mmbf), and, following the timber harvest, (3) develop a connected trail network to meet recreational demand for quality outdoor recreation on BLM lands where no such recreational opportunities currently exist.  *Id*.

The draft EA considered a No Action Alternative, as 40 C.F.R. § 1502.14(d) requires, and four Action Alternatives: Alternative 2 (Trail Development only); Alternative 3 (Trail

---

[3] *See also* AR2343 (The Willamalane ERMA also includes a third, larger parcel, Section 5 (approximately 663 acres), AR3961 (map), which was removed from consideration for trail development due to public access constraints.)

Development and a 155-Acre Regeneration Harvest); Alternative 4 (Trail Development and a 105-Acre Regeneration Harvest; and Alternative 5 (Regeneration Harvest only).  AR3977-87.

Many public comments expressed concern that the proposed regeneration harvest would greatly diminish the recreational experience.  AR0086-87; 0088 (local landowners); 0111-12 (Letter from Cong. Peter DeFazio); 3868, 3871, 3892 (Plaintiffs' comments); 0117-21 (Eugene Weekly article); 0158-59 (BLM's summary of concerns WPRD expressed in phone meeting). Numerous public comments also urged BLM to thoroughly evaluate in the Project EA how the proposed regeneration harvesting would increase fire risk to immediately adjacent Springfield communities.  AR3968-69; 3873-83.

In May 2018, BLM issued a revised EA to allegedly provide additional context for some of the issues raised in public comments.  AR3604; 3606-3673 (Final EA).  While acknowledging that the proposed logging would increase fire hazard in the surrounding areas for the next 40 years, this final EA did not provide a site-specific detailed analysis of this issue.  AR3618-20. Rather, BLM states that it eliminated this issue from detailed study because it sufficiently analyzed fire hazard in the programmatic-level Environmental Impact Statement (EIS) for developing the new regional Northwestern and Coastal Oregon RMP, to which the Thurston Hills Project EA tiers.  *Id*.; AR3968 (same discussion from draft EA).  BLM also simultaneously issued its Finding of No Significant Impact ("FONSI") for the Project.  AR3674-81. The agency selected Alternative 3, which included a 155-acre regeneration harvest that would directly overlay the proposed trail network and border many residences in the Project vicinity.  *Id*.

The public, WPRD, City of Springfield, and Congressmen Peter DeFazio all raised serious concerns with BLM's decision to authorize regeneration logging in the newly designated Willamalane ERMA.  AR10445-47; 10488-533; 0078-79; 0111-12; 0154.   BLM subsequently

decided to withdraw its FONSI and associated Decision Record (DR) and, in August 2018,

issued another FONSI and DR selecting a modified Alternative 4.  AR4572-75 (Final DR), 3526-

35 (Final FONSI).  This modified Alternative 4 results in a 100-acre regeneration harvest within

the ERMA, which would still overlap and surround much of the future trails network but would

retain more trees along the border with WPRD's property and in grouped patches.  *Id.*

Plaintiffs timely filed a joint protest letter and subsequent appeal with the Interior Board

of Land Appeals (IBLA).  AR10168-10206 (Protest letter); 16369-412 (IBLA appeal).

Plaintiffs' protest raised numerous concerns, chief among them being that the BLM's stated

"purpose and need" to conduct regeneration harvest was unreasonably narrow, precluding

consideration of a thinning alternative that would have been consistent with: (1) the agency's

own RMP directives concerning fire hazard and risk around adjacent communities, and (2) the

Willamalane ERMA's planning framework.  AR10172-89.

BLM denied Plaintiffs' protest on October 5, 2018.  AR10059-71; 10072-84.  On

February 1, 2019 BLM awarded the Pedal Power timber sale to Seneca Sawmill Company

(Seneca).  AR16241-42.  Seneca has stated that it plans to begin preparatory road work for the

sale this June and July and intends to begin regeneration logging operations as early as mid-

August 2019.  *Decl. of Scott Keep* (Dkt #11), ¶¶12-13.

### D.  Regeneration Logging Increases Fire Hazard and Risk to Adjacent Communities

Western states – indeed, geographies across the globe – have experienced an increase in

the magnitude of wildfires.  AR8052-53; 1041-53.  The "causes" of the increase in wildfires are

complex.  AR1041-53 (*Severe fire weather and intensive forest management increase fire*

*severity in a multi-ownership landscape*, Zald and Dunn (2018)).  Global climate change has

resulted in longer durations of more extreme fire weather (hotter, drier, windier conditions),

while past forest management practices have made forests less resilient to natural disturbances like wildfire (e.g. by logging the largest, most fire resistant trees; replacing diverse, complex ecosystems with dense, homogenous plantations; and, for a century, suppressing the natural role of fire from forested landscapes causing a build-up of "ladder fuels"). *Id*.; AR8060-62. These factors, combined with expanding populations in "WUIs" have made addressing wildfire risk to human communities increasingly complicated. *Id*.; AR13501 (FEIS/PRMP).

Recent scientific research confirms that how forests are managed is a primary driver of wildfire severity, second only to weather. AR1041-53. Specifically, Zald and Dunn (2018) found intensive plantation forestry that results in dense young forests and spatially homogenized fuels significantly increased fire severity under a variety of weather conditions. *Id*. (looking at how different forest management practices influence fire severity in the very landscape that encompasses the Thurston Hills Project area – the checkerboard "O&C lands" in Southwestern Oregon). AR1041; 11431-32, 11643 (maps depicting checkerboard ownership pattern of region); 1040 (BLM's Fuels Specialist stating study's findings regarding intensive forestry practices increasing fire severity "are not a surprise to those of us who fight fire"); *see also* AR3873-83 (Plaintiffs' comments citing numerous scientific studies showing regeneration logging/plantation forestry increases fire hazard). As BLM's Fuels Specialist Report for the Thurston Hills Project acknowledges, regeneration logging, by removing virtually all forest canopy, greatly increases surface fuels, resulting in higher rates of spread and greater flame lengths in the event of a fire, which in turn increases fire risk to the public and firefighting community. AR2292-95 ("[b]rush fuel types are more volatile and are susceptible to high rates of fire caused mortality."); 13511-12 (FEIS/PRMP showing residual fuel load greatest with

heavy/moderate clearcut types of harvest as called for here).  Consequently, the ability to control a fire following a regeneration harvest is also reduced.  *Id*.

