BILLY J. WILLIAMS
United States Attorney
District of Oregon

LAWRENCE VANDYKE
Deputy Assistant Attorney General
Environment and Natural Resources Division

JOHN P. TUSTIN (Texas State Bar No. 24056453)
Senior Attorney
Natural Resources Section
P.O. Box 7611
Washington, D.C. 20044-7611
Phone: (202) 305-3022 / Fax: (202) 305-0506
john.tustin@usdoj.gov

*Attorneys for Federal Defendant*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF OREGON**

| | |
|---|---|
| CASCADIA WILDLANDS and OREGON WILD | ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) ) |
| BUREAU OF LAND MANAGEMENT, | ) ) |
| Federal Defendant, and | ) ) |
| SENECA SAWMILL COMPANY, | ) ) |
| Defendant-Intervenor. | ) ) ) |

Case No. 6:19-CV-0247-MC

FEDERAL DEFENDANT'S CROSS-
MOTION FOR SUMMARY JUDGMENT
AND RESPONSE IN OPPOSITION TO
PLAINTIFFS' MOTION FOR
SUMMARY JUDGMENT [ECF No. 16]

ORAL ARGUMENT REQUESTED

Plaintiffs Cascadia Wildlands and Oregon Wild challenge the Bureau of Land Management's ("BLM") decision to authorize the Thurston Hills Non-Motorized Trails and Forest Management Project ("Project") under the Federal Land Management Policy Act, the National Environmental Policy Act, and the Administrative Procedure Act ("APA"). Defendant cross-moves for summary judgment on all claims.

The Ninth Circuit has endorsed the use of Rule 56 motions for summary judgment in reviews of agency administrative decisions under the limitations imposed by the APA. *See, e.g.*, *Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1471-72 (9th Cir. 1994) (discussing the standards of review under both the APA and Fed. R. Civ. P. 56). Under Rule 56, "[t]he moving party is entitled to summary judgment as a matter of law where, viewing the evidence and the inferences arising therefrom in favor of the nonmovant, there are no genuine issues of material fact in dispute." *Id.* at 1472. Because the role of the Court under the APA is not to "find facts" but is limited to reviewing the Administrative Record to determine whether the federal agencies considered the relevant factors and reached conclusions that were not arbitrary and capricious, there can be no genuine issue of material fact, and summary judgment is the appropriate resolution of this case.

In support of this cross-motion, Defendant submits the following memorandum in support, the Administrative Record lodged on April 29, 2019 (ECF No. 9), and any argument that may be presented in Court. As Defendant will show, Plaintiffs' arguments are misguided. The Project satisfies all statutory requirements and enjoys local support. The Court should grant judgment in favor of Defendant on all claims, dismiss this action with prejudice, and grant any other such relief that is appropriate.

Respectfully submitted on this 24th day of June, 2019.

BILLY J. WILLIAMS
United States Attorney
District of Oregon

LAWRENCE VANDYKE
Deputy Assistant Attorney General
Environment and Natural Resources Division

*/s/  John P. Tustin*
JOHN P. TUSTIN
Senior Attorney
Natural Resources Section
P.O. Box 7611
Washington, D.C. 20044-7611
Phone:  (202) 305-3022 / Fax:  (202) 305-0506
john.tustin@usdoj.gov

*Attorneys for Federal Defendant*

**MEMORANDUM IN SUPPORT OF CROSS-MOTION FOR SUMMARY JUDGMENT
AND RESPONSE IN OPPOSITION TO PLAINTIFFS'
MOTION FOR SUMMARY JUDGMENT**

## <u>TABLE OF CONTENTS</u>

I.      Introduction ........................................................................................................ 1

II.     Background ........................................................................................................ 2

III.    Standard of Review ........................................................................................... 7

        A.      The Federal Land Policy & Management Act ....................................... 7

        B.      The National Environmental Policy Act ............................................... 7

IV.     Argument .......................................................................................................... 8

        A.      The Project is consistent with management direction in the Resource
                Management Plan and thus complies with FLPMA. .............................. 8

        B.      The Project complies with NEPA. ...................................................... 16

                1.      The EA took a hard look at the potential environmental effects of
                        the Project. ............................................................................... 16

                a.      BLM considered and disclosed the Project's effects on fire
                        hazard and risk .......................................................................... 18

                b.      BLM considered and disclosed the effects of regeneration harvest on
                        scenic quality and recreation ..................................................... 22

                2.      The range of alternatives satisfies the Project's purpose and need for
                        timber harvest ........................................................................... 26

V.      Conclusion ..................................................................................................... 35

# TABLE OF AUTHORITIES

**Cases**

*Alaska Ctr. for Env't v. U.S. Forest Serv.*,
    189 F.3d 851 (9th Cir. 1999) ............................................................................... 15

*Balt. Gas & Elec. Co. v. Nat. Res. Def. Council Inc.*,
    462 U.S. 87 (1983)...................................................................................... 17, 31

*BARK v. U.S. Forest Serv.*,
    No. 3:18-cv-1645-MO, 2019 WL 2518123 (D. Or. June 18, 2019)................... 34, 35

*Bering Strait Citizens for Responsible Dev. v. U.S. Army Corps of Eng'rs*,
    524 F.3d 938 (9th Cir. 2008) .......................................................................... 17

*Blue Mountains Biodiversity Project v. Blackwood*,
    161 F.3d 1208 (9th Cir. 1998) ......................................................................... 17

*Cal. ex. rel. Imperial Cty. Air Pollution Control Dist. v. U.S. Dep't of the Interior*,
    767 F.3d 781 (9th Cir. 2014) .......................................................................... 21

*City of Angoon v. Hodel*,
    803 F.2d 1016 (9th Cir. 1986) ......................................................................... 31

*City of Carmel-by-the-Sea v. U.S. Dep't of Transp.*,
    123 F.3d 1142 (9th Cir. 1997) ......................................................................... 34

*Ctr. for Biological Diversity v. Salazar*,
    695 F.3d 893 (9th Cir. 2012) .......................................................................... 26

*E.E.O.C. v. Peabody W. Coal Co.*,
    400 F.3d 774 (9th Cir. 2005) .......................................................................... 16

*Earthlink, Inc. v. FCC*,
    462 F.3d 1 (D.C. Cir. 2006)............................................................................. 17

*Friends of Se.'s Future v. Morrison*,
    153 F.3d 1059 (9th Cir. 1998) .................................................................... 27, 34

*Friends of Yosemite Valley v. Kempthorne*,
    520 F.3d 1024 (9th Cir. 2008) ......................................................................... 16

*Headwaters, Inc. v. BLM*,
    914 F.2d 1174 (9th Cir. 1990) ................................................... 10, 13, 15, 26, 35

*Idaho Conservation League v. Mumma*,
    956 F.2d 1508 (9th Cir. 1992) ......................................................................... 26

*In re Big Thorne Project & 2008 Tongass Forest Plan*,
    93 F. Supp. 3d 1134 (D. Alaska 2015) .............................................................. 32

*In re Big Thorne*,
    No. 1:14-cv-13-RRB, 2015 WL 13402140 (D. Alaska Mar. 31, 2015) .................. 16

*Kern v. BLM*,
    284 F.3d 1062 (9th Cir. 2002) ................................................................ 19

*Klamath Siskiyou Wildlands Ctr. v. Gerritsma*,
    No. 1:12-CV-1166-PA, 2013 WL 4477834 (D. Or. Aug. 21, 2013) ........................ 7

*Lands Council v. McNair*,
    537 F.3d 981 (9th Cir. 2008) .......................................................... 17, 18

*Lands Council v. Powell*,
    395 F.3d 1019 (9th Cir. 2005) ............................................................. 8

*League of Wilderness Defenders v. Marquis-Brong*,
    259 F. Supp. 2d 1115 (D. Or. 2003) ..................................................... 34

*Marsh v. Or. Nat. Res. Council*,
    490 U.S. 360 (1989)............................................................... 8, 18, 31

*Methow Forest Watch v. U.S. Forest Serv.*,
    383 F. Supp. 2d 1263 (D. Or. 2005) ................................................... 17, 25

*Metro. Edison Co. v. People Against Nuclear Energy*,
    460 U.S. 766 (1983)...................................................................... 25

*Miller v. Fairchild Indus., Inc.*,
    797 F.2d 727 (9th Cir. 1986) ............................................................ 16

*Native Ecosystems Council v. Tidwell*,
    No. CV 08-121-M-DWM, 2009 WL 10695236 (D. Mont. June 1, 2009) .............. 32

*Native Ecosystems Council v. U.S. Forest Serv.*,
    428 F.3d 1233 (9th Cir. 2005) ................................................... 26, 29, 35

*Norton v. S. Utah Wilderness, All.*,
    542 U.S. 55 (2004)........................................................................ 7

*Nw. Envtl. Def. Ctr. v. NFMS*,
    647 F. Supp. 2d 1221 (D. Or. 2009) .................................................... 21

*Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.*,
    18 F.3d 1468 (9th Cir. 1994) ............................................................. 2

*Or. Nat. Res. Council Fund v. Brong*,
    492 F.3d 1120 (9th Cir. 2007) ........................................................... 7

*Pac. Rivers v. BLM*,
    No. 6:16-CV-1598-JR, 2018 WL 6735090 (D. Or. Oct. 12, 2018).................... 9, 16