Here, the Pedal Power timber sale will convert predominantly mature forest stands that are currently a *low* fire hazard to slash and brush – with *high* fire hazard ratings – that, following heavy artificial reforestation, in five to ten years transition to dense, young conifer plantations that also have a *high* fire hazard rating.  AR2292-95 ("Fires within homogenous young plantations would exhibit high flame lengths, rates of spread, and fire intensity.")  Only after *fifty years* would stands that have been regeneration harvested transition back toward a mature structural stage with a low to mixed fire hazard rating.  *Id*.

Urban development and population growth in the surrounding communities are also expected to increase, as is public use of newly developed recreational opportunities.  *Id*.  The vast majority (96%) of fires are also human caused and occur within close proximity to developed areas.  AR2296.  The risk of human caused fires within the Thurston Hills Project area is already considered moderate to high.  AR2287; 5908 (SRTH WUI Project EA).  Increased development of homes in the WUI, trails systems, recreation, and major travel corridors all serve to increase the risk of human-caused fires.  AR5908; 13504 (FEIS/PRMP).

"Numerous public comments" expressed concern that regeneration logging in the Thurston Hills area, coupled with more extreme fire weather, a growing population and increased recreational use, could significantly increase the overall fire hazard and risk to immediately adjacent human communities.  AR3968-69 (EA); 0001; 3873-83.

//

//

//

**E. Regeneration Logging Will Degrade the Scenic Quality and Recreational Experience of the Willamalane ERMA**

Currently, the Willamalane ERMA is a predominately natural appearing landscape with a few land use modifications[4] and comprised of conifer forests from a diverse range of age classes (ranging from 27 to 210 years old) with a mix of hardwood trees (golden chinquapin, madrone, bigleaf maple, and red alder), understory vegetation and a variety of riparian areas (e.g. streams, springs, seeps, ponds, waterfalls, and wetlands). AR11375; 3377; 2582, 16410-12 (photos of Project area); 2387 (Hydrology report). A combined trail network in the Thurston Hills area, with a diversity of landscapes, trail types, and experiences within the City of Springfield, where no such proximal mountain biking opportunities exist, is of considerable value for many reasons. AR2342; 4966 (THNA Management Plan); 2406-09. The majority of WPRD's Thurston Hills property faces south-southwest and is oak savannah, ideal for winter and shoulder-season use but hot and dry in summer. Conversely, BLM's Willamalane ERMA is primarily north-facing and forested with conifers, which makes for excellent trail conditions from late spring through fall. AR2342. Before BLM added a regeneration harvest to the proposed action, the original trail design for the Willamalane ERMA focused on maximizing the sense of "play" for mountain bikers, "with time spent in the mature conifer forest where the trail could be weaved through the trees." AR2343-44. Existing thick stands of trees would also "help provide some semblance of escape [] by placing the trails away from existing roads and into areas where the evergreen vegetation would provide a visual and auditory screen from surrounding development." *Id.*

Studies of recreational values and the desired experiences of trail users strongly correlate to a predominantly natural setting. AR10176-80 (studies cited by Plaintiffs); 3408, 3413

---

[4] *See e.g.* AR2407 (a powerline corridor runs through the eastern portion of parcel 1).

(BLM's spatial analysis showing "wildlife viewing, interpretation and nature study' had the highest number of participants" for recreational users of Western Oregon's BLM lands); 016739 (BLM's *Guidelines for a Quality Trail Experience* showing recreation setting/nature experience top factor for all trail users); 14479 (FEIS/PRMP acknowledging logging that changes the "naturalness" of a recreation setting in turn affects where visitors may choose to recreate).  As the narrative analysis from BLM's independent trail consultant explains: "one of the intrinsic reasons that people use trails is to remove themselves from the built environment.  The term recreation comes from the idea that outdoor activity in a natural environment helps "re-create" one's spirit, recognizing the palliative physical, mental, and physiological effects brought on by such excursions."  AR2352.

"Post-harvest landscapes contain few of the commonly recognized characteristics of a natural environment."  *Id*.  BLM's selected action would remove roughly 85% of the existing forest across 100 acres from the two relatively small parcels that will contain the ERMA's only mountain biking and hiking trails, leaving just a handful of individually dispersed trees and small groups of trees ("aggregated retention") as a buffer alongside some trail segments.  AR3527, 3666 (map).  From a scenic perspective, the proposed regeneration logging will dramatically alter the landscape from mid-seral and mature forests to non-forest (brush) that, over the course of the next four decades, will grow into dense, even-aged plantations resembling a private industrial tree farm.  *See e.g.* AR10169-70 (pictures of a recent regeneration harvest on BLM's Roseburg District); 2292 ("The combination of regeneration harvest and heavy reforestation (approximately 400 trees per acre of mostly Douglas fir) will result in the establishment of new homogeneous Douglas-fir plantations.")  As BLM acknowledged internally, AR4126, opportunities for wildlife viewing and nature appreciation would "not [be] happening", despite

being among the list of targeted visitor activities for the Willamalane ERMA.  *See* AR11374.

The focus would simply be providing 8.5 miles of trails with varying degrees of physical

difficulty for mountain bikers.  AR4126.

As BLM's trail consultant further explained, regeneration logging "degrades the

recreational experience to a large extent for several reasons."  AR2348.  Removal of forest

canopy cover will result in the loss of surface organic matter that makes for a highly desired

riding surface for cyclists, as it provides an unsurpassed feel that is most frequently compared to

skiing powder or to surfing.  *Id*.  As the soils report indicates, the proposed logging and extensive

use of heavy, ground-disturbing equipment to cut, pile and haul approximately four million

board feet of timber, will result in soil displacement, compaction, the loss of nutrients that

adversely affect forest re-growth, and logging skid trails that scar the landscape for decades to

come.  AR2515-17, 2526-29.  This soil disturbance also makes the area less stable and prone to

landslides.  *Id*.  The trails in exposed areas will suffer from increased direct rainfall, wind

erosion, freeze-thaw, and drying.  AR2348.  All these conditions reduce the ability of the trail

system to withstand use during the preferred spring-to-fall season.  *Id*.  Both "play" and

"challenge" are also enhanced for mountain bikers when they are integrated into a landscape that

comes with the natural variation in vegetation, terrain, and canopy.  *Id*.[5]  The Willamalane

ERMA would not provide local hikers/walkers/trail runners hoping to quickly immerse

themselves in a natural setting close to home the opportunity to do so.  AR3398-440.  Logging

85% of the existing forest across 100 acres surrounding the future trails will provide little of the

natural setting characteristics many outdoor recreationists seek.  *Id*.