*Robertson v. Methow Valley Citizens Council*,
    490 U.S. 332 (1989)................................................................... 8, 25

*Selkirk Conservation All. v. Forsgren*,
    336 F.3d 944 (9th Cir. 2003) ....................................................... 17, 22

*W. Watersheds Project v. Lueders*,
   122 F. Supp. 3d 1039 (D. Nev. 2015)............................................................ 18, 21

*Wasco Prods., Inc. v. Southwall Techs., Inc.*,
   435 F.3d 989 (9th Cir. 2006) ....................................................................... 15

*Westlands Water Dist. v. U.S. Dep't of Interior*,
   376 F.3d 853 (9th Cir. 2004) ................................................................. 26, 29

**Statutes**

42 U.S.C. § 1701 ............................................................................................. 15

42 U.S.C. § 4332(2)(C) ..................................................................................... 7

42 U.S.C. § 4332(2)(E) .................................................................................... 26

43 U.S.C. § 1701 ............................................................................................... 9

43 U.S.C. § 2601 ..................................................................................... 1, 2, 9

43 U.S.C. §§ 1701–1785 .................................................................................. 7

**Regulations**

40 C.F.R. § 1502.20 ......................................................................................... 18

40 C.F.R. § 1502.21 ......................................................................................... 21

40 C.F.R. § 1506.4 ........................................................................................... 18

40 C.F.R. § 1508.13 ........................................................................................... 8

40 C.F.R. § 1508.27 ......................................................................................... 16

40 C.F.R. § 1508.9(a)...................................................................................... 7, 8

40 C.F.R. § 1508.9(b) .................................................................................... 7, 26

43 C.F.R. § 1610.5–3(a).................................................................................... 7

# TABLE OF ACRONYMS

| | |
|---|---|
| ASQ | Allowable Sale Quantity |
| BLM | Bureau of Land Management |
| DR | Decision Record |
| ERMA | Extensive Recreation Management Area |
| FEIS | Final Environmental Impact Statement |
| FLPMA | Federal Land Policy & Management Act |
| FONSI | Finding of No Significant Impact |
| HLB | Harvest Land Base |
| MITA | Moderate Intensity Timber Area |
| MMbf | Million Board Feet |
| NEPA | National Environmental Policy Act |
| RMP | Resource Management Plan |
| SRMA | Special Recreation Management Area |
| SYU | Sustained Yield Unit |
| WPRD | Willamalane Park and Recreation District |

# I. <u>INTRODUCTION</u>

The Thurston Hills Non-Motorized Trails and Forest Management Project ("Project") encompasses two separate actions: a new-non motorized trail system for mountain biking and hiking, and a timber harvest named the Pedal Power Timber Sale. The 1,058 acre Project area is located southeast of Springfield, Oregon, and on lands managed by the Bureau of Land Management. The Project authorizes a form of regeneration harvest known as variable retention with two-aged stands on approximately 100 acres from the Harvest Land Base land ("HLB") use allocation. BLM manages the HLB for the express purpose of sustained yield timber production as allowed by BLM's 2016 Northwest and Coastal Oregon Resource Management Plan ("RMP") and in accordance with the Oregon & California Revested Lands Act of 1937 (the "O&C Act"), 43 U.S.C. § 2601. Once timber harvest is complete, the Project authorizes development of 8.5 miles of non-motorized trail where none existed before. The trail system will contribute to the development of the proposed Willamalane Extensive Recreation Management Area ("ERMA") authorized in the 2016 RMP and will connect to a trail system being developed by the Willamalane Parks and Recreation Department ("WPRD").

Plaintiffs allege the Project violates the Federal Land Management Policy Act ("FLPMA") and the National Environmental Policy Act ("NEPA"). As this memorandum will show, Plaintiffs' arguments are misguided. Plaintiffs' FLPMA argument fails because BLM is not required to constrain sustained yield timber harvest in favor of recreation management in the ERMA. To the contrary, FLPMA contains a savings clause that exempts certain O&C Lands – such as those from the HLB – from FLPMA's multiple use mandate. Plaintiffs' first NEPA argument fails because the analysis in the Environmental Assessment analyzed the environmental effects of the Project at the site-specific level and tiers to and incorporates the

2016 RMP's landscape-level Environmental Impact Statement. Plaintiffs' second NEPA argument also fails. BLM explained why Plaintiffs' preferred thinning alternative, instead of regeneration, does not satisfy the Project's purpose and need for timber harvest.

The Project satisfies all statutory requirements and enjoys local support, including from the City of Springfield and the Willamalane Parks and Recreation Department. The Court should deny Plaintiffs' motion for summary judgment and allow the Project to proceed.

## II. <u>BACKGROUND</u>

For much of 2016, BLM and the WPRD had been communicating about the possibility of completing a single environmental analysis for trails and forest management on three BLM-managed parcels east of Springfield, Oregon, in an area known as Thurston Hills. AR0949, 0962.[1] BLM's 2016 Record of Decision for the RMP designated approximately 55% of the 1,058 acre parcels as HLB. AR3609. BLM manages HLB forest stands to provide a sustained yield of timber in accordance with the O&C Act of 1937, 43 U.S.C. § 2601. AR11393, 11446. The three parcels also overlap with the proposed Willamalane ERMA established in the 2016 RMP. AR0949, 0951 (map). The Willamalane ERMA has the potential to create open space and non-motorized trail opportunities near Springfield. AR11697.

In March 2017, BLM began the formal process under NEPA to develop such a proposal. As outlined in the scoping notice, BLM proposed "to develop a non-motorized trail system [in the ERMA] in harmony with long-term forest management activities including sustainable yield timber harvest and fuels reduction." AR0949. BLM engaged in extensive public outreach and coordination, including hosting a public scoping meeting in April 2017 and an open house in November 2017, contacting landowners within ¼ mile of the Project area, distributing press

---

[1] Federal Defendants lodged the Administrative Record on April 29, 2019. ECF No. 9.

releases, and working closely with the WPRD and the City of Springfield.  AR3616.  Early in the public participation period, BLM determined it was not feasible to include the largest parcel (Section 5) because there are no public easements to access the land and landowners were not receptive to providing access.  AR3610.  Planning continued for the two remaining parcels (Sections 1 and 31).  At the November 2017 open house, BLM distributed maps showing proposed areas of regeneration harvest[2] and the locations of possible trails.  AR0357-59, 0365-67.  The maps presented three alternatives: optimized trails (Alternative 2), optimized timber harvest (Alternative 3), and balanced trails and timber (Alternative 4).  *Id.*  BLM's specialists prepared reports for the proposed Project on a variety of subjects, including silviculture (AR2581-98), fuels (AR2284-301), and recreation (AR2341-54, 2404-31).  As the Project developed internally, BLM determined not to propose a specific project component for fuels, in part because the fuels specialist determined that ground conditions showed less fire risk than historic conditions indicated.  AR1473, 1490.

In May 2018, BLM released the Environmental Assessment ("EA") and Finding of No Significant Impact ("FONSI") for the Thurston Hills Non-Motorized Trails and Forest Management Project and signed the Decision Record.  AR3604-73 (EA); AR3682-89 (May 30 FONSI).  The Project encompasses two separate actions: (1) a new non-motorized trail system for hiking and biking and (2) a timber harvest, named the Pedal Power Timber Sale.  AR3609.

---

[2] Regeneration harvest is a recognized silvicultural system with a variety of harvest types. AR12343.  The gradient of regeneration harvest spans from clearcut with even-aged stands, to variable retention with two-age stands, to selection with uneven-aged stands.  AR12344 (Figures C-3 and C-4).  Live trees are retained long-term (reserved from harvest) to facilitate the development of a two-aged stand structure.  The retained trees may be left in a dispersed, aggregated, or mixed spatial pattern.  AR 12347-48 (Figure C-6).  In the HLB, BLM uses the two-aged system with variable retention harvest method to achieve the goal of establishing new tree regeneration.  AR12347; AR12346 (Table C-13).

BLM identified purposes and needs for each of the actions, AR3612-15, and analyzed the environmental effects of the actions on five alternatives. AR3628-58. The four action alternatives include a range of trail development and timber harvest, ranging from trails only (Alternative 2) to regeneration harvest only (Alternative 5). AR3628. BLM initially selected Alternative 3, which developed 8.3 miles of trails and authorized regeneration harvest on 155 acres, but withdrew that decision ten weeks later in favor of modified Alternative 4. AR3526-35 (August 15 FONSI), 4572-74 (August 15 Decision Record); *see* AR3548-56 (Determination of NEPA Adequacy Worksheet), 3556 (map), 4608-19 (May 30 Decision Record). During this period, BLM held an additional public meeting in August of 2018. AR0005-07; AR0022.