---

[5] *See* AR016724, 016747-48; 3992 (Defining characteristics of "play, challenge, and escape")

Attempting to restore a desirable recreational experience for hikers and mountain bikers post-regeneration logging will be considerably difficult and costly. AR2348-54. To counter the adverse effects of intensive logging, additional construction efforts will be needed to amend the soil with crushed rock and more aggressive manipulation of the trail tread to control drainage. *Id*. Even with costly post-logging treatments trails placed in harvest areas will require greater maintenance than the same trail placed under a mature evergreen canopy. *Id*. Until that time in which the canopy covers the trails, they will be more susceptible to water-based erosion from rain, and they will more quickly dry out in the sun and become susceptible to user- and wind-based erosion. *Id*. In addition, the rapid growth of the understory in recently harvested areas will crowd the trail corridor, frequently with painful invasive plants such as blackberry, requiring increased corridor clearing. *Id*. This is opposed to an open understory typical of a mature evergreen forest where the trail corridor needs only minor annual clearing. *Id*.

## STANDARD OF REVIEW

This action is governed by the Administrative Procedure Act, which directs that the Court "shall" set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 377 (1989). While review under the "arbitrary and capricious" standard is narrow, a court's inquiry must be "searching and careful," and an agency must articulate a rational connection between the facts found and the conclusions made. *Marsh*, 490 U.S. at 378. This Court "must disapprove the agency's action" "where the agency's reasoning is irrational, unclear, or not supported by the data it purports to interpret." *Nw. Coalition for Alternatives to Pesticides v. EPA*, 544 F.3d 1043, 1052 n.7 (9th Cir. 2008) (internal quotes omitted). A decision is arbitrary and capricious if the agency:

"has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that is could not be ascribed to a difference in view or the product of agency expertise."

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). An agency's decision can be upheld only on the basis of the reasoning found in that decision. *Anaheim Mem'l Hosp. v. Shalala*, 130 F.3d 845, 849 (9th Cir. 1997).

## ARGUMENT

## I.    BLM VIOLATED THE FEDERAL LAND POLICY & MANAGEMENT ACT

The Federal Land Policy and Management Act of 1976 (FLPMA), 43 U.S.C. §§ 1701 *et seq.*, requires BLM to prepare Resource Management Plans (RMPs) for the various districts under its control. 43 U.S.C. § 1712. BLM must ensure that site-specific management actions are consistent with and conform to the governing RMP. 43 U.S.C. § 1732(a); 43 C.F.R. §§ 1601.0-5(b); 1610.5-3(a); *Ore. Natural Resources Council v. Brong*, 492 F.3d 1120, 1125 (9th Cir. 2007). As such, the Pedal Power timber sale must conform to the requirements of the Northwestern and Coastal Oregon RMP (2016). AR4572 (DR). The 2016 RMP requires BLM to "[p]rovide a diversity of quality recreational opportunities" and to manage all ERMAs "in accordance with their plaining frameworks." AR11475 (RMP).

BLM must manage ERMAs "to support and sustain the principal recreation activities and the associated qualities and conditions of the ERMA." AR11638; 15670 (BLM Handbook). The principal visitor activities for which the Willamalane ERMA was designated are: Mountain biking; Hiking; Picnicking; Day use; Environmental education; Wildlife viewing; and Geocaching. AR11374. RMP planning frameworks focus on identifying and retaining the links between each RMA's targeted activities, desired visitor experiences and benefits. AR15701-04;

11374-75 (listing e.g. enjoying access to natural landscapes with the benefit of enhancing awareness and understanding of nature and ecologically friendly tourism operations).

BLM's approval of the Pedal Power timber sale is inconsistent with the specific forest management directives and restrictions set forth in the RMP's planning framework for the Willamalane ERMA. AR11375. As an initial matter, it is important to note that when BLM designated the Willamalane ERMA under the new RMP – for the very purpose of creating the first, and *only*, quality hiking and mountain biking trails system within BLM's Upper Willamette Resource Area – the agency knew that a little over half the ERMA would overlap lands allocated to the Harvest Land Base (HLB). AR11434-36. Knowing that, BLM deliberately chose to establish restrictions that *constrain* the manner and extent of timber harvest activities within this specially designated recreation area: "vegetation modifications" (e.g. commercial logging) are allowed but only to the extent they are "compatible" with "meeting recreation objectives, not interfering with recreation opportunities, and maintaining setting characteristics." AR11376.[6]

To be clear, Plaintiffs do not contend all logging in this ERMA is prohibited outright. Plaintiffs recognize that ERMAs are to be managed *commensurately* with other management objectives, including generating timber volume. AR11638. BLM, however, can choose between regeneration harvesting and less intensive thinning for any site-specific project on lands allocated to the HLB. AR11491; 11446-47. It is the *manner, extent,* and *precise location* of timber

---

[6] In responding to Plaintiffs' protest, BLM ignored the plain language and purpose of the very "allowable use restrictions" it chose to impose upon timber harvest within the Willamalane ERMA (AR11376). *See* AR10262 (incorrectly stating the Willamalane ERMA framework does not include any restrictions or prohibitions on timber harvest); *see also* AR1489 (internally stating "Recreation is NOT the priority in an ERMA" and that the planning framework does not preclude timber harvest in the RMZ if the underlying land allocation is in the HLB). An agency position that is contrary to the clear language of its own land management plan is not entitled to deference. *Native Ecosystems Council (NEC) v. Forest Serv.*, 418 F.3d 953, 962 (9th Cir. 2005).

harvest BLM chose here that is incompatible with the agency's overlapping management directives for the Willamalane ERMA. The record shows intensive plantation forestry resembling a clearcut (as opposed to thinning) in this specific area – 100 acres of currently mature forest surrounding and bordering the only portions of the Willamalane ERMA deemed feasible for trail development – will indeed "interer[e] with" the opportunity to provide high-quality outdoor recreational experiences. *Supra Facts Section*. BLM's decision in effect forces recreation to yield to high-volume logging—that is not "commensurate" management of resources.[7]