The Selected Action implements Alternative 4 as described in the EA, with a minor modification to the timber harvest:



Figure 1. Modified Alternative 4 - 100 Acre Regeneration Harvest and Trails

**THURSTON HILLS NON-MOTORIZED TRAILS AND FOREST MANAGEMENT PROJECT**

AR3556 (map), 3526. The timber harvest component of the Selected Action implements regeneration harvest, per the management direction[3] of the 2016 RMP and as described in the EA, in the HLB–Moderate Intensity Timber Area ("MITA"). *Id.* BLM developed the Selected Action specifically to address concerns regarding impacts to the recreational settings and scenic values from the timber sale. The modification to the timber harvest increases green tree retention from 10% to 15%, which results in a harvest area of 100 acres and timber volume of 4.0 million board feet ("MMbf"), instead of 105 acres and 4.2 MMbf in the original version of Alternative 4. AR3527. Approximately half of the total aggregate retention will be along the south side of the regeneration harvest in Section 1, which provides visual screening from the harvest area and a forested corridor for future trails. *Id.* (yellow highlight). BLM coordinated with WPRD on the location for the additional retention. AR0096.

The Selected Action also includes road work, post-harvest slash disposal, and site preparation. AR3527. Road work includes approximately 0.4 miles of road construction, 3.5 miles of road renovation, new cross-drains, and up to five culverts at stream crossings. *Id.* The majority of the post-harvest slash disposal would begin within 90 days after completion of harvest activities; the disposal reduces fire hazard and prepares the site for reforestation. AR3635. The duration of the slash disposal treatment varies with the specific activity and seasonal weather and air quality conditions. AR3635. Pile burning will occur in the first possible wet season but could take one to two years to complete. *Id.* Controlled burning is done in the spring and fall and could take one to five years to complete. *Id.* Reforestation occurs after site preparation. After harvest activities and site preparation, BLM will reforest the area,

---

[3] Management direction "identifies where future actions may or may not be allowed and what restrictions or requirements may be placed on those future actions to achieve the objectives set for the BLM-administered lands and resources." AR11390.

predominantly with Douglas fir and some western hemlock and western red cedar. AR3635.

The trails component of the Selected Action authorizes construction of non-motorized hiking and mountain biking trails in the proposed Willamalane ERMA as described in Alternative 4 of the EA. Approximately 8.5 miles of non-motorized trail will be developed where none existed before. The trails system will have two potential connections to the adjacent hiking and biking trail system being developed by WPRD near Springfield. AR3528, 3549; AR3650 (Table 8). All trails are open to hiking and mountain biking, but are designed for primary use by mountain bikers. AR3528. The Selected Action implements timber harvest prior to trail development, and forgoes harvest on approximately 56 acres in the HLB, where trails would be developed prior to a future timber harvest in the HLB. AR3527.

While this lawsuit shows that not everyone supports the Project, many do. Throughout the planning process members of the public expressed support for the balanced alternative BLM ultimately selected. *See e.g.*, AR0491-94 (summary of scoping comments), 0549-52 (comments from Nov. 2017 open house), 0006 (comments from August 2018 public meeting). The Mayor of Springfield and the Willamalane Board President jointly wrote to BLM in support of Alternative 4, and that was before BLM included additional retention acreage. AR0094. The local leaders thanked BLM for its past and ongoing collaboration and wrote, "[w]e believe Alternative #4 constitutes an appropriate balance of meeting both the recreation needs of our community, as well as the [BLM's] obligations to achieve timber harvest quotas from its [RMP]." *Id.*

BLM awarded the Pedal Power Timber Sale to Seneca Sawmill in February 2019. AR16241-50. Timber harvest is anticipated to begin in mid-August 2019, once necessary road construction and reconstruction activities have been completed. ECF No. 6 at 6.

### III. <u>STANDARD OF REVIEW</u>

**A.      <u>The Federal Land Policy & Management Act</u>**

The FLMPA establishes requirements for land use planning on public lands.  *See* 43 U.S.C. §§ 1701–1785.  Under FLPMA, BLM is required to "develop, maintain, and when appropriate, revise land use plans to ensure that land management be conducted on the basis of multiple use and sustained yield."  *Or. Nat. Res. Council Fund v. Brong*, 492 F.3d 1120, 1125 (9th Cir. 2007) (citations and internal quotations omitted).  Once a land use plan is developed, "[a]ll future resource management authorizations and actions ... shall conform to the approved plan." 43 C.F.R. § 1610.5–3(a).  BLM has "a great deal of discretion in deciding how to achieve" compliance with the applicable land use plan.  *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 66 (2004); *Klamath Siskiyou Wildlands Ctr. v. Gerritsma*, No. 1:12-CV-1166-PA, 2013 WL 4477834, at *4 (D. Or. Aug. 21, 2013).

**B.      <u>The National Environmental Policy Act</u>**

NEPA requires agencies to prepare an environmental impact statement ("EIS") for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C).  NEPA's implementing regulations provide that an agency shall prepare an EA to determine whether a proposed federal action will have a significant impact and to determine whether preparation of an EIS will be necessary.  40 C.F.R. § 1508.9 (2000).  An EA is a "concise public document" that "include[s] brief discussions of the need for the proposal, of alternatives as required by [42 U.S.C. § 4332(2)(E)], of the environmental impacts of the proposed action and alternatives, and a listing of agencies and persons consulted." 40 C.F.R. §§ 1508.9(a),  (b) (2000).  If the agency concludes in the EA that there is no significant effect from the proposed project, the federal agency may issue a FONSI in lieu of preparing an EIS.  40

C.F.R. § 1508.9(a)(1) (2000); *id.* § 1508.13.

NEPA is procedural, not substantive.  *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 371
(1989); *Lands Council v. Powell*, 395 F.3d 1019, 1026 (9th Cir. 2005).  So long as "the adverse
environmental effects of the proposed action are adequately identified and evaluated, the agency
is not constrained by NEPA from deciding that other values outweigh the environmental costs."
*Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 351 (1989).

## IV.  ARGUMENT

A.    **The Project is consistent with management direction in the Resource Management
      Plan and thus complies with FLPMA.**

Plaintiffs claim the Project violates FLPMA because it is allegedly inconsistent with
recreation management direction in the Willamalane ERMA.  Pls.' Mot. for Summ. J. and Mem.
in Supp. ("Pls.' Mem."), ECF No. 16 at 19-24.  Plaintiffs misunderstand the ERMA designation.
The designation does not oblige BLM to manage recreation on equal footing with other uses of
the land, as Plaintiffs believe.  All of the acres in the Project harvest area are in the Harvest Land
Base land use allocation, and all are O&C lands[4] subject to the O&C Act explicitly exempted
from FLPMA's multiple use mandate.  The dominant purpose of the underlying HLB land use
allocation is timber production and takes precedence over other purpose the land may have, such
as recreation.

Enacted in 1937, the O&C Act provides that certain revested railroad lands in western
Oregon

> classified as timberlands . . . shall be managed . . . for permanent forest production,
> and the timber thereon shall be sold, cut, and removed in conformity with the
> [principle] of sustained yield for the purpose of providing a permanent source of
> timber supply, protecting watersheds, regulating stream flow, and contributing to

---

[4] "O&C Lands" are public lands granted to the Oregon & California Railroad Company and
subsequently revested to the United States.  AR11685.

the economic stability of local communities and industries, and providing recreational facilities.

43 U.S.C. § 2601. The O&C Act further requires BLM to determine and declare the "annual productive capacity" from these lands, which BLM has done in its declaration of Allowable Sale Quantity ("ASQ") for each BLM district in western Oregon.[5] *Id.* The ASQ for sustained-yield timber production in the Eugene sustained-yield unit ("SYU") where this Project is located is 53 MMbf. AR11393.

The FLPMA generally requires BLM to manage its lands under principles of multiple use, but provides a specific exception for the O&C lands. Section 701(b) of FLMPA states

> [n]otwithstanding any provision of this Act, in the event of conflict with or inconsistency between this Act and the Acts of August 28, 1937 (50 Stat. 874; 43 U.S.C. § 1181a-1181j), and May 24, 1939 (53 Stat. 753), insofar as they relate to management of timber resources, and disposition of revenues from lands and resources, the latter Acts shall prevail.

43 U.S.C. § 1701 note (1976) (Effect on Existing Rights; Repeal of Existing Laws; Severability Effect on Existing Rights). BLM uses the planning procedures of FLPMA to adopt RMPs for western Oregon O&C lands. AR13252. While the O&C Act includes purposes other than a permanent source of timber supply, such as protecting watersheds and providing recreational facilities, this Court recently reiterated that the Act "is not a 'multiple use mandate for public federal forestland management.' Rather, courts have repeatedly held the O&C Act is a 'primary' or 'dominant' use statute for sustained-yield timber production." *Pac. Rivers v. BLM*, No. 6:16-CV-1598-JR, 2018 WL 6735090, at *17 (D. Or. Oct. 12, 2018) (citations omitted), *findings and recommendations adopted*, 2019 WL 1232835 (Mar. 15, 2019), *appeal docketed* No. 19-35384

---

[5] The RMP defines "Allowable Sale Quantity" as the timber volume that a forest can produce continuously under the intensity of management described in the RMP for those lands allocated for permanent timber production. AR11676.

(9th Cir. May 3, 2019); *Headwaters, Inc. v. BLM*, 914 F.2d 1174, 1183 (9th Cir. 1990) ("the primary use of the O&C Act lands is for timber production to be managed in conformity with the provision of sustained yield." (citation omitted)).