As discussed *supra*, an area's scenic quality/"naturalness," ecological conditions and landscape features are all inextricably linked to providing the types of *quality* outdoor recreational opportunities, desired visitor experiences and benefits for which BLM specially designated the Willamalane ERMA. AR11374-75, 11475; *Supra Facts Section* Simply put, authorizing intensive plantation forestry in the very same area as the future trails network will substantially degrade both the natural setting characteristics of the area and the conditions of the trails themselves, in turn "interfering with" this ERMA's ability to provide *quality* opportunities for hiking, mountain biking, wildlife viewing, etc. *Supra Facts Section*; AR11376 (framework). Had BLM taken a hard look at this "compatibility" issue in its EA, it may have concluded that the regeneration harvest would interfere with these targeted recreation opportunities to such a degree that some (even many) prospective visitors may not view the Willamalane ERMA as a desirable place to recreate at all, at least for many years post-logging. Yet, BLM failed to carefully evaluate the degree to which such intensive logging will diminish (or even defeat) the

---

[7] Alternatives that would harmonize quality recreation, timber production and, also, fuels reduction exist, but BLM failed to adequately consider options that would truly balance competing interests. *See infra Sec*.II.B.

links between the ERMA's targeted visitor activities, the quality of the desired visitor experiences and the benefits BLM anticipated from creating a combined trails network in the Springfield-Eugene region "consistent with" WPRD's vision for the Thurston Hills area. AR11374-75 (planning framework); *Infra Sec.*II.A.2.  This failure renders BLM's decision arbitrary and capricious in violation of FLPMA.  *See e.g., ONRC v. Brong*, 492 F.3d  at 1126-32 (BLM violated FLPMA by failing to show the approved logging was compatible with management plan objectives).

Second, regeneration logging this area is also inconsistent with the framework's restrictions for forest management activities because it will adversely alter – i.e. not "maintain" – the area's setting characteristics.  AR11375 (vegetation modifications must be compatible with "maintaining setting characteristics").  As BLM explained in its programmatic-level analysis, the intent of the new RMP was to establish allowable use activities and restrictions within ERMAs that limit "incompatible activities" in order to protect "desired targeted recreation setting characteristics" over the long-term.  AR12678-79 (FEIS/PRMP) (management direction would "preserve the desired physical recreation setting characteristics within both SRMAs and ERMAs. These restrictions would restrict or prohibit the type of development that would affect these settings and shift the setting characteristics to an undesirable setting.")

BLM assesses setting characteristics in terms of an area's remoteness and "naturalness."[8] AR12671-74.  BLM uses forest structural stage classes as a proxy to measure changes in recreation opportunity spectrum classes for "naturalness."  *Id*.  Currently, while not remote, the

---

[8] 'Naturalness' is defined by the level of an area's influence by human modifications other than roads and trails.  Human modifications can include areas of development, utilities, rights-of-way, livestock structures, fences, habitat treatments, or landscape alterations.  Naturalness considers the presence of human modifications and how these modifications may, or may not, affect the visitor's experience.  AR12672 (FEIS/PRMP).

Thurston Hills Project area is mostly comprised of mature forest, a structural stage class typically associated with backcountry forest settings.  *See* AR12674.  BLM, however, proposed classifying the "Recreation Setting Characteristics" (RSC) for the Willamalane ERMA as "Front Country."  AR11375.  In terms of an area's "naturalness" BLM describes "Front Country" settings as partially modified but without modifications that overpower the natural landscape (e.g., structures, utilities).  *See e.g.*, AR15796; 016748.  At any rate, the proposed regeneration logging would not maintain the naturalness characteristics of either a "Back Country" or a "Front Country" setting.  AR12674.  Rather, converting mature forest to non-forest followed by the re-growth of dense, young plantations would undesirably shift the trail network's RSC to "rural." *Id*. (rural areas are characterized as having "substantially modified natural landscapes" with a forest structural stage class of "stand establishment with or without structural legacies."); 2293 (Fuels Report describing forest structural stages post-regeneration harvest: over first 3 to 5 years logged areas will transition from slash to brush and then, over the following 10 to 40 years, from the stand establishment stage to dense, homogenous stands).

Finally, BLM also failed to establish a Recreation Management Zone (RMZ) – a buffer  – for all designated trails as directed by the planning framework. AR11376.  Timber harvest activity is only allowed within the RMZ to "protect/maintain setting characteristics and/or to achieve recreation objectives."  *Id*.  Initially BLM's project planning team identified establishing an RMZ as part of the Project's "purpose and need."  AR1444 (July 26, 2017 meeting notes).  In response to Plaintiffs' administrative protest, however, BLM concluded that "[i]n the absence of designated trails and an established RMZ, the BLM cannot manage the RMZ."  AR10262.  This circular reasoning is an arbitrary and capricious attempt to end-run the planning framework. Aside from the timber sale component, the entire purpose of the Thurston Hills Project is to

establish a trails network (i.e. designate trails).  AR0949-50, 3962-63; 1444.  BLM has already

decided on the design, length, and location of trail segments.  AR3987, 4012.[9]   Accordingly,

BLM was required to establish an RMZ around the newly designated trails and to then prohibit

any regeneration logging within that buffer zone, because such an aggressive form of logging

would neither "protect/maintain recreation setting characteristics" nor "achieve recreation

objectives."  AR11375.  BLM failed to show the Pedal Power timber sale is in accordance with

the Willamalane ERMA's planning framework, rendering its decision arbitrary and capricious.

*ONRC v. Brong*, 492 F.3d at 1126-32.

## II.    BLM VIOLATED THE NATIONAL ENVIRONMENTAL POLICY ACT

In passing NEPA, Congress declared "a broad national commitment to protecting

and promoting environmental quality."  *Robertson v. Methow Valley Citizens Council*,

490 U.S. 332, 348 (1989); 42 U.S.C. § 4331.  To ensure this commitment is met, NEPA imposes

"action-forcing" procedures guaranteeing that: (1) the agency has carefully contemplated a

project's environmental impacts, and (2) the relevant information will be made available so the

public can play a role in both the decision-making process and the implementation of that

decision.  *Robertson*, 490 U.S. at 348-49; *see also* 42 U.S.C. § 4321; 40 C.F.R. § 1501.1.  In

other words, NEPA requires agencies to take "a 'hard look' at the potential environmental

consequences of a proposed action to ensure a "fully informed and well-reasoned" decision.