Critical to this action is the fact that *all* of the harvest area in the Pedal Power Timber Sale is in the HLB–MITA land use allocation identified in the 2016 RMP. AR3526. The following side-by-side comparison of the Project area shows where the regeneration harvest occurs relative to the land use allocation:



AR3666 (excerpt, blue image from EA Alternative 4 map, showing regeneration harvest in tan, riparian reserve in blue, and late-successional reserve in green) and AR11436 (excerpt, right image from RMP land use allocation map, showing HLB–MITA in burnt orange, riparian reserve in blue, and late-successional reserve in green); *see also* AR3443 (map, showing HLB, City of Springfield, and major roads); AR3549 (Table 1, identifying 111 acres in Modified Alternative 4); AR11430 (Table 1, showing the five land use allocations and eight sub-allocations of all BLM land governed by the Northwest and Coastal Oregon RMP).

BLM offers the sustained yield volume, in accordance with the O&C Act, only from the HLB land use allocation. AR11393. As such, the RMP management direction BLM is required to follow for the Pedal Power Timber Sale is that which applies to the HLB land use allocation, and focuses on timber production. AR11446; *see* AR11446-50. BLM manages HLB forest stands to achieve sustained yield timber production through a balance of growth and harvest, to

offer for sale the declared ASQ of timber, and to enhance the economic value of timber in forest stands. AR11446. The management direction for HLB expressly allows for regeneration harvest and commercial thinning. AR11446-47, 11450. In fact, modeling for timber production in the HLB–MITA begins with the assumption that between 8 and 17% of the area will experience regeneration harvest in each decade. AR16712. Silvicultural treatments in HLB are conducted to contribute to timber volume and the ASQ, to enhance timber values, and to reduce fire risks and insect and disease outbreaks. AR11446.

All of the Project area is also located in the Willamalane ERMA. AR3609, 3611. While ERMAs are managed to provide a diversity of recreational opportunities, AR11475, ERMAs are not land use allocations and do not allow, restrict, or exclude other management activities unless expressly stated in the RMP or within their framework documents. AR10262. In land use allocations where the management of other resources is dominant, BLM provides recreational opportunities where they can be managed consistent with the management of these other resources. AR11475.

The management direction for the HLB land use allocation is dominant to management direction for ERMAs. AR11241. BLM's Deputy State Director clarified in November 2018 that where ERMA designations overlap with the underlying HLB land use allocation, the Agency implements actions as directed by the HLB management direction, with consideration of project design features that would minimize or avoid adverse effects to recreational resources. *Id.* BLM issued the clarification to correct any mistaken interpretation that ERMAs could restrict timber harvest in the HLB. AR11242. As stated in the RMP, and reiterated in the clarification, "BLM will not defer or forgo timber harvest of stands in the HLB for reasons not described in the management direction or this appendix." *Id.* (citing AR11492). The EIS analysis and vegetation

modeling for the RMP assumed that there would be no restriction of timber harvest where ERMAs overlap with the HLB.  AR11242 (citing AR13595-96), 16715 (for ERMAs on O&C and public domain lands, "[n]o effect to timber harvest intensities would be derived from the recreation tag.  The underlying land use allocation will drive the level of timber harvest intensity in these areas."); *see* AR16694 (hierarchy tab, line 43, showing that HLB-MITA is at the bottom of the land use allocation hierarchy.

Plaintiffs' FLPMA argument turns this express direction from the RMP and binding case law interpreting the O&C Act on its head.  They claim that recreation is to be managed commensurately with other management directives, Pls.' Mem. 20 (citing AR11638), but this argument ignores the fact that BLM must first observe the underlying land use allocations in the ERMA.  AR3610.  The argument ignores RMP management objectives[6] that state "[i]n land use allocations where management of other resources is dominant, provide recreational opportunities where they can be managed consistent with the management of those other resources."  AR11475.  The argument also ignores the Deputy State Director's clarification, which holds that recreation direction is subservient to the HLB land use designation – and thus affirms the O&C Act mandate of sustained yield timber production on HLB.  AR11241-42.  Plaintiffs similarly claim that BLM "deliberately chose to establish restrictions that *constrain* the manner and extent of timber harvest activities" within the ERMA, Pls.' Mem. 20 (citing AR11376), but per the O&C Act, the RMP, and the Deputy State Director's clarification, these restrictions apply only to ERMAs on lands outside the HLB; recreational considerations do not provide the Agency with a basis to restrict sustained yield timber harvest where ERMAs overlap with HLB.  AR11241-42;

---

[6] Management objectives are "descriptions of desired outcomes for BLM-administered lands and resources in an RMP.  AR11390.

AR10262.  While BLM considers project design features to minimize or avoid adverse impacts

to recreational resources, this is not required and does not provide BLM with a basis to forgo

timber harvest on HLB.  AR11241-42.  Sustained yield timber production is the primary purpose

of HLB in O&C Act lands; nowhere does the Act suggest otherwise.  *Headwaters*, 914 F.2d at

1183, 1185.

Plaintiffs raise a number of secondary points along with their flawed argument that

recreation is on equal footing with timber production on these O&C Act HLB acres.  They claim

the authorized harvest methods are inconsistent with scenic quality and natural setting

characteristics important to some recreationists.  Pls.' Mem. 21, 23.  Neither scenery nor natural

characteristics are management direction for either the HLB land use allocation or the proposed

ERMA.  *See* AR11446, 11450, 11475.  Even if BLM had to maintain recreation setting

characteristics in ERMAs, the Willamalane ERMA is front country, AR11698, which is defined

as including a partially modified landscape with more noticeable modifications – including

timber harvest.  AR10225, 12673, 12682-83.  Site investigations found significant human

modifications in the area.  AR3622-23.  Front country can have high levels of visual change, and

management activities may dominate the view.  AR11481.[7]  Additionally, the entire Project area

is in visual resource management class IV, which allows major modifications of the existing

character of the landscape.  AR4606, 12930.  BLM anticipated the visual impacts of regeneration

harvest in the HLB and found that though the visual landscape could change, any changes would

---

[7] Plaintiffs state "some (even many) prospective visitors may not view the Willamalane ERMA as a desirable place to recreate at all, at least for many years post-logging."  Pls.' Mem. 21. While Plaintiffs' unsupported assertion may be true for some recreationists, others, including those who attended BLM's November 2017 open house, stated that the "biking community doesn't care what the landscape looks like relative to the timber harvest, they just want a place to ride close to town."  AR302.

not shift the visual resource management class rating. AR12683. Furthermore, though not required, the Project includes certain features that will enhance the visual aspects of the proposed recreation activities in the area, such as preserving green trees along portions of future trails and reshaping existing roads into trails. AR3556 (light green area showing retention), 3672. The visual impacts from regeneration harvest in the Project area are consistent with the RMP.

Plaintiffs then claim regeneration harvest is inconsistent with management direction to maintain the area's recreation setting characteristics. Pls.' Mem. 22-23. There are three flaws with this argument. First, it is contrary to RMP direction that recreation objectives are subservient to objectives for the HLB land use designation. Second, it confuses management direction for two distinct recreation classifications, Special Recreation Management Areas ("SRMAs") and ERMAs. The former are almost entirely in reserve land use allocations where existing or proposed recreation activities are recognized for their unique value, importance, or distinctiveness, and where recreation is the predominant land use focus. AR11638. The latter require specific management consideration to address recreation use or demand, but where management is commensurate with the management of other resources, and in the case of HLB, is subservient to timber production. *Id.*; AR11241-42. RMP management direction only requires BLM to maintain the recreation setting of SRMAs, not ERMAs. AR11475. Third, the Willamalane ERMA trail system is proposed and does not yet exist. AR11697. The RMP protects *existing* developed recreation opportunities, of which there are none here, since no managed trails exist yet. AR11413, 12680.

Plaintiffs' final argument is that BLM did not establish a recreation management zone ("RMZ"). Pls.' Mem. 23-24. RMZs are subdivisions of SRMAs and ERMAs that further delineate specific recreation opportunities or ensure that recreation is managed commensurate

with other resources and resource uses.  AR11638.  BLM's recreation handbook states that

"[e]stablishing RMZs and associated objectives are [land use planning] decisions."  AR15699.

The proposed Willamalane ERMA framework says that RMZs will be established "for all

designated trails."  AR11376.  The problem with Plaintiffs' argument is twofold.  First, while

there are approximate locations and mileages for the proposed trails, trail designation is a

prerequisite to delineating the RMZ for recreation management purposes.  AR10262.  Without a

land use planning decision that designates trails and objectives (such as through the travel

management plan decision), there are no RMZs.  AR15699, 10262.  Plaintiffs say such reasoning

is circular, but the plain language of the Willamalane ERMA framework refers to designated

trails, not proposed trails.  The Project record contains preliminary planning for RMZs, but this

measured how RMZ acreage would impact harvest area and the ability to meet the ASQ.  *See,*

*e.g.*, AR1459-61.  Second, Plaintiffs have not identified anything in the RMP that says RMZs

must be established before trails are designated.  To the contrary, the recreation handbook says

there is a separate decision process.  AR15699.  BLM is entitled to substantial deference in

interpreting its own RMP.  *See Alaska Ctr. for Env't v. U.S. Forest Serv.*, 189 F.3d 851, 857 (9th

Cir. 1999).  Delineating RMZs after trail designation is not arbitrary and capricious.[8]

     In sum, the RMP's direction for recreation management is not on equal footing with

direction for timber production on the HLB land use designation.  Where the two are in conflict,

timber production "shall prevail."  42 U.S.C. § 1701 (note); *see Headwaters*, 914 F.2d at 1183;

---

[8] Plaintiffs fault BLM for not establishing RMZs, but they did not plead a failure to act claim
under 5 U.S.C. § 706(1) and cannot raise one now.  *Wasco Prods., Inc. v. Southwall Techs., Inc.*,
435 F.3d 989, 992 (9th Cir. 2006) ("Simply put, summary judgment is not a procedural second
chance to flesh out inadequate pleadings.") (citation omitted).  Additionally, there is no
unreasonable delay.  BLM signed the Decision Record less than a year ago, and trails will not be
constructed until after harvest is complete.  Until the trails are laid out and constructed, BLM
cannot measure from the centerline of the trails to designate the RMZ.  AR4610.