*Ocean Advocates v. U.S. Army Corps of Engineers*, 361 F.3d 1108, 1124-28 (9th Cir., 2004);

*Klamath-Siskiyou Wildlands Ctr. v. BLM*, 387 F.3d 989, 993-94 (9th Cir., 2004).  Because of

NEPA, "important effects will not be overlooked or underestimated only to be discovered after

---

[9] While precise trail locations may deviate slightly from the map (up to 100 feet from center
line), AR2405-06, this does not prevent BLM from taking that potential deviation into account
when establishing a preliminary RMZ, such as a wider buffer corridor from logging activities.

resources have been committed or the die otherwise cast." *Robertson*, 490 U.S. at 349; *ONRC v. Brong*, 492 F.3d at 1132 ("NEPA ensures an agency will not act on incomplete information, only to regret its decision after it is too late to correct.")

NEPA's action forcing procedures dictate that if a proposed action *may* significantly affect the environment, the action agency must prepare an Environmental Impact Statement (EIS). *Blue Mts. Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1211-12 (9th Cir. 1998) (citing 42 U.S.C. § 4332(2)(C)). "As a preliminary step, an agency may prepare an [Environmental Assessment (EA)] to decide whether the environmental impact of a proposed action is significant enough to warrant preparation of an EIS." *Id.* (citing 40 C.F.R. § 1508.9). "The purpose of an EA is to provide the agency with sufficient evidence and analysis for determining whether to prepare an EIS or to issue a [Finding of No Significant Impact]." *Metcalf v. Daley*, 214 F.3d 1135, 1143 (9th Cir. 2000) (citing 40 C.F.R. § 1508.9). "Because the very important decision whether to prepare an EIS is based solely on the EA, the EA is fundamental to the decision-making process." *Id.* If the agency decides not to prepare an EIS, it must supply a "convincing statement of reasons why potential effects are insignificant." *Id.*

The Council on Environmental Quality (CEQ) promulgated uniform regulations to implement NEPA that are binding on all federal agencies. 42 U.S.C. § 4342; 40 C.F.R. §§ 1500 et seq. CEQ regulation 40 C.F.R. § 1508.27 guides an agency's determination of whether a proposed action may have a significant environmental impact. "Significantly" as used in NEPA requires considerations of both context and intensity. *Id.* For purposes of context, in a site-specific action, significance depends upon "the effects in the locale rather than in the world as a whole." *Id.* at § 1509.27(a); *Anderson v. Evans*, 314 F.3d 1006, 1019 (9th Cir. 2002) (focus is on whether the action may significantly affect the environment *in the local area*). Intensity refers to

"the severity of the impact."  40 C.F.R. § 1508.27(b) (listing several factors agencies should

consider in determining the intensity of a project's effects).

**A.  BLM Failed to Take the Requisite Hard Look**

As in an EIS, the EA must take a "hard look" at the environmental consequences of the

proposed action, including disclosing and analyzing all foreseeable direct, indirect and

cumulative impacts.  40 C.F.R. §§ 1502.16, 1508.7, 1508.8; *Klamath-Siskiyou Wildlands Ctr. v.*

*BLM*, 387 F.3d at 993-94.  Information must be of high quality.  40 C.F.R. § 1500.1(b).

Scientific analysis, expert agency comments, and public scrutiny are essential to implementing

NEPA.  *Id*.  To this end, NEPA requires agencies to facilitate public involvement in decision

making to the fullest extent possible.  40 C.F.R. § 1500.2(d).  Environmental information must

be available to the public before decisions are made.  40 C.F.R. §1500.1.  "Informed public

participation in reviewing environmental impacts is essential to the proper functioning of

NEPA."  *League of Wilderness Defenders/Blue Mtns. Biodiversity Project v. Connaughton*

*("LOWD")*, 752 F.3d 755, 761 (9th Cir. 2014).  Consistent with this scheme, the agency must

ensure the public has received sufficient information to allow it to challenge the agency's

decision.  *Idaho Sporting Congress (ISC) v. Thomas*, 137 F.3d 1146, 1150 (9th Cir. 1998), *rev'd*

*on other grounds by Lands Council v. McNair*, 537 F.3d 981 (9th Cir. 2008).

1.  Increased Fire Hazard and Risk

BLM made no attempt to fully analyze and publicly disclose the degree to which the

Thurston Hills Project is likely to increase fire hazard and risk to adjacent communities—an

omission admitted by the agency.  AR3968-70, 3618-20 (EAs).  BLM attempts to dodge its

obligation to analyze the site-specific environmental consequences of this action by saying its

broad, programmatic-level EIS for the 2016 RMP already addressed fire hazard across the entire

1.3 million-acre planning area. *Id.*, 4616 (DR, Appendix A– response to comments). BLM claims that its programmatic EIS concluded the new "RMP would over time increase stand level fire resistance and reduce stand level fire hazard" across the planning area (as a whole). AR4616 (citing PRMP/FEIS p. 223 at AR13469). Based on that, and the relatively small geographic scale of the proposed action, BLM decided there was no reason to analyze this issue in detail at the project-level. *Id.* This rationale is contrary to NEPA's core purposes and must fail.

For one, the programmatic EIS plainly acknowledges that effects from logging in the HLB "are diminished at the scale of *all* BLM-administered lands within Wildland Development Areas, particularly in the coastal/north."[10] AR13510 (emphasis added). Indeed, the adverse effects of regeneration logging in the HLB can be further diluted when averaged with the effects of *all* forest management across *all* 1.3 million acres BLM manages under the 2016 RMP—the agency's primary rationale for not taking a "hard look" at this issue in the local context. AR4616. But here, BLM admits that regeneration logging in the Thurston Hills Project area will *increase* stand level fire hazard for the next 40 years. AR3618, 3968. So, as Plaintiffs previously explained, the fact that the RMP prohibits regeneration logging in other land use allocations (e.g. Riparian Reserves, Late-Successional Reserves, etc.), which "over time" may average out to more acres of reduced fire hazard throughout the entire RMP planning area, does not negate the potentially significant increase in fire hazard/risk from conducting regeneration logging within the Springfield city limits and WUI to immediately adjacent communities. AR16378 (IBLA appeal). Courts have rejected similar arbitrary and capricious attempts to use large spatial scales to dilute the actual localized impacts of a project. *See e.g. Pac. Coast Fed'n*

---

[10] "Wildland Developed Areas" are defined as: A delineation of where people live in the wildland, classifying a minimum of one structure per 40 acres as a developed area. AR11694.

*of Fishermen's Ass'n v. Nat'l Marine Fisheries Serv.*, 265 F.3d 1028, 1036 (9th Cir. 2001);

*ONRC v. Brong*, 492 F.3d at 1130.