*Pac. Rivers*, 2018 WL 6735090, at *17; AR11241.  "Changes to the existing law and regulations (i.e. to adjust the focus of industries in the region, more heavily promote certain statutory objectives, or further protect specific locations) would require 'a policy judgment of a legislative nature[,]'" which is not a matter for courts to decide.  *In re Big Thorne*, No. 1:14-cv-13-RRB, 2015 WL 13402140, at *1 (D. Alaska Mar. 31, 2015) (citing *E.E.O.C. v. Peabody W. Coal Co.*, 400 F.3d 774, 785 (9th Cir. 2005).  BLM has met its obligations under the O&C Act and complied with FLPMA by designing this Project to be consistent with the governing RMP.  The Court should grant judgment in Defendants' favor on the FLPMA claim.

**B.**     **The Project complies with NEPA.**

Plaintiffs raise two claims under NEPA.  They argue that the Project did not adequately consider potential environmental effects and did not consider a reasonable range of alternatives.  Plaintiffs' NEPA claims fail because the BLM considered the Project's environmental effects on a variety of resource concerns and because the range of alternatives respond to the Project's purpose and need.[9]

**1.**     **The EA took a hard look at the potential environmental effects of the Project.**

Plaintiffs allege BLM failed to take a hard look at two areas of potential significant impact: fire hazard and risk, and scenic quality and the recreational experience.  Pls.' Mem. 26-33.  The hard look arguments focus on Plaintiffs' interpretation of areas within the BLM's

---

[9] Though Plaintiffs' recitation of NEPA case law includes a short discussion about significance in the NEPA context, they do not argue that BLM's decision to prepare an EA rather than an EIS was arbitrary and capricious.  *Compare* Pls.' Mem. 26-33 (NEPA hard look argument) *with id.* at 24-26 (case law on significance); *see* 40 C.F.R. § 1508.27.  Plaintiffs do not state how the EA's evaluation of context or the ten intensity factors was arbitrary and capricious.  Rather, Plaintiffs' argument is that BLM did not adequately consider the Project's environmental effects on fire hazard or scenic quality.  Any argument that BLM should have prepared an EIS instead of an EA is therefore waived.  *See Friends of Yosemite Valley v. Kempthorne*, 520 F.3d 1024, 1033 (9th Cir. 2008); *Miller v. Fairchild Indus., Inc.*, 797 F.2d 727, 738 (9th Cir. 1986).

expertise and on Plaintiffs' own aesthetic preferences. The EA considered and disclosed the Project's environmental effects on these two areas and complies with NEPA.

"Judicial review of agency decision-making under NEPA is limited to the question of whether the agency took a 'hard look' at the proposed action as required by a strict reading of NEPA's procedural requirements." *Bering Strait Citizens for Responsible Res. Dev. v. U.S. Army Corps of Eng'rs*, 524 F.3d 938, 947 (9th Cir. 2008) (citing *Churchill Cty. v. Norton*, 276 F.3d 1060, 1072 (9th Cir. 2001)). In other words, BLM must "undertake a thorough environmental analysis before concluding that no significant environmental impact exists…." *Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1216 (9th Cir. 1998). Determining whether BLM took the requisite "hard look" is judged against the APA's arbitrary and capricious standard. *Id.* An EA is sufficient under NEPA if "it contains a 'reasonably thorough discussion of probable environmental consequences.'" *Methow Forest Watch v. U.S. Forest Serv.*, 383 F. Supp. 2d 1263, 1273 (D. Or. 2005) (quoting *Selkirk Conservation All. v. Forsgren*, 336 F.3d 944, 958 (9th Cir. 2003)).

A court must be "at its most deferential" when reviewing scientific judgments and technical analyses within the agency's expertise. *Balt. Gas & Elec. Co. v. Nat. Res. Def. Council Inc.*, 462 U.S. 87, 103 (1983). A court should also "conduct a 'particularly deferential review' of an 'agency's predictive judgments about areas that are within the agency's field of discretion and expertise . . . as long as they are reasonable.'" *Lands Council v. McNair*, 537 F.3d 981, 993 (9th Cir. 2008) (quoting *Earthlink, Inc. v. FCC*, 462 F.3d 1, 12 (D.C. Cir. 2006)). "When specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive." *Id.* at 1000 (quoting *Marsh*, 490 U.S. at 378).

a.     BLM considered and disclosed the Project's effects on fire hazard and risk.

Plaintiffs allege BLM did not adequately consider the effect of regeneration harvest on fire hazard and risk.[10] Pls.' Mem. 26-30; *see id.* at 12-14.  Not so.  The site-specific analysis of fire hazard risk in the Project EA tiers to the analysis of fire hazard and risk in the RMP/Final EIS ("RMP/FEIS") and provides a comprehensive picture of fire hazard and risk at the landscape and project level.  AR2404.  Together, the two analyses enabled the BLM to make an informed decision about the Project's environmental effects.

NEPA regulations "encourage[]" agencies "to tier their environmental impact statements to eliminate repetitive discussions of the same issues and to focus on the actual issues ripe for decision at each level of environmental review."  40 C.F.R. § 1502.20.  "Any environmental document in compliance with NEPA may be combined with any other agency document to reduce duplication and paperwork."  40 C.F.R. § 1506.4.  NEPA regulations provide that, whenever a broad EIS has been prepared (like one prepared for an RMP) and a subsequent statement or environmental assessment is then prepared on an action included within the entire program (such as a timber harvest), "the subsequent statement or environmental assessment need only summarize the issues discussed in the broader statement and incorporate discussions from the broader statement by reference and shall concentrate on the issues specific to the subsequent action."  40 C.F.R. § 1502.20.  Tiering is "expressly permitted and encouraged under NEPA, so long as the tiered-to document has been subject to NEPA review."  *W. Watersheds Project v. Lueders*, 122 F. Supp. 3d 1039, 1047 (D. Nev. 2015) (internal quotation omitted), *aff'd*, 701 F. App'x 651 (9th Cir. 2017) (citing *Kern v. BLM*, 284 F.3d 1062, 1073 (9th Cir. 2002)).

---

[10] Fire hazard refers to the ease of ignition, potential fire behavior, and resistance to control of the fuel complex.  AR3618.  Fire risk is the chance of fire starting as a result of natural and human-caused sources.  AR3619.

The RMP/FEIS contains a robust, landscape level analysis of fire and fuels for the 1.3 million acre Northwest and Coastal Oregon planning area. AR13469-521. Using localized data for modeling and modern GIS mapping techniques, the RMP/FEIS examined how the alternatives would affect fire hazard within close proximity to developed areas (AR13499-510) and the number of acres at risk from residual activity fuels associated with timber management (AR13510-16). All of the alternatives analyzed in the RMP/FEIS would increase the acres in low fire hazard, relative to current conditions, on all BLM-administered lands within close proximity to Wildland Development Areas. AR13510. Some of the alternatives, including the Selected Action, would increase the total combined acres in high or moderate fire hazard. *Id.* BLM's limited ability to shift overall landscape fire hazard is due to the checkerboard pattern of the landscape and the small acreage of the HLB relative to the larger Late Successional Reserve. *Id.*

BLM's analyses of fire hazard and risk in the Project area did not simply tier to the analysis in the RMP/FEIS. The Project EA also discusses fire hazard and risk in the local context of the Thurston Hills Project area, with regard to the specific watershed in which the Project is located. AR2024-26, 3618-20. The relatively small amount of harvest in the Project planning area is an important consideration for analyzing the Project's effects on fire hazard. The Project is located in the 6th field subwatershed, which encompasses 33,737 acres and is 91% private land. AR3618. BLM analyzed and disclosed in the EA a range of alternatives including 100 to 155 acres of harvest, under which the proposed harvest area would affect less than 0.5% of the total watershed acreage. AR3618. BLM explained in the EA that where, as here, BLM manages only a small portion of the total acreage, it simply administers too little acreage, in too dispersed of concentration, to effectively influence landscape-level fire hazard. AR3618-19.

Relative to current conditions, the EA explained that regeneration harvest would create an increase in fire hazard at the stand level (*i.e.*, within the stands actually harvested) for the next 40 years and within the next 50 years would be at a mature, single-layer stage with a low fire hazard. AR3618. For fire risk, the EA evaluated potential risk in the Project area associated with residual fuels resulting from timber harvest activities – the same as in the analysis for the RMP/FEIS. AR3619, 13515. The EA also analyzed site-specific effects not covered in the RMP/FEIS, such as the recreational use on trails within the Project area. AR3619-20. Based on the BLM's predictions and analysis in the EA, BLM determined the Project area has a low wildfire hazard potential, even under a high level of timber management. AR3619. None of the effects relative to fire risk are beyond those analyzed in the RMP, and the fire risk in the Project area would be either neutral or positive. *Id*. For both fire hazard and fire risk, BLM concluded that there is no potential for significant effects beyond those already disclosed in the RMP/FEIS, and that additional analysis would not be necessary to inform the decision maker. *Id*.