BLM also arbitrarily and capriciously asserts that it need not analyze, in detail, how individual logging projects may increase fire hazard levels at the local scale because: (1) the agency's forest management practices "are unable to provide more than slight variation to fire hazards within the planning area [i.e. all 1.3 million acres of BLM-administered lands] due to the checkboard pattern of the landscape," and (2) individual logging projects like this one only affect a small percentage of the broader landscape, with fire hazard accruing from all areas.  AR3968; 3618-19.  The fact that BLM partnered with the City and WPRD in addressing hazardous fuels on non-BLM parcels in the Thurston Hills WUI belies the notion that forest management practices are inconsequential at the local level.  AR5905-08.  Indeed, research shows removing overly dense fuel sources (e.g. crowded stands of young trees and brush) is among the most effective ways to reduce fire hazard and risk to human communities.  *Id.*  Yet, here BLM not only arbitrarily and capriciously dropped fuels reduction as a primary purpose of the Project, but also authorized the creation of these hazardous fuel conditions (brush and dense young trees) right next door to Springfield residences.  *Supra Facts Section*.  Moreover, BLM's position would effectively insulate the agency from ever having to conduct a site-specific analysis of how proposed logging projects within WUIs influence fire hazard to adjacent communities simply by pointing to the fact that other sources of hazardous fuel conditions still exist.  This cannot be so.

Second, the discussion of fire hazard in the programmatic EIS was too broad, general, and unrelated to individual geographic conditions to meaningfully account for the specific environmental consequences of the Thurston Hills Project in the relevant local context. AR13499-517 (PRMP/EIS fire hazard/risk analysis).  As the Ninth Circuit held in *Klamath-*

*Siskiyou Wildlands Ctr. v. BLM*,  "[t]iering to the RMP-EIS cannot save the EA[]" when both those documents are missing detailed, site-specific information.  387 F.3d 989, 997 (9th Cir. 2004); *see also Muckleshoot Indian Tribe v. Forest Serv.*, 177 F.3d 800, 809-10 (9th Cir.1999) (rejecting tiering of a project-level EIS for a land exchange proposal to a programmatic Land and Resource Management Plan ("LRMP"), because, although the LRMP discussed the land exchange program in general and mentioned the particular exchange at issue by name, it did not "account for the specific impacts of the Exchange...."); *Blue Mts.*, 181 F.3d at 1214 (tiering to Forest Plan EIS inadequate, as site-specific impacts of logging were not addressed).

Here, neither the FEIS/PRMP nor project-level EA provide a detailed analysis, in a manner that meaningfully quantifies and predicts the degree to which regeneration logging in the Thurston Hills site will increase fire hazard/risk to immediately adjacent communities.  *See e.g.* AR13499-510 (FEIS/PRMP); 3618, 3968 (EAs).  The EAs only mention in passing that regeneration logging would increase fire hazard at the stand level for the next 40 years.  AR3618, 3968.  Simply recognizing the problem without any discussion of its magnitude is insufficient. Such generalized analyses fail to adequately inform not only the "decision maker" (as BLM states at AR3619), but the general public, and in turn also fail to inform potential alternative courses of action to avoid increasing fire hazard/risk in this specific locale.  "General statements about 'possible' effects and 'some risk' do not constitute a "hard look" absent a justification regarding why more definitive information could not be provided."  *Neighbors of Cuddy Mtn. v. Forest Serv.*, 137 F.3d 1372 (9th Cir., 1998).

BLM also cannot rely on the somewhat more detailed analysis of its Fuels Specialist Report, AR2284-01, to save the shortcomings of its EA, because NEPA dictates that all the required, detailed analysis must be contained in the NEPA documents that an agency circulates

to the public for comment.  AR4616 (DR, App. A citing Fuels Specialist Report); 10268 (same

for BLM response to Plaintiffs' protest).  *See Blue Mts.*, 161 F.3d at 1214 (A federal agency's

defense of its positions must be found in its EA); *see also Pacific Rivers Council v. Forest Serv.*,

689 F.3d 1012, 1031 (9th Cir. 2012), *vacated as moot,* 133 S.Ct. 2843 (2013) (citing 40 C.F.R. §

1502.21) (Material that is incorporated by reference must be "briefly described" in the body of

the project-level analysis, but a brief description cannot fulfill the purpose of the NEPA analysis

if the substance of what is incorporated is an important part of that effects analysis).  The

purpose of NEPA analyses are to inform both decisionmakers *and* the public of the

environmental consequences of a proposed federal action.  *Id*.; *Supra*.  As the Ninth Circuit

admonished, that purpose would be defeated if a critical part of the analysis could be omitted

from the NEPA documents that are circulated to the public for comment.  *Pacific Rivers,* 689

F.3d at 1031.  NEPA requires that the public see not only the agency's conclusions but also the

underlying data and analysis.  *ISC*, 137 F.3d at 1150.  In sum, BLM failed NEPA's hard look

duty by refusing to analyze in its EA this critical issue in detail.

### 2.  Degrading Scenic Quality and the Recreational Experience

BLM's cursory analysis in the EA of how regeneration logging would affect recreational

experiences in the ERMA wholly ignores the bigger picture; the agency again falls short of

fulfilling NEPA's hard look duty with respect to another key issue.  *See* AR3994-95 (EA

discussion of Issue 1).  Rather than carefully evaluate how this intensive clearcut-like method of

logging would impact the ability of the Willamalane ERMA to provide the high-quality outdoor

recreational experiences for which it was designated, BLM's summary discussion focuses almost

exclusively on how the logging would affect the physical quality of the trails themselves.  *Id*.

(e.g. trails in harvest units "would not have the highest quality tread" and would require

increased maintenance).  While this is an important piece of the picture, specifically for

mountain bikers, it is certainly not the whole picture as it ignores the broader consequences of

degrading the area's scenic quality and other recreational values (e.g. nature appreciation).

Agency action is arbitrary and capricious where the agency has "entirely failed to consider an

important aspect of the problem."  *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43.