The fuels specialist report prepared for the Project provides even more information on the Project's environmental effects on fire hazard and risk. AR2284-301. The report provides information on the historic and current conditions in the area, vegetation condition class in the subwatershed, and fire history in the area. AR2284-86. Based on GIS information and site visits, BLM evaluated the stand-level fire hazard within close proximity to developed areas over the next 50 years on two different spatial scales, the harvest area and the watershed (where much of the impacts of fire occur). AR2288-89. The report then detailed the direct, indirect, and cumulative effects of fire hazard and risk for each of the five alternatives. AR2290-94. The EA summarized the results of this report. *See* AR3618-20. Plaintiffs claim BLM cannot rely on this report because the report itself was not circulated for public comment, Pls.' Mem. 29-30, but

they are wrong.  NEPA allows for incorporation by reference so long as the incorporated

material is "reasonably available for inspection" and its content is briefly described.  *Nw. Envtl.*

*Def. Ctr. v. NFMS*, 647 F. Supp. 2d 1221, 1247 (D. Or. 2009) (citing 40 C.F.R. § 1502.21);

*California ex. rel. Imperial Cty. Air Pollution Control Dist. v. U.S. Dep't of the Interior*, 767

F.3d 781, 792-95 (9th Cir. 2014).  Here, the EA summarized the fuel report's findings, disclosed

the fuel specialist in the list of preparers, and made the project record available for public

inspection.  AR3618-20, 3659.   The Project decision record incorporates by reference the EA,

RMP/FEIS, the FONSI, and all documents in the Project file.  AR4572; *see also* AR4616 (May

30, 2018 Decision Record stating that more detailed information is available in the Fuels

Specialist Report).  Plaintiffs do not allege the fuel report was unavailable for their review.  Had

they asked, BLM would have provided a copy to them.

      Either through oversight or omission, Plaintiffs never acknowledge that the Project

considered the impacts of fire hazard and risk at the stand level and the 33,737-acre watershed

level.  Plaintiffs refer only to the 1.3 million acre landscape level analysis, and never to either the

EA's consideration of fire hazard and risk at the local level or the Project area's much smaller

scale of watershed, where the proposed harvest area would affect less than 0.5% of the total

acreage.  AR3618.  BLM disclosed the effects of regeneration harvest on fire hazard and risk in

the watershed – where the hazard and risk would occur, how many acres would be affected, and

how long the effects would last.  AR3618-20.  This local, site-specific analysis of fire hazard and

risk, coupled with the rigorous landscape level analysis in the RMP/FEIS, is expressly permitted

and encouraged under NEPA.  *W. Watersheds Project*, 122 F. Supp. 3d at 1047.  Plaintiffs cite a

few cases where courts found tiering to be inappropriate because either the analysis for the land

and resource management plan, the site-specific analysis, or both lacked detailed information,

which prevented an informed decision on a project's environmental effects.  *See* Pls.' Mem. 27-29 (citing cases).  That is not the situation here, where both the RMP/FEIS and Project EA use sophisticated GIS modeling and modern computing abilities to provide a comprehensive and thorough analysis of fire hazard and risk.  AR14375.

In short, the information on fire hazard and risk in both the landscape-level RMP/FEIS and site-specific Project EA contain a reasonably thorough discussion of probable environmental consequences.  NEPA requires no more.  *Selkirk Conservation All.*, 336 F.3d at 958.

        b.      <u>BLM considered and disclosed the effects of regeneration harvest on scenic quality and recreation.</u>

Plaintiffs also allege BLM did not adequately consider the effect of regeneration harvest on scenic quality and the recreational experience.  Pls.' Mem. 30-33; *see id.* at 15-18.  The record shows otherwise.

BLM examined the direct, indirect, and cumulative effects of regeneration harvest the Project's ability to provide different recreational experiences, and disclosed those effects in the EA.  AR3645-46 (Alternatives 3 and 4).  Alternative 4 modified, the Selected Action, will construct 8.5 miles of trail where none existed before.  AR3646 (implementing trail experiences from Alternative 2 in this section); AR3650 (Table 8).  The Selected Action provides a broad range of trail experiences on 56 acres on the east side of Section 1 where harvest would be deferred and in the 165 acres of riparian reserves where no harvest occurs.  AR3548, 3615.  In this area of deferred or no harvest, the quality of the trail would be high, predominantly under a forest canopy, and would offer a broad range of high quality mountain biking and hiking experiences.  AR3644-45.  In the remainder of the Project area where there is harvest (100 acres), there would be open trail exposure and a loss of tree canopy.  AR3645; AR3646 (stating that trail experiences are similar to those in Alternative 3 for areas with regeneration harvest).

Tread quality would not be high due to the loss of the dense organic layer and greater exposure to seasonal impacts. AR3645. To compensate for reduced tread quality and recreation experience, the Project calls for additional soil manipulation and the creation of man-made features, such as rollers, jumps, and rock gardens. AR3645. After Project completion, the trail design in Alternative 4 would include as experiences as good as those in Alternative 2, the trails only alternative. AR3638 (comparison table). To address canopy loss in the regeneration harvest area, the Project calls for aggregate green tree retention along some trail corridors to preserve some of the characteristics that provide high quality tread and to enhance recreational experiences. AR3646; AR2588.

The EA and other documents in the record provide additional information on the effects of regeneration harvest on scenic quality and recreation. For example, the EA describes how the variable retention harvesting directed by RMP would produce heterogeneous, multi-layered stands with structural legacies and would increase habitat for species associated with snags and down woody material. AR3625; *see* AR13566-75 (RMP). A narrative report on the alternatives and trail system contains detailed information that was summarized in the EA. *See* AR2342-54. The report notes that trails in the eastern portion of Section 1 (where harvest is deferred) "are arguably the most valuable for trail users…in a landscape that is particularly conducive to the proposed trails…." AR2351. The report notes that Alternative 4 strikes a balance between Alternatives 2 and 3 and that the negative effects of harvesting can be moderated by providing tree retention areas in corridors along the trails. AR2348-49.

Plaintiffs fault the BLM's analysis of regeneration harvest on scenic quality and recreation because, according to Plaintiffs, it provides too much detail on physical impacts to trails and not enough to their liking on "naturalness." Plaintiffs' belief in a pre-existing, natural

area designated for recreation that will be irreparably damaged by a multiple-use project is not

supported by the facts. The Project area is immediately east of Springfield and has a two-lane

road (79th Street) passing through and State Highway 126 less than a mile to the north. AR3443.

Homes are adjacent to the Project area, and some homeowners complained of existing

undesirable uses common to populated areas, such as illegal dumping, carcass disposal, late night

party debris, recreational shooting, destruction of property, and off-highway vehicle trespass.[11]

AR3622. The Project area is not a late successional forest with a diversity of age class and

canopy structures; 70-year old stands dominate the area, lack an understory, and are structurally

homogenous. AR2586.

Plaintiffs similarly mischaracterize how the Project will look after regeneration harvest.

They paint a picture of a barren landscape that will grow into an even-aged "private industrial

tree farm," Pls.' Mem. 16, but the RMP – which expressly allows for regeneration harvest –

refutes this characterization. The RMP requires two-aged management systems with variable

retention regeneration harvest. AR13533. What this means is that not all stands are cut at once,

and not all of the trees are removed when there is harvest. *Id.* The result produces stands in a

mix of age classes with legacy structures, like certain trees or snags, and multiple canopy layers.

*Id.*; *see* AR12343-44. Additionally, there is no harvest in the riparian or late successional

reserves in the Project area, and the Project design calls for tree retention along some of the trail

corridors.[12] The Project incorporates a number of project design features and best management

---

[11] During and after trail construction, BLM plans to implement a number of management
measures to enhance security and to address these undesirable problems. AR3623. The
measures include gate or barrier installation, improved boundary demarcations and signage,
more frequent BLM law enforcement patrols, continued outreach to partners and trail groups,
and advising adjacent landowners on landscaping for vegetative screening. *Id.*

[12] Plaintiffs claim about the increased cost of trail construction when there is regeneration
harvest, Pls.' Mem. 9, but the difference in cost between the trails-only alternative and the

practices for timber harvest and trail design.  AR3669-72 (EA, Appx. B).  Finally, the rapid

growth of the understory after regeneration harvest will not be "slash and brush" as Plaintiffs

claim but will largely be diverse native plants associated with early successional conditions.  *See*

AR12949-50, 13373 (RMP discussion on early successional habitat).