As discussed *supra*, BLM recognizes in other planning documents that an area's scenic

quality or level of "naturalness" is a major driver for where many people choose to recreate

outdoors, especially those seeking an opportunity to immerse themselves in a natural setting

close to home.  *Supra Facts Section* & *Sec*.I.  Indeed, BLM uses forest conditions as a proxy for

an area's level of "naturalness," which in turn determines an area's "recreation setting

characteristics."  *See Supra Sec*.I.  In other words, BLM recognizes that impacts to scenic quality

in areas specifically designated for recreational purposes (i.e. RMAs), such as by dramatically

altering forest conditions, is an "important aspect of the problem."  *Motor Vehicle Mfrs. Ass'n*,

463 U.S. at 43; *see e.g.* AR15722-25 (BLM's own guidance for assessing impacts to

recreation/scenic quality).  At a minimum, BLM was required to carefully evaluate this issue in

the EA but failed to do so.

The Pedal Power timber sale will substantially degrade the scenic quality of the

Willamalane ERMA's mature forests, yet there is no discussion in the EA as to how the Project's

impacts to scenic values may impede the ERMA's targeted visitor activities, rather than "support

and sustain" them as intended, and erode the links between those activities and the desired visitor

experiences and benefits.  *See Supra Sec*.I (citing AR11638, 11374-75 (planning framework)).

BLM's Planning Handbook for Recreation and Visitor Services provides detailed guidance for

how the agency can discuss and consider the direct, indirect, and cumulative effects of land

management decisions on an RMA's recreational values, including scenic quality. *See* AR15722-25, 15742-43.[11]   No such discussions were a part of the EA here.

For instance, with respect to "direct effects" the EA never addressed the degree to which the regeneration logging would alter the area's "recreation setting characteristics." *See Supra Sec*.I.  Nor did BLM provide basic information on the timber sale's direct effects to scenic quality, such as how much of the logging would encroach upon the trail network's surrounding viewshed.  BLM could have described how much of the logging would be immediately visible from the trails; for hikers going at a slower pace than cyclists, how effective the aggregate retention areas are expected to be at mitigating visual impacts/whether logged areas would still be visible through the patches of trees retained as buffers alongside some trail segments; if recreationists deviate from trails to explore nature in non-harvested segments how close they will be to encountering a recently heavily logged area – a generally unexpected, and negatively viewed, setting in most recreation areas; or the degree to which wildlife viewing, another targeted visitor activity (AR11374), would likely be impaired.  This list can go on.

BLM also ignored indirect effects.  For instance, BLM should have considered whether, and to what degree, diminishing the ability to recreate in a scenic, naturally appearing landscape may result in lower visitation rates, which may in turn reduce the desired social, environmental, and economic visitor benefits outlined in the ERMA's planning framework (e.g. less "ecologically friendly tourism" and associated revenue for the Springfield-Eugene region). AR11374-75 (listing "Visitor Benefits"); *see also, e.g.* AR15723 (Handbook example).

---

[11] *See also* AR15720 (explaining BLM's interpretation of NEPA's "hard look" requirement as a "reasoned analysis containing quantitative or detailed qualitative information. The level of detail must be sufficient to support reasoned conclusions by comparing the amount and the degree of change (impact) caused by the proposed action and alternatives.")

Even if these potential effects are not "significant" enough within the meaning of NEPA to ultimately require a full-blown EIS, they are certainly important enough to have warranted a "hard look" in the EA given the overarching purpose and intent of this specially designated *recreation* area.   In short, BLM acted arbitrarily and capriciously by entirely failing to consider this "important aspect of the problem." *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43.

### B.   BLM Failed to Analyze Reasonable Alternatives

NEPA requires federal agencies to "study, develop, and describe appropriate alternatives" to a proposed project when the agency is preparing an EA. 42 U.S.C. § 4332(2)(E); *Bob Marshall Alliance v. Hodel*, 852 F.2d 1223, 1229 (9th Cir. 1988); 40 C.F.R. § 1508.9. "{C]onsideration of alternatives is critical to the goals of NEPA even where a proposed action does not trigger the EIS process." *Hodel*, 852 F.2d at 1228-29.   The discussion of alternatives is intended to provide a "clear basis for choice among options by the decisionmaker and the public." 40 C.F.R. § 1502.14.   This requirement is critical to serving NEPA's primary purposes of ensuring fully informed decisions and providing for meaningful public participation in environmental analyses and decision-making. *See* 40 C.F.R. § 1500.1(b), (c).

All reasonable alternatives must receive a "rigorous exploration and objective evaluation…particularly those that might *enhance environmental quality or avoid some or all of the adverse environmental effects*." 40 C.F.R. § 1500.8(a)(4) (emphasis added).   This requirement applies to EAs in addition to EISs. *Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*, 538 F.3d 1172, 1217 (9th Cir. 2008).   Despite this lesser obligation for an EA, the Ninth Circuit made clear in *W. Watersheds Project v. Abbey*: "The existence of a viable but unexamined alternative renders an EA inadequate." 719 F.3d 1035, 1050 (9th Cir. 2013).

Viable alternatives are feasible, meet the stated goals of the project, or are reasonably related to the purposes of the project. *Id.* at 1052 ("Feasible alternatives should be considered in detail.")

A project's statement of purpose and need is crucially important to the adequacy of an EA because it "delimit[s] the universe of the action's reasonable alternatives." *Citizens Against Burlington v. Busey*, 938 F.2d 190, 195 (D.C. Cir. 1991). While courts afford agencies discretion in defining the purpose and need of a project, a purpose and need statement will fail, if it unreasonably narrows the alternatives in a manner that preordains the outcome. *Id.* at 196; *City of Carmel by the Sea v. U.S. Dept. of Trans.*, 123 F.3d 1142, 1155 (9th Cir. 1997) ("The stated goal of a project necessarily dictates the range of reasonable alternatives and an agency cannot define its objectives in unreasonably narrow terms.") As one appellate court aptly put it: "One obvious way for an agency to slip past the strictures of NEPA is to contrive a purpose so slender as to define competing 'reasonable alternatives' out of consideration (and even out of existence)." *Simmons v. U.S. Army Corps of Eng'rs*, 120 F.3d 664, 666 (7th Cir. 1997).

Here, Plaintiffs repeatedly requested that BLM analyze a commercial thinning alternative as opposed to regeneration logging. AR3866-71; 10500-07. Plaintiffs contend that a thinning alternative would: (1) allow BLM to contribute towards the District's annual timber volume targets ("ASQ"), AR3614, (2) help reduce hazardous fuel conditions in the WUI rather than create or increase such conditions as is the case with regeneration harvests, AR10499-50,[12] and (3) be compatible with preserving the ERMA's scenery and opportunities for high-quality outdoor recreation. AR10450. BLM, however, declined to analyze a thinning alternative in

---

[12] *See* AR10434 (BLM's Fuel Specialist acknowledging that a thinning alternative "would be more compatible with fire/fuels objectives and direction.")

detail because it did not meet the agency's exceptionally narrow purpose, contrived after the public scoping period, "to shift acres" from the 70-year age class to the 0-10 class. AR3640.