Plaintiffs' criticisms boil down to their disagreement with the Selected Action and their

desire for the trails-only alternative with no regeneration harvest.  But disagreement with an

agency's reasoned conclusion does not establish a NEPA violation.  *Robertson*, 490 U.S. at 351

("NEPA itself does not mandate particular results, but simply prescribes the necessary

process."); *Metro. Edison Co. v. People Against Nuclear Energy*, 460 U.S. 766, 777 (1983)

("The political process, and not NEPA, provides the appropriate forum in which to air policy

disagreements.").  The record shows that the EA contains a reasonably thorough discussion of

the probable environmental consequences of regeneration harvest on scenic quality and

recreation.  *Methow Forest Watch*, 383 F. Supp. 2d at 1273.  BLM arrived at a well-supported

decision to authorize an alternative that balances competing interest and includes regeneration

harvest.  Plaintiffs have not me their burden to show that the EA did not adequately consider the

Project's environmental effects on fire hazard and risk or scenic quality and the recreational

experience.  The Court should grant judgment in favor of Federal Defendant on the NEPA hard

look claim.

---

Selected Action is just under $18,000.  AR3652 (Table 9).  Additionally, while there is no
revenue from the trails-only alternative (since there is no timber harvest), revenue from the
Selected Action is $1,360,540.  *Id.*, AR3553.

**2.     The range of alternatives satisfies the Project's purpose and need for timber harvest.**

Plaintiffs' final NEPA claim alleges BLM failed to analyze a reasonable range of alternatives.  Pls.' Mem. 33-38.  Plaintiffs are wrong.  The alternatives analyzed in the EA satisfy the Project's purpose and need to adjust the age class distribution of the timber stand and to produce commercial timber from the HLB in order to meet the RMP's declared ASQ.

NEPA requires federal agencies to "study, develop, and describe appropriate alternatives to recommended courses of action."  *Ctr. for Biological Diversity v. Salazar*, 695 F.3d 893, 915 (9th Cir. 2012) (quoting 42 U.S.C. § 4332(2)(E)).  The alternatives provision of NEPA applies whether an agency is preparing an EIS or an EA, and NEPA's implementing regulations require an EA to include "brief discussions of the need for the proposal, of alternatives as required by [42 U.S.C. § 4332(2)(E)], of the environmental impacts of the proposed action and alternatives, and a listing of agencies and persons consulted."  40 C.F.R. § 1508.9(b).  "[A]n agency's obligation to consider alternatives under an EA is a lesser one than under an EIS."  *Native Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1246 (9th Cir. 2005).  Whether an alternative is reasonable, and should have been considered by an agency in its EA or EIS, depends on the nature and scope of the proposed action.  *Idaho Conservation League v. Mumma*, 956 F.2d 1508, 1520 (9th Cir. 1992).  Alternatives that do not advance the purpose of a project will not be considered reasonable or appropriate.  *Native Ecosystems*, 428 F.3d at 1247; *see Westlands Water Dist. v. U.S. Dep't of Interior*, 376 F.3d 853, 868 (9th Cir. 2004) ("The range of alternatives that must be considered in the EIS need not extend beyond those reasonably related to the purposes of the project.") (citation and internal quotation marks omitted).  An agency need not consider alternatives which are "infeasible, ineffective, or inconsistent with the basic policy objectives for the management of the area."  *Headwaters*, 914 F.2d at 1180 (citations omitted).

Timber harvest is one of the two purposes and needs for the Project, the other being to develop a new non-motorized trail system.[13]  AR3612.  The EA provides two purposes and needs for the timber harvest purpose and need: (1) to conduct regeneration to adjust the age class distribution in the sustained yield unit and (2) to implement commercial harvest to produce timber and contribute to the attainment of the ASQ.  AR3613-14.  Agencies are afforded "considerable discretion to define the purpose and need of a project."  *Friends of Se.'s Future v. Morrison*, 153 F.3d 1059, 1066 (9th Cir. 1998).  The timber harvest purpose and need conforms to existing decisions, policies, regulations, and law, and is related to achieving goals and objectives of the RMP.  AR16017.

For the first purpose and need, the RMP directs BLM to adjust age class distribution in each SYU to provide a variety of forest structure stages across the HLB.  AR3613-14; AR11446. A balanced age class distribution provides a more constant supply of forest conditions for wildlife habitat, recreation, and consistent timber supply.  AR2586.  A balanced age class distribution also improves forest vigor since the variety of age classes and stands are less prone to insect, disease, and other disturbances.  *Id.*  Per the RMP's management direction, adjusting the age class distribution can only be accomplished with regeneration harvest.  AR11446.  By contrast, the management direction for commercial thinning tells BLM to use thinning to accomplish specific things, none of which include age-class distribution.  AR 11447.  The EA shows an unbalanced age class distribution in the SYU, with overrepresentation of the 70-year age class and underrepresentation of the 0-10 and 11-20 year age classes:

---

[13] Plaintiffs do not complain about alternatives for developing the new non-motorized trail system.  The two actions are independent and have independent purposes and needs.  AR3612.



AR3613 (age class distribution of forest stands on lands administered by the Upper Willamette Field Office). Within the 65,800 acre Eugene SYU, only 490 acres (0.7 percent) are in the 0-10 year age class. AR3614. Within the Project area, there are no acres in this age class. *Id.*

For the second timber harvest purpose and need, the RMP directs BLM to conduct silvicultural treatments, including regeneration harvest, to contribute timber volume to the declared ASQ. AR11446. The Eugene SYU has an annual declared ASQ of 53 million board feet.[14] AR3614, 11393. The ASQ volume represents the sustained-yield volume of timber from each SYU and is offered only from the 65,800 acres of HLB in the Eugene SYU. AR3614, 11393. To achieve the Eugene SYU's annual declared ASQ, and to ensure that the actual volume is within 20% over the entire decade as required by the RMP, BLM must offer a substantial amount of commercial timber harvest. AR3614.

---

[14] The RMP allows the ASQ to include some variation to acknowledge practical difficulties in predicting annual implementation levels, to reflect year-to-year variation in BLM's capacity to offer timber volume, and to facilitate sharing of staff and resources among districts. AR11393. The 53 MMbf in the Eugene SYU can vary by as much as 40% annually and as much as 20% each decade. *Id.*

In response to the purpose and need, BLM developed five alternatives (four action alternatives and a no action alternative) to examine the range of environmental effects of the Project. AR3628-38. The action alternatives consisted of trail development only (Alternative 2, AR3629-32), trail development and 155-acre regeneration harvest (Alternative 3, AR3632-35), trail development and 105-acre regeneration harvest (Alternative 4, AR3636-37), and a 155-acre regeneration harvest only (Alternative 5, AR3637). The range of alternatives in the EA adequately examined the range of viable alternatives that meet the Project's purpose and need. *Native Ecosystems*, 428 F.3d at 1247; *Westlands Water Dist.*, 376 F.3d at 868.

BLM ultimately selected Alternative 4, with a slight modification. AR3548, 4572; *see* AR3549 (Table 1, showing differences between Alternative 4 and Alternative 4-modified). The Selected Action will redistribute 100 acres from the 70-year age class to the 0-10 age class in the SYU. *Id.* Even after this Project is fully implemented, the 70-year age class will still be significantly overrepresented in the Eugene SYU. The Selected Action contributes approximately 4.0 MMbf to the ASQ production in the Eugene SYU, which met the SYU target for the 2018 fiscal year. AR3527.

The EA also considered five alternatives but eliminated them from detailed study. AR3638-41. Among the alternatives considered but eliminated is Plaintiffs' preferred thinning-only alternative. BLM explained that merely thinning the stands would not adjust the age class distribution in the sustained yield unit. AR3670. Management direction for the HLB requires the use of regeneration harvest to adjust the age class distribution. AR11446-47. Commercial thinning does not adjust a stand's age class, and even if thinning could be designed to do so, the RMP management direction does not authorized BLM to use thinning to adjust age class. AR11446-47. Because thinning would not allow BLM to shift acres from the over-represented

70-year age class to the under-represented 0-10 year age class, this alternative does not meet the Project's purpose and need. AR3640; *see* AR3614, 2589. The silviculture report provides an additional reason for why thinning-only is not a viable alternative: the stand was previously thinned in 2002 by the Cedar Flats timber sale. AR2589-90. The thinning-only alternative would produce only 4-6% of the needed ASQ from the Upper Willamette Field Office for fiscal year 2019. AR2589. In contrast, regeneration harvest provides 12-18% of the needed ASQ, or three times as much. AR2583. Because the conifer stock volume is low, a commercial thinning timber sale would not support a commercially viable timber sale, and thus would not advance the purpose of the Project. AR2590; *see* AR2583 (showing net revenue between $213,011 and $298,530 for thinning and between $1,361,238 and $2,077,295 for regeneration harvest).

Plaintiffs claim BLM's analysis of alternatives is arbitrary and capricious because it only considered creating stands in the 0-10 year age class and did not consider maintaining the Project stands on a trajectory to provide late successional stands more than 130 years old. Pls.' Mem. 35-36. This argument fails for several reasons. First, the argument ignores that management direction for the HLB requires BLM to adjust the age class distribution in each SYU in order to provide a perpetual supply of timber harvest opportunities on O&C lands, which the Project identifies as a purpose and need for timber harvest. AR11446. Plaintiffs cite an RMP objective for HLB–MITA to develop diverse late-successional ecosystems for a portion of the rotation, Pls.' Mem. 35 (citing AR11450), but RMP management objectives are descriptions of desired outcomes; they are not rules, restrictions, or requirements by which BLM determines implementation actions. AR11490. In contrast, RMP management direction identifies where future actions may occur and what restrictions or requirements may be placed on those future actions. *Id.* The management direction for HLB allows BLM to conduct both regeneration

harvest and commercial thinning to contribute to the ASQ and for other reasons, but only regeneration harvest to adjust the age class distribution. AR11491. Plaintiffs never acknowledge that thinning cannot adjust age class distribution; only regeneration harvest can.[15] AR11446. Even if Plaintiffs were correct and there were an equal "need" to redistribute age class upwards, BLM is not required to address every need on every acre at every moment in time. *City of Angoon v. Hodel*, 803 F.2d 1016, 1021 (9th Cir. 1986) ("When the purpose is to accomplish one thing, it makes no sense to consider the alternative ways by which another thing might be achieved.").