BLM's approach here is arbitrary and capricious for several reasons. First, BLM unreasonably narrowed its range of alternatives by only looking at creating forests in the 0-10 year age class, ignoring in its analysis the scarcity of older forests, especially relative to historical conditions, on the other end of the spectrum. BLM never addresses the fact that there are no forests in the Upper Willamette portion of the SYU older than 130 years old. AR3616.



Figure 2. Age class distribution of forest stands on lands administered by the Upper Willamette Field Office [Source: compiled from BLM Micro*Storms database 2018]

AR3613 (graph from EA). In fact, this graph shows most forests within this SYU are between zero and 80 years old. *Id.* The EA states that "each SYU needs to contain a well-distributed mix of age classes across the HLB." *Id.* BLM's management objectives for the HLB -- Moderate Intensity Timber Areas, where this Project is located, AR3610, include "[d]evelop[ing] diverse late-successional ecosystems for a portion of the rotation" and "[p]rovid[ing] a variety of forest structural stages distributed both temporally and spatially." AR11450. Thus, because there are almost no late-successional forests in this SYU, BLM should have considered a thinning

alternative that would maintain the existing forest on a late-successional trajectory, establishing a more balanced age class distribution within the SYU while also contributing to the District's ASQ in a manner commensurate with protecting and enhancing the ERMA's recreational values.

Second, as noted *supra*, the original intent of the Thurston Hills Project, as presented to the public, was to partner with WPRD in developing a connected trails system that would be "in harmony with long-term forest management activities including sustainable-yield timber harvest *and* fuels-reduction."  *Supra Facts Section* (emphasis added).  Indeed, fuels reduction was consistently identified as an "important need" and key component of the Project in the early planning stage, given the "gap" in fuels management on these parcels and their location within city limits and the WUI.  *Id.*  BLM, apparently unable to reconcile the goal of fuels reduction with a volume-driven regeneration harvest that would admittedly *increase* the level of fire hazard to adjacent communities, simply dropped fuels reduction as a "purpose and need" of the Project.  Then, to rule out a thinning alternative and position regeneration logging as the *only* harvest option, BLM added adjusting forest age class distribution to the "purpose and need" statement.  AR3614; 1282; 1459 (describing how Project planning team was given "sideboards" from BLM official that precluded consideration of anything but regeneration harvest with a maximum of 15% retention: "I spoke with Richard Hardt about decision space for > 15% Retention: None.")  This became an operating "assumption" as BLM adjusted the purpose and need for the Project.  AR1456 ("Assumptions based on P&N"); 1282 (January 2018 meeting notes).

An agency must look hard at the factors relevant to its definition of purpose.  *Nat'l Parks & Conservation Ass'n v. BLM*, 606 F.3d 1058, 1070-72 (9th Cir. 2009).  Here, the record shows BLM ignored the lack of older forests in the SYU to arrive at a preordained logging prescription and arbitrarily ditched fuels reduction as an "important need" of the Project.  Importantly, the

governing RMP specifically contemplates commercial thinning in the HLB to "produce timber to contribute to the attainment of the declared [ASQ]" and "[r]educe stand susceptibility to disturbances such as fire." AR11447.[13]  And while a thinning alternative would undeniably generate less timber volume than a regeneration harvest, the record shows the District expected to exceed its annual timber targets for this SYU. AR0104; 11393 (RMP also showing that annual timber targets for each SYU can vary by as much as 40%).  In short, there was no true "need" to conduct an intensive regeneration harvest in the Willamalane ERMA, such that thinning was not a viable alternative.

A very similar situation was addressed in *LOWD v. Marquis-Brong*. 259 F. Supp. 2d 1115 (D. Or. 2003).  There, BLM developed an EA to propose logging activities after a fire burned through the project area. *Id.* at 1117.  While the project initially contemplated thinning and other rehabilitative logging techniques, BLM's final EA only had alternatives that conducted salvage logging (post-fire regeneration harvest) in the burned area. *Id.* at 1123.  The court held that the "EA unreasonably excluded consideration of any alternative that provided for restoration of the burned area without salvage logging" because "the EA itself presented three action alternatives, and each of the three included salvage logging." *Id.* at 1124.  BLM argued that the relevant RMP did not contemplate rehabilitation techniques, but it became apparent at the preliminary injunction hearing that this representation by BLM was untrue. *Id.*

The same is true here.  The RMP's management directives for the HLB-Moderate Intensity Timber Area do not prevent consideration of commercial logging as an alternative within this land allocation; in fact, commercial thinning is expressly listed as a management

---

[13] It is also worth noting that BLM's underlying analysis for the RMP assumed that the minimum age for stands being regeneration harvested would be 80 years old, AR12369, and the stands at issue here are barely 70 years old. AR3389.

option.  Moreover, when the RMP's timber harvest directives are read together with both the management directives for the Willamalane ERMA and fuels reduction, commercial thinning is shown to be a far more well-reasoned choice for the Thurston Hills Project.  *See e.g., Muckleshoot,* 177 F.3d at 813 ("Forest Service failed to consider an alternative that was more consistent with its basic policy objectives than the alternatives that were the subject of final consideration.")

In sum, BLM unreasonably narrowed the range of alternatives presented in the EA to only include intensive regeneration logging as the sole timber harvest prescription, despite the agency's recognition that a commercial thinning alternative would have met fire/fuels objectives, the directives set forth in the ERMA's planning framework, while contributing to the District's ASQ.  This is a textbook example of an agency crafting a purpose and need statement so narrowly drawn as to foreordain approval of other reasonable alternatives.  As such, BLM acted arbitrarily and capriciously in violation of NEPA.  *See NPCA*, 606 F.3d at 1072; *LOWD v. Marquis-Brong,* 259 F. Supp. 2d at 1124.

## CONCLUSION

The Court should grant summary judgment and relief in Plaintiffs favor for these reasons.  Respectfully submitted this 20th day of May, 2019.

*/s/ Jennifer R. Schwartz*
Jennifer Schwartz (OSB # 072978)
Tel: (503) 780-8281
Email: jenniferroseschwartz@gmail.com

*Of Counsel for Plaintiffs*