Second, Plaintiffs' argument for creating older stands is inconsistent with management direction to achieve sustained yield harvest levels and to contribute to attaining the ASQ. As the figure above (AR3613) shows, there are very few stands in the 0-10 year and 11-20 age year classes in the Eugene SYU, and none in the Project area. AR3614. If BLM does not redistribute older stands into the 0-10 year age class to create a well-distributed mix of age classes across the HLB, the cycle of growth and harvest expected for sustained yield required by the O&C Act and provided for in the RMP will not be possible. AR3614. Regeneration harvest – not thinning – allows BLM to adjust the age distribution in the SYU from the over-represented 70-year age class to the under-represented 0-10 year age class and to create younger stands.

As for the volume and value of the timber under the two harvest methods, regeneration harvest in the Project area contributes approximately 4.0 MMbf to the 53 MMbf ASQ production

---

[15] To the extent that Plaintiffs believe that thinning could adjust the age class distribution, they cite nothing in the record to support this claim, much less anything to contradict the reasoned decisions of BLM's forest management experts that regeneration harvest is the only silvicultural method to adjust age class distribution. *Marsh*, 490 U.S. at 377; *Balt. Gas & Elec. Co.*, 462 U.S. at 103 ("When examining this kind of scientific determination ... a reviewing court must generally be at its most deferential").

in the Eugene SYU, whereas thinning contributes only 1.5 MMbf, or just over one-third the contribution. AR3549 (Alternative 4-modified), 2583, 2592 (Alternative 4). That the annual ASQ can vary by as much as 40% does not mean that BLM can shirk its ASQ target; the ASQs allow for variation to acknowledge practical difficulties and to reflect annual variation in capacity to offer volume. AR11393.[16] Additionally, and critically, the thinning alternative would not support a commercially viable timber sale. AR2590. Plaintiffs cite nothing to show that thinning is commercially viable for the stands in the Project area, but even if they did, economic forecasts are well within the Agency's expertise. *See Native Ecosystems Council v. Tidwell*, No. CV 08-121-M-DWM, 2009 WL 10695236, at *4 (D. Mont. June 1, 2009) ("The Forest Service's expertise includes conducting feasibility and economic analyses on timber projects."), *aff'd*, 371 Fed. App'x 718 (9th Cir. 2010); *see In re Big Thorne Project & 2008 Tongass Forest Plan*, 93 F. Supp. 3d 1134, 1141 (D. Alaska 2015) (The Forest Service "has recognized expertise and discretion in predicting timber demand." (citation omitted)), *aff'd*, 691 F. App'x 417 (9th Cir. 2017).

Third, Plaintiffs' argument ignores the small scale of the Project and the relatively small portion of BLM land available for sustained yield timber production. The Project authorizes regeneration harvest on just 100 acres of 70-year age class stands. AR3549. Removing this small acreage of this age class does not preclude BLM from creating conditions that allow other stands to advance in age. Indeed, only time can create older trees. Additionally, the table of land use allocations shows that 247,045 out of 1,265,669 acres (20%) of BLM land in northwestern

---

[16] Plaintiffs incorrectly state the RMP assumes 80-year age class for regeneration harvest. Pls.' Mem. 37 n.13 (citing AR12369). That citation refers to the minimum harvest age where BLM did not model for regeneration harvest in the RMP's no action alternative. AR12369. The minimum harvest age is 50 years for the Selected Action. AR12373.

and coastal Oregon are HLB.  AR11430 (Table 1).  The remaining acreage (80%) is in reserves,

*id.*, which means the acres are reserved from sustained yield timber production – in other words,

not available for sustained yield volume.  AR11393, 13285.  While some of the land use

allocation reserves allow for active management, silvicultural treatments are limited (*i.e.*,

thinning in reserves to speed development of northern spotted owl habitat or treatments to reduce

insect and disease infestation or wildfire risk) and are not managed for timber production to

contribute to the ASQ.  *See* AR11442-43 (congressionally reserved lands and national

conservation lands), 11443-46 (district-designated reserves), 11451-54 (late successional

reserve), 11455-61 (riparian reserve).

  Plaintiffs also argue that the alternative selection is arbitrary and capricious because the

purpose and need evolved in early, internal staff discussions.  Pls.' Mem. 36.  Specifically, they

claim the final purpose and need should have included a third purpose and need for fuels

reduction because that component was contemplated in an early planning document.  Pls.' Mem.

7 (citing AR1516).[17]  As the Project developed internally, the fuels specialist determined not to

propose a specific project for fuels, in part because ground conditions show less risk due to north

facing "wet bowls," which retain moisture longer than south facing areas.  AR1473, 1490.[18]

Based on this determination, the alternatives discussion shifted to ways to implement the

purposes and needs for the trail and timber harvest components.  AR1473.  An agency may alter

the purpose and need section of a final document to more clearly articulate the purpose and need

---

[17] That same document says the project area contains harvestable lands in the HLB and that forest management actions may include regeneration harvest.  AR1515-16.  Thus, the O&C Act and RMP requirements to manage the HLB to contribute to the ASQ, redistribute age class, and a maximum of 15% retention was always a possibility.  BLM did not insert this pre-existing statutory and RMP direction at a later date to "rule out a thinning alternative" as Plaintiffs claim.

[18] Even though fuels reduction is not a stated purpose and need, the Project includes treatment of post-harvest activity fuels.  AR3635.

of the project.  *See City of Carmel-by-the-Sea v. U.S. Dep't of Transp.*, 123 F.3d 1142, 1156 (9th

Cir. 1997).  As information becomes available in project planning, agencies have the discretion

to adapt the purpose and need.  *Id.*  BLM did so here, and the development of the purpose and

need is entitled to considerable discretion.  *Friends of Se.'s Future*, 153 F.3d at 1066.

Plaintiff analogizes their alternatives claim to *League of Wilderness Defenders v.

Marquis-Brong*, 259 F. Supp. 2d 1115 (D. Or. 2003).  In that case, BLM considered only

alternatives that included salvage logging and did not consider one that focused only on

rehabilitation of the burned area.  The court found the range of alternatives to be arbitrary and

capricious because the relevant RMP "does not preclude rehabilitation-only alternatives."  *Id.* at

1124.  Here, BLM issued a new RMP in 2016 that replaced the RMP discussed in *Brong*.

AR11389.  The 2016 RMP that governs this Project is far more explicit in directing that

regeneration harvest is to occur in the HLB, and for specified reasons, including redistributing

the age class.  AR11446.  While commercial thinning is a management option for HLB, it cannot

be used to redistribute the age class, which is one of the purposes and needs of this Project.  *Id.*

*Brong* therefore is inapposite.

Earlier this month Chief Judge Mosman rejected a similar range of alternatives argument

brought by the same Plaintiffs (and two others) in a challenge to Crystal Clear Restoration

Project on the Mount Hood National Forest.  *BARK v. U.S. Forest Serv.*, No. 3:18-cv-1645-MO,

2019 WL 2518123 (D. Or. June 18, 2019).  There, as here, the agency articulated a rational

connection between the purposes of the project and the reasons for rejecting Plaintiffs' preferred

alternatives.  *Id.* at *10-11.  While Plaintiffs may prefer a thinning-only alternative, they do not

identify anything to show the Project's purpose and need is inconsistent with the statutory

mandates in the O&C Act or direction in the RMP.   BLM provided a reasoned explanation for

why a thinning alternative would not satisfy the Project's purpose and need for timber harvest. *Native Ecosystems*, 428 F.3d at 1247-48; *Headwaters*, 914 F.2d at 1180; *BARK*, 2019 WL 2518123, at *11. The Court should grant judgment in favor of Federal Defendant on the NEPA alternatives claim.

## V. CONCLUSION

The Project provides for sustained-yield timber production from Harvest Land Base lands managed for this very purpose and satisfies BLM's statutory obligations under the O&C Act. The Project complies with the governing Resource Management Plan and thus complies with FLPMA. The thorough analyses of environmental effects in the RMP/FEIS and in the Project EA satisfy BLM's obligations under NEPA. The Court should grant Federal Defendants' motion for summary judgment on all claims and deny Plaintiffs' motion for summary judgment in its entirety.

Respectfully submitted on this 24th day of June, 2019.

BILLY J. WILLIAMS
United States Attorney
District of Oregon

LAWRENCE VANDYKE
Deputy Assistant Attorney General
Environment and Natural Resources Division

*/s/  John P. Tustin*
JOHN P. TUSTIN
Senior Attorney
Natural Resources Section
P.O. Box 7611
Washington, D.C. 20044-7611
Phone:  (202) 305-3022 / Fax:  (202) 305-0506
john.tustin@usdoj.gov

*Attorneys for Federal Defendant*