IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

**CASCADIA WILDLANDS**, an Oregon
nonprofit corporation; and **OREGON
WILD**, an Oregon nonprofit corporation,

        Plaintiffs,

        v.

**BUREAU OF LAND MANAGEMENT**, a
federal agency,

        Defendant,

    and

**SENECA SAWMILL COMPANY**, an
Oregon corporation,

        Defendant-Intervenor.

_____

Civ. No. 6:19-cv-00247-MC

**OPINION AND ORDER**

**MCSHANE, Judge**:

        Plaintiffs Cascadia Wildlands and Oregon Wild bring this action for declaratory and

injunctive relief under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701 *et seq.*,

alleging that Defendant—the United States Bureau of Land Management ("BLM")—violated (1)

the Federal Land Policy and Management Act ("FLPMA"), 43 U.S.C. §§ 302 *et seq.*, by

authorizing regeneration harvesting[1] in the Willamalane Non-Motorized Trails Extensive Recreation Management Area; and (2) the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321 *et seq.*, and controlling regulations by stating an unreasonably narrow purpose and need, failing to consider reasonable and feasible alternatives, and failing to take the requisite hard look at the proposed action's potential environment impacts. Pls.' Am. Compl. ¶¶ 1–2, ECF No. 2.

Specifically, Plaintiffs allege that the timber harvest will increase fire hazard levels to adjacent communities, degrade the area's scenic quality, and reduce recreational opportunities. Pls.' Mem. 3, 12–18, ECF No. 16. Plaintiffs ask the Court to vacate and set aside the Decision Record and remand the matter back to BLM. Pls.' Compl. 18; Pls.' Mot. 2, ECF No. 16. Plaintiffs, BLM, and Defendant-Intervenor Seneca Sawmill Company ("Seneca") filed a Motion and Cross-Motions for Summary Judgment on the claims in this case. ECF Nos. 16, 22, and 26.

Because BLM arbitrarily and capriciously failed to designate a Recreation Management Zone and did not fully analyze and publicly disclose the degree of fire hazard, Plaintiff's Motion for Summary Judgment (ECF No. 16) IS GRANTED in part and Defendant and Defendant-Intervenor's Cross-Motions for Summary Judgment (ECF Nos. 22 and 26) are DENIED in part. Because BLM authorized the Pedal Power timber sale consistent with the applicable management directives, adequately evaluated its effects on targeted visitor activities, quality recreation, and anticipated benefits, took a hard look at its potential impact on recreational experiences, and adequately analyzed reasonable alternatives, Defendant and Defendant-Intervenor's Cross-Motions for Summary Judgment (ECF Nos. 22 and 26) are GRANTED in part and Plaintiff's Motion for Summary Judgment (ECF No. 16) is DENIED in part.

---

[1] Plaintiffs assert that regeneration logging is essentially plantation forestry "akin to clear-cutting" (as opposed to thinning) and "results in dense, young, homogenous tree plantations that represent very hazardous fuel conditions, especially when compared to mature forests." Pls.' Mem. 1, 21.

**<u>BACKGROUND</u>**

BLM conducted spatial analysis to identify and designate various recreation areas near Oregon's population centers under its 2016 Northwestern and Coastal Oregon Record of Decision and Resource Management Plan ("2016 RMP"). Pls.' Mem. 3–4. The 2016 RMP governs approximately 1.3 million acres of land in the Coos Bay, Eugene, Salem, and Roseburg Districts. Pls.' Mem. 4. BLM designated various Recreation Management Areas and Extensive Recreation Management Areas to protect and enhance recreation and scenery. *Id.* The 2016 RMP directs BLM to manage these areas in accordance with "specific planning frameworks," including recreation values, types of visitors, objectives, actions, and allowable use restrictions. *Id.* It also established five land allocations, which overlap with Resource Management Areas. *Id.*

The Willamalane Parks and Recreation District acquired the Thurston Hills Natural Area for preservation and development of a hiking and biking trail. Pls.' Mem. 5. They formally collaborated with BLM, which manages land immediately adjacent to the area, to collaborate on a connected trail system. *Id.*; Def.'s Mem. 6, ECF No. 22. BLM officially designated this 1,058-acre area, located in the Upper Willamette Resource Area of BLM's Northwest Oregon District within Springfield city limits, as the Willamalane Non-Motorized Trails Extensive Recreation Management Area ("Willamalane ERMA"). Pls.' Mem. 1, 5; Def.'s Mem. 1.

The Willamalane ERMA was intended for recreational development consistent with the Willamalane Parks and Recreation District's goals to preserve views, enhance wildlife habitat and sensitive areas, and provide recreation opportunities. Pls.' Mem. 6. Plaintiffs acknowledge that the Willamalane ERMA was also designed to allow for resource management and uses but argue that its designation requires specific management consideration regarding "recreational use, demand, visitor experiences and related program investments." Pls.' Mem. 6. Fifty-five

percent of the Willamalane ERMA overlaps with Harvest Land Base lands, which BLM manages for sustained-yield timber production under the 2016 RMP and the Oregon & California Revested Lands Act of 1937 ("O&C Act"), 42 U.S.C. § 2601.[2] Pls.' Mem. 6; Def.'s Mem. 1–2. According to Seneca, because the Harvest Land Base land use allocation "implements a statutory mandate for 'permanent forest production' as a dominant use," the Harvest Land Base management direction always controls. Def.-Intervenor's Mot. 4, ECF No. 23 (citing AR 11241 (explaining that Extensive Recreation Management Area direction applies to the extent that it is consistent with the underlying land use allocation's management direction)).

In early 2017, BLM began planning a proposal to develop a non-motorized trails network and timber sale in the Willamalane ERMA—the Thurston Hills Non-Motorized Trails and Forest Management Project. Pls.' Mem. 7; Def.'s Mem. 2. BLM issued a public scoping notice for the Project in March 2017. Pls.' Mem. 8. Plaintiffs submitted comments citing their concerns and recommendations. Pls.' Mem. 8–9. In November 2017, BLM held an open house regarding the proposal and solicited further public feedback. Pls.' Mem. 9; Def.'s Mem. 3. In April 2018, BLM issued a Draft Environmental Assessment. Pls.' Mem. 9–10. In May 2018, BLM issued a revised Final Environmental Assessment, Finding of No Significant Impact, and Decision Record. Pls.' Mem. 11–12; Def.'s Mem. 3. BLM adopted Alternative 3, providing for 155 acres of regeneration timber harvest and 8.3 miles of recreational trails. Def.-Intervenor's Mot. 6.

After the public, the Willamalane Parks and Recreation District, the City of Springfield, and Congressman Peter DeFazio raised concerns regarding regeneration logging, BLM withdrew its initial Finding of No Significant Impact and Decision Record and issued modified versions in August 2018. Pls.' Mem. 11–12; *see* Def.'s Mem. 4. BLM ultimately adopted a modified

---

[2] Lands under the O&C Act ("O&C lands") are public lands that were granted to the Oregon & California Railroad Company and later revested to the United States. Def.'s Mem. 9 (citing AR 11685).

Alternative 4, providing for 100 acres of timber harvest and 8.5 miles of recreational trails and increasing green tree retention from 10 to 15%. Def.-Intervenor's Mot. 7. Plaintiffs jointly filed a protest letter and appeal with the Interior Board of Land Appeals, which BLM denied on October 5, 2018. Pls.' Mem. 12. On February 1, 2019, BLM awarded the Pedal Power timber sale to Seneca. Pls.' Mem. 12; Def.'s Mem. 6. Seneca intended to begin preparatory road work in June and July 2019 and logging in mid-August 2019. Pls.' Mem. 12, ECF No. 16; Def.'s Mem. 6. The process is expected to last for two years, after which trail development (which is expected to take five years to fund and construct) may begin. Def.-Intervenor's Mot. 7.

## STANDARD OF REVIEW

Judicial review of agency action is governed by the Administrative Procedure Act (APA). 5 U.S.C. § 706. The reviewing court

> must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment. Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency.

*Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416 (1971) (citations omitted), *abrogated on other grounds by Califano v. Sanders,* 430 U.S. 99, 97 (1977). Agency decisions are "entitled to a presumption of regularity." *Id.* at 415. While such review is deferential to the agency action taken, the court must not "rubber-stamp" the agency action as correct. *Lands Council v. Martin,* 529 F.3d 1219, 1225 (9th Cir. 2008); *N. Spotted Owl (Strix Occidentalis Caurina) v. Hodel,* 716 F. Supp. 479, 482 (W.D. Wash. 1988).

A court may set aside an agency's action if the action is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A) and (D). "[I]f an agency 'fails to consider an important

aspect of a problem . . . [or] offers an explanation for the decision that is contrary to the evidence,' its action is arbitrary and capricious." *Or. Natural Res. Council Fund v. Goodman,* 505 F.3d 884, 888–89 (9th Cir. 2007) (quoting *Lands Council v. Powell,* 395 F.3d 1019, 1026 (9th Cir. 2005)). "An agency action is also arbitrary and capricious if the agency fails to 'articulate a satisfactory explanation for its action including a "rational connection between the facts found and the choice made."'" *Friends of Wild Swan, Inc. v. U.S. Fish & Wildlife Serv.,* 12 F.Supp.2d 1121, 1131 (D. Or. 1997) (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43 (1983)).

Because this Court's review under the APA is generally limited to the administrative record, *see infra,* no facts are in dispute. However, the parties have filed a Motion and Cross-Motions for Summary Judgment, which may be used as vehicles for the Court to conduct its review of the record. Therefore, the Court's role is "to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did." *Occidental Eng'g Co. v. INS,* 753 F.2d 766, 769 (9th Cir. 1985).

## DISCUSSION

## I. FLPMA

The Federal Land Policy and Management Act ("FLPMA"), 43 U.S.C. §§ 1701 *et seq.*, requires BLM to prepare Resource Management Plans for its districts. 43 U.S.C. § 1712. BLM must ensure that site-specific actions conform to the governing Resource Management Plan. 43 U.S.C. § 1732(a); 43 C.F.R. § 1601.0-5(b) (defining "conformance" as "specifically provided for in the plan" or "clearly consistent with the terms, conditions, and decisions of the approved plan or plan amendment."); 43 C.F.R. § 1610.5-3(a); *Ore. Natural Resources Council v. Brong*, 492

F.3d 1120, 1125 (9th Cir. 2007). The Resource Management Plan governing the Project at issue

is the 2016 RMP. Pls.' Mem. 9; AR 4572, 11380.[3]

FLPMA generally requires BLM to manage lands "on the basis of multiple use and sustained

yield unless otherwise specified by law" and to protect a wide range of natural resource values. *See,*

*e.g.*, 43 U.S.C. § 1701(a)(7); *see generally id.* §§ 1701–1782. FLPMA provides an exception for

O&C lands:

> Notwithstanding any provision of this Act, in the event of conflict with or inconsistency
> between this Act and the Acts of August 28, 1937 (50 Stat. 874; 43 U.S.C. § 1181a-
> 1181j), and May 24, 1939 (53 Stat. 753), insofar as they relate to management of timber
> resources, and disposition of revenues from lands and resources, the latter Acts shall
> prevail.

Def.'s Mem. 9 (citing 43 U.S.C. § 1701 note (b) (1976) (Effect on Existing Rights;

Repeal of Existing Laws; Severability Effect on Existing Rights)).

The O&C Act provides that certain revested timberlands in western Oregon shall be

managed for permanent forest production in accordance with the "sustained yield" principle to

provide a "permanent source of timber supply" and recreational facilities, protect watersheds,

regulate stream flow, and contribute to local communities' and industries' economic stability. 43

U.S.C. § 2601. It also requires BLM to set an "annual productive capacity" from O&C lands. *Id.*

BLM uses FLPMA planning procedures to adopt Resource Management Plans for western

Oregon O&C lands. Def.'s Mem. 9; *see* AR 13252.

The Pedal Power timber sale authorizes regeneration logging in 100 acres of mature

forest bordering portions of land designated for trail development. Pls.' Mem. 20–21 (citing AR

11375). This authorization is consistent with the 2016 RMP and Willamalane ERMA

management directives, and BLM adequately evaluated its effects on the area's targeted visitor

---

[3] "AR" refers to the administrative record filed in this case by BLM. Electronic copies of this record are on file with
the Court and available upon request.

activities, quality recreation, and anticipated benefits. *See* Pls.' Mem. 20–21. Therefore, BLM did not violate FLPMA.

The 2016 RMP Harvest Land Base management direction focuses on sustained-yield timber production. AR 11446–47, 11450. When management of other, non-recreational resources is dominant in a given land use allocation, the 2016 RMP directs BLM to provide recreational opportunities to the extent they can be managed consistent with other resources. AR 11475. BLM argues that it is not required to manage recreation commensurate with other land uses here because the harvest area exists in the Harvest Land Base land use allocation, which is comprised of O&C land and has a dominant purpose of timber production. Def.'s Mem. 9. BLM argues that despite its other named purposes, the O&C Act is not a "multiple use mandate" but rather a "'primary' or 'dominant' use statute for sustained-yield timber production." Def.'s Mem. 9 (quoting *Pac. Rivers v. BLM*, No. 6:16-CV-1598-JR, 2018 WL 6735090, at *17 (D. Or. Oct. 12, 2018) (citations omitted), *findings and recommendations adopted*, 2019 WL 1232835 (Mar. 15, 2019), *appeal docketed* No. 19-35384 (9th Cir. May 3, 2019)); *see also Headwaters, Inc. v. BLM*, 914 F.2d 1174, 1183 (9th Cir. 1990) ("the primary use of the O&C Act lands is for timber production to be managed in conformity with the provision of sustained yield" (citations omitted)). Plaintiff maintains that BLM must harmonize sustained-yield timber production with fire hazard and risk and high-quality recreational experiences. Pls.' Reply 1, ECF No. 25. Indeed, the Ninth Circuit has held that the O&C Act "has not deprived the BLM of all discretion with regard to either the volume requirements of the Act or the management of the lands entrusted to its care." *Portland Audubon Soc. v. Babbitt*, 998 F.2d 705, 709 (9th Cir. 1993).

The 2016 RMP also directs BLM to "[p]rovide a diversity of quality recreational opportunities" and manage Extensive Recreation Management Areas "in accordance with their

planning frameworks." AR 11475. In November 2018, however, BLM's Deputy State Director

clarified that:

> Where [Extensive Recreation Management Area] designations overlap with the Harvest Land Base, [BLM must] implement actions as directed by the Harvest Land Base management direction and consider project design features that would minimize or avoid adverse effects to the recreational resources identified in the [Resource Management Plan's] [Extensive Recreation Management Area] Planning Framework to the extent consistent with Harvest Land Base management direction.

AR 11241; *see also* AR 11492 (explaining that "BLM will not defer or forego timber

harvest of stands in the Harvest Land Base for reasons not described in the management

direction or this appendix.").

BLM's chosen action is not "plainly inconsistent" with the Harvest Land Base

management directives or Willamalane ERMA planning framework. *See Oregon Nat. Res.*

*Council Fund v. Brong*, 492 F.3d 1120, 1132 (9th Cir. 2007). The Harvest Land Base

management directives authorize regeneration harvest for numerous reasons, including

contribution to the attainment of the Allowable Sale Quantity and adjustment of a sustained yield

unit's age class distribution. AR 11446–47, 11450. Plaintiffs advocate for thinning instead,

arguing that "intensive plantation forestry in the very same area as the future trails network will

substantially degrade" the area's natural setting characteristics (from "front country" to "rural")[4]

and the trails' conditions, interfering with the Willamalane ERMA's "ability to provide *quality*

opportunities for hiking, mountain biking, wildlife viewing, etc." Pls.' Mem. 20–21 (citing AR

11375–76).

---

[4] Plaintiffs argue that the proposed action would convert the trail network's recreation setting characteristics from "front country," meaning "partially modified but without modifications that overpower the natural landscape (e.g. structures, utilities)," to "rural," meaning "having 'substantially modified natural landscapes' with a forest structural stage class of 'stand establishment with or without structural legacies.'". Pls.' Mem. 23 (citing AR 15796, 016748, 12674, 2293).

The Harvest Land Base land use allocation does not provide management direction for scenery or natural characteristics. AR 11446, 11450, 11475. The Willamalane ERMA framework only seeks to maintain the "community's distinctive recreation-tourism market niche or setting character" and is designated front country, which allows for "a partially modified landscape with more noticeable modifications." AR 11698, 10225. Moreover, the entire Project area was designated Visual Resource Management Class IV, which is the lowest visual quality classification and indicates "no special high quality visual or scenic resources present" and provides for management activities requiring major modifications of the landscape. AR 4606, 12930. Additionally, the Project includes visual-enhancing features, including green tree preservation along portions of future trails and reshaping roads into trails. Def.'s Mem. 14 (citing AR 3556, 3672).

The Court declines to make a subjective finding that BLM arbitrarily and capriciously evaluated the proposed logging's effects on visitor experiences. BLM does not have a clear directive to preserve the area's natural setting characteristics, and there is no evidence that visitors will be deprived of "quality" experiences because portions of the trails pass through regeneration harvest areas. In fact, the Willamalane ERMA framework cites "open space and non-motorized trail opportunities" as recreational values. AR 11374. The framework does not prioritize forest canopy or naturalness, and there is no evidence in the record that such values are universal. In fact, many comments from mountain bikers, for example, did not discuss scenery or naturalness at all. *See, e.g.*, AR 351, 589, 591, 601, 608, 614, 619, 621.

However, Plaintiffs also argue that BLM arbitrarily and capriciously[5] failed to designate a Recreation Management Zone—a buffer wherein timber harvest is only allowed to

---

[5] The Court does not construe Plaintiff's argument as a failure to act claim under 5 U.S.C. § 706(1). Plaintiff argues that BLM's decision to allow logging to begin before it designates trails and establishes a Recreation Management

"protect/maintain setting characteristics and/or to achieve recreation objectives." Pls.' Mem. 23 (citing AR 11376). The Willamalane ERMA framework requires BLM to establish a Recreation Management Zone "distance (off of center line) for all *designated* trails." AR 11376 (emphasis added). The framework does not specify when BLM must establish such a Zone, though its language necessitates that the agency designate trails first.

BLM initially said that it would establish a Recreation Management Zone as part of the Project's "purpose and need," then later concluded that they could not do so "in the absence of designated trails and an established [Recreation Management Zone]." AR 1444, 10262. But this "cut the trees first, zone the buffer later" argument ignores the Willamalane ERMA framework's language and certainly the expectations of the Willamalane Parks and Recreation District when they collaborated with BLM. At oral argument, Defendant argued that it makes more sense economically and operationally to designate trails and establish a Recreation Management Zone after logging. Defendant provided no basis or explanation for this argument. In essence, they argue that it is simply easier to paint on a blank canvas. But allowing logging and then establishing a Recreation Management Zone at some unspecified later date—if at all—seems to defeat the Zone's very purpose. The Court therefore requires BLM to designate trails and establish a Recreation Management Zone before logging begins to ensure adequate protection in the buffer area.

## II. NEPA

The National Environmental Policy Act ("NEPA") requires an analysis of "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C). NEPA exists to ensure that agencies take careful consideration of information related to

---

Zone is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "without observance of procedure required by law" under 5 U.S.C. § 706(2)(A) or (D). *See* Def.'s Mem. 15, n.8.

significant environmental impacts of their proposed actions and to give "the public the assurance that the agency 'has indeed considered environmental concerns in its decision making process.'" *Roberston v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989) (quoting *Baltimore Gas & Electric Co. v. Natural Resources Defense Council, Inc.*, 462 U.S. 87, 97 (1983)). NEPA imposes procedural requirements on agencies but "does not contain substantive environmental standards, nor does the Act mandate that agencies achieve particular substantive environmental results." *Bering Strait for Responsible Res. Dev. v. U.S. Army Corps of Engineers*, 524 F.3d 938, 947 (9th Cir. 2008). Judicial review of agency actions under NEPA is limited to determining whether the agency took the requisite "hard look" at the proposed action. *Id.*

An agency's "hard look" at an action and its environmental impacts includes an environmental assessment. *Connor v. Burford*, 848 F.2d 1441, 1446 (9th Cir. 1988). Based on the environmental assessment, the agency determines whether to prepare an environmental impact statement. 40 C.F.R. § 1501.4(c). If the agency finds that the action will not have a significant impact, it may issue a finding of no significant impact in lieu of an environmental impact statement. 40 C.F.R. § 1501.4(e); 40 C.F.R. § 1508.9(a)(1); 40 C.F.R. § 1508.13.

A "hard look" requires a consideration of "all foreseeable direct and indirect impacts" and a full assessment of the cumulative impacts of the proposed action. *Ctr. For Biological Diversity v. Salazar*, 695 F.3d 893, 916–17 (9th Cir. 2012). It is not sufficient to make speculative, conclusory statements about the impact of an action. *National Parks & Conservation Ass'n v. Babbitt*, 241 F.3d 722, 735 (9th Cir. 2001). To prevail, a plaintiff must raise "'substantial questions whether a project may have a significant effect' on the environment." *Blue Mts. Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1212 (9th Cir. 1998) (quoting *Idaho Sporting Congress*, 137 F.3d at 1149).

Plaintiffs argue that BLM violated NEPA by failing to: (1) take the requisite hard look at increased fire hazard and risk and degradation of scenic quality and recreational experiences; and (2) adequately analyze reasonable alternatives. Pls.' Mem. 26–38.

## A. Hard Look

### i. Fire Hazard and Risk

BLM did not fully analyze and publicly disclose the degree of fire hazard to adjacent communities that the Project is likely to increase. *See* AR 3968–70, 3618–20.

The Final Environmental Impact Statement for the 2016 RMP addressed fire hazard over the 1.3 million-acre planning area and concluded that, over time, stand-level fire resistance would increase and stand-level fire hazard would decrease. AR 3968–70, 3618–20, 4616. Based on this analysis and the relatively small scale of the proposed action, BLM concluded that it did not need to analyze the issue in detail at the Project level. AR 4616. The Project Environmental Assessment discussed the issue in the local context but eliminated it from detailed analysis. AR 2024–26, 3618–20. BLM argues that the Project Environmental Assessment's site-specific analysis "tiers" to that in the Environmental Impact Statement. Def.'s Mem. 18. BLM also argues that because the proposed harvest area would affect less than 0.5% of the 33,737-acre watershed, which is 91% private land, it cannot "effectively influence landscape-level fire hazard." Def.'s Mem. 19, 21 (citing AR 3618–19). BLM admits, however, that the selected action would increase the planning area's total number of acres in high or moderate fire hazard. Def.'s Mem. 19 (citing AR 13510).

40 C.F.R. § 1502.20 provides that "[a]gencies are encouraged to tier their environmental impact statements to eliminate repetitive discussions of the same issues and to focus on the actual issues ripe for decision at each level of environmental review (§ 1508.28)." A subsequent

environmental assessment need only summarize and incorporate by reference the broader statement's discussion and "shall concentrate on the issues specific to the subsequent action." *Id.* Courts view tiered analyses as a whole when determining whether they adequately address all impacts and may reject such environmental review where none of the documents address significant issues. *W. Watersheds Project v. Lueders*, 122 F. Supp. 3d 1039, 1047 (D. Nev. 2015) (internal citations omitted), *aff'd*, 701 F. App'x 651 (9th Cir. 2017). An agency cannot minimize an activity's environmental impact by adopting a broad scale analysis and marginalizing the activity's site-specific impact. *Pac. Coast Fed'n of Fishermen's Ass'n v. Nat'l Marine Fisheries Serv.*, 265 F.3d 1028, 1036 (9th Cir. 2001); *see also Oregon Natural Resource Council v. Brong*, 492 F.3d 1120, 1130 (9th Cir. 2007) (holding that the agency improperly diluted the effects of its proposed actions by averaging snag retention over too wide an area).

Here, BLM improperly diluted the proposed action's effects by analyzing it as part of the 1.3 million-acre planning area, even admitting that the "Harvest Land Base effects on fire hazard patterns are diminished at the scale of all BLM-administered Lands within Wildland Development Areas." *See* AR 13499–517, 13510. The Environmental Impact Statement did not analyze site-specific geographic conditions or effects on the immediate area, nor did the Project Environmental Assessment. *See* AR 13499–517, 3618, 3968. The Environmental Assessment simply acknowledged that there would be a significant increase in stand-level fire hazard in the Project area for the next 40 years without explaining what that means or analyzing the degree or severity of fire hazard to the community and neighboring landowners. *See* 3618, 3968. Instead, it attempted to marginalize the effects of regeneration logging by measuring the harvest area against the 33,737-acre watershed around the Project area, which it has little control over. *See* AR 4616, 3618, 3968, 16378.

BLM also failed to include crucial information from its fuels specialist in the Environmental Assessment and deprived the public of meaningful participation. *See* AR 2284–2301, 3618–20, 3968–70. The fuels specialist reported that the change from a "mature" to an "early successional" stand structural stage would change the associated stand-level hazard from low to moderate/high. AR 2292. The stands would go from a timber model to a slash fuel model with higher predicted flame length, fire duration, and intensity and decreased ability to control a fire, with the greatest risk of a fire start during the first 5 years following harvest. *Id.*; *see also* AR 4178–95, 1040–53. Over the next 10 to 40 years, stands would transition through stages associated with high stand-level fire hazard rating and go from a slash fuel to a brush fuel type, which are more volatile and susceptible to high fire-caused mortality rates. AR 2293. These potential fires would have high flame lengths, rates of spread, and intensity and would be difficult to initially attack and control. *Id.* Overall fire hazard would increase for 5 to 20 years following planting, then drop from high to moderate after the next treatment. *Id.*

In response to potential questions from the public, the fuels specialist said that BLM would analyze the issue more in the Environmental Assessment. AR 0368. BLM did not do so. Worse still, the April and May 2018 Environmental Assessments reduced the fuels report to a single sentence, explaining that "regeneration/reforestation actions would create an increase in fire hazard at the stand level for the next 40 years as stands regrow and transition through progressive structural stages." AR 3968, 3618. BLM argues that the Environmental Assessment summarized the report, incorporated it by reference, named the fuels specialist, and made the record available for public inspection. Def.'s Mem. 20–21 (citing AR 3618–20, 3659).

NEPA allows incorporation by reference where the incorporated material is "reasonably available for inspection" and its content is briefly described. *Nw. Envtl. Def. Ctr. v. Nat'l Marine*

*Fisheries Serv.*, 647 F. Supp. 2d 1221, 1247 (D. Or. 2009). First, although the fuels specialist's report was part of the public Project record, neither Environmental Assessment mentions its existence. *See* 3957–4019, 3606–3673. In fact, BLM waited until the May 2018 Environmental Assessment, after the public's opportunity to comment had closed,[6] to disclose the fuels specialist's identity. *See* 3957–4019, 3659. Therefore, the report was not *reasonably* available for inspection. Second, the sentence reproduced above is a far cry from a summary or brief description of the fuels specialist's 18-page report. *See* AR 2284–301. Therefore, BLM failed to properly incorporate the report by reference and did not take the requisite "hard look." *See Or. Natural Desert Ass'n v. Rose*, 921 F.3d 1185, 1191 (9th Cir. 2019) (citation omitted) (holding that "general statements about 'possible' effects and 'some risk' do not constitute a 'hard look' absent a justification" for why the agency could not provide more "definitive information."). Further, BLM's failure to incorporate the report into the April 2018 Environmental Assessment deprived the public of its only opportunity to comment. *See* AR 3604.[7]

Plaintiffs' argument that BLM arbitrarily and capriciously dropped fuels reduction as a primary purpose of the Project is addressed below. *See* Pls.' Mem. 28.

## ii. Scenic Quality and Recreational Experience

BLM took a hard look at regeneration logging's potential impact on recreational experiences in the Willamalane ERMA. *See* AR 3994–95, 3645–46.

The selected action provides for trail experiences on 56 acres of the east side of Section 1, where harvest will be deferred, and 165 acres of riparian reserves, where no harvest will occur. AR 3548, 3615. BLM argues that these areas will have high trail quality, be predominantly under

---

[6] BLM posted the April 2018 Environmental Assessment on April 12, 2018 and made it available for public review and comment for 15 days. AR 3604. BLM did not allow for further public review when it released the May 2018 Environmental Assessment. *Id.*

[7] Indeed, none of the comments expressing concern over fire hazard and risk discuss the fuels specialist's report or increased fire hazard as a result of regeneration logging. *See* AR 603, 616, 620, 627–28, 632, 649.

a forest canopy, and offer a broad range of high quality mountain biking and hiking opportunities. Def.'s Mem. 22 (citing AR 3644–45). Where harvest will occur—in the remaining 100 acres of the project area—there will be loss of canopy, open trail exposure, and new roads for use during logging. AR 3548, 3645. These conditions will lead to poor tread quality, especially for mountain bikers, while "increased direct rainfall, wind erosion, freeze-thaw, and seasonal over-drying" will reduce the trails' ability to withstand heavy use from spring to fall for hikers and bikers. *Id.* To compensate for tread loss and provide the desired challenge experience for mountain bikers, the Project incorporates soil manipulation and man-made rollers, jumps, and rock gardens. *Id.* The Project also incorporates crushed rock to help provide sustainable trail tread and aggregate green tree retention along certain trails to address canopy loss. AR 3994–95, 3645–46, 2588.

Plaintiffs argue that the Environmental Assessment focuses on the physical quality of the trails and not how the Project may impede the area's "scenic quality and other recreational values (e.g. nature appreciation)." Pls.' Mem. 30–31. As discussed above, there is no objective basis in the record for prioritizing these recreational values, and BLM is not responsible for meeting Plaintiffs' subjective expectations of what any given visitor's recreational experience should resemble. The Environmental Assessment specifically discussed how future conditions would impede various users' experiences and offered mitigation measures. *See* AR 3994–95, 3645–46. BLM has taken a hard look at the practical consequences of the proposed action on recreational experiences in the Willamalane ERMA.

Additionally, BLM objects to Plaintiffs' emphasis on the "naturalness" of the area, explaining that it is immediately east of Springfield, has a two-lane road passing through it, is situated less than a mile south of a state highway, is adjacent to homes, and suffers from

undesirable uses such as "illegal dumping, carcass disposal, late night party debris, recreational shooting, destruction of property, and off-highway vehicle trespass." Def.'s Mem. 24–25 (citing AR 3443, 3622, 2586). Plaintiffs maintain that the area contains mature forests with a diverse mix of hardwoods and native understory plants and will be converted to homogenous Douglas fir plantations if the Project proceeds, with "multi-layered stands" only after several decades. Pls.' Reply 29 (citing AR 2292, 2586). The Thurston Hills Silviculture Report, however, explains that the existing stands are 54% Douglas-Fir, "generally lack a developed understory[,] and are more structurally homogenous." AR 2586.

## B. Reasonable Alternatives

Finally, BLM adequately analyzed reasonable alternatives and explained why Plaintiffs' preferred thinning alternative would not achieve the Project's purpose and need.

Plaintiffs argue that BLM arbitrarily and capriciously: (1) focused on an exceptionally narrow purpose of creating 0-10 year age class forests and ignored the scarcity of older forests, rather than considering their proposed thinning alternative to maintain a "late-successional trajectory" and establish a more balanced age class distribution; and (2) originally presented fuels reduction as an important need of the Project, then abandoned it in favor of "volume-driven regeneration harvest." Pls.' Mem. 35–36; *see* AR 3866–71, 10500–07. Plaintiffs argue that the District expected to exceed its annual timber targets for the sustained yield unit at issue, therefore there was no need for intensive regeneration logging in the Willamalane ERMA. Pls.' Mem. 37 (citing AR 0104, 11393); *see Klamath-Siskiyou Wildlands Ctr. v. U.S. Forest Serv.*, 373 F. Supp. 2d 1069, 1088–89 (E.D. Ca. 2004) (holding that the agency failed to consider an adequate range of alternatives or explain why they would not achieve the project's purpose and need where it

"simply dismissed out of hand any proposal which would have reduced the amount of timber harvest" as "uneconomical.").

BLM analyzed alternatives that satisfied the Project's purpose and need to adjust the timber stand's age class distribution and produce timber to contribute to the 2016 RMP's stated Allowable Sale Quantity. Def.'s Mem. 26; *see* AR 3613–14. Agencies are afforded considerable discretion in defining a project's purpose and need. *Friends of Se.'s Future v. Morrison*, 153 F.3d 1059, 1066 (9th Cir. 1998). An agency may not, however, "define its objectives in unreasonably narrow terms." *Id.* (quoting *City of Carmel-by-the-Sea v. United States Dept. of Transportation*, 123 F.3d 1142 (9th Cir. 1997)). Here, the 2016 RMP's Harvest Land Base management direction requires BLM to adjust the age class distribution in sustained yield units to provide a perpetual supply of timber on O&C lands. AR 11446, 3613. A "well-distributed mix of age classes" provides more constant forest conditions for wildlife habitat, recreation, and consistent timber supply and forest vigor in the face of disturbances such as insects and disease. AR 3613–14, 2586. Conversely, the 2016 RMP's Harvest Land Base management objective to develop diverse late-successional ecosystems is a desired outcome, not a rule, restriction, or requirement. AR 11450, 11490.

The 2016 RMP authorizes regeneration harvest to contribute to attainment of the Allowable Sale Quantity and adjust the age class distribution in sustained yield units. AR 11446. It authorizes commercial thinning to contribute to attainment of the Allowable Sale Quantity and reduce stand susceptibility to fire and other disturbances. AR 11447. BLM did not analyze thinning in detail because it did not meet its purpose to shift acres from the 70 to 0-10 year age class, and the 2016 RMP does not authorize it to use thinning for that purpose. AR 3640, 3638–41, 11447. Additionally, thinning would produce 4–6% of the necessary Allowable Sale

Quantity, whereas regeneration would produce 12–18%. Def.'s Mem. 30 (citing AR 2589, 2583). The Allowable Sale Quantity can vary by up to 40%, but BLM has a target nonetheless. AR 11393. Unlike the agency in *Klamath-Siskiyou Wildlands Center*, BLM adequately explained why other alternatives would not achieve the Project's purpose and need. *See* 373 F. Supp. 2d at 1088–89.

Regarding fuels reduction, a February 2016 Project initiation letter said that, "[g]iven the location of the project at the wildland urban interface . . . the reduction of fire hazards through fuels reduction is an important need" to address the area's "gap in fuels management." AR 1515. The letter then discussed timber harvest "in addition to provision of recreational opportunities and fuels management." *Id.* In February 2017, an inter-agency email discussed balancing non-motorized trail system and logging activities and said that there was "also a fuels reduction component." AR 1514.

BLM now argues that it abandoned fuels reduction as a third purpose in part because its fuels specialist determined that ground conditions showed less fire risk due to north-facing "wet bowls." Def.'s Mot. 33 (citing AR 1473, 1490). The fuels specialist also said that the site is in a high-risk area and she wanted the Project to coordinate fuels reduction projects with the Willamalane Parks and Recreation District and minimize any added fire risk from trail additions. AR 1490. BLM and the Willamalane Parks and Recreation District are working together to reduce wildfire hazard, risk, and consequences to the Springfield community. AR 3619. BLM has also provided funding through the Wildland Urban Interface Community Fire Assistance Program, which began work in spring 2018 and is anticipated to bring fuels reduction and/or restoration treatments to 400 to 500 acres over the next 5 years. *Id.* Additionally, BLM concluded that there would be no increase in fire risk due to trail development. AR 3970, 3620.

BLM acted well within its discretion in departing from the Project's original stated fuels reduction purpose and did not act arbitrarily and capriciously in narrowing its focus.

## CONCLUSION

Plaintiffs Cascadia Wildlands and Oregon Wild's Motion for Summary Judgment, ECF No. 16, is GRANTED in part and DENIED in part, consistent with this Opinion. Defendant Bureau of Land Management's Motion for Summary Judgment, ECF No. 22, is GRANTED in part and DENIED in part, consistent with this Opinion. Defendant-Intervenor Seneca Sawmill Company's Cross-Motion for Summary Judgment, ECF No. 23, is GRANTED in part and DENIED in part, consistent with this Opinion. The matter is REMANDED to the Bureau of Land Management to issue a new environmental assessment that adequately discloses and analyzes the likely increase of fire hazard to adjacent communities, make it available for public review and comment, and—if the Project proceeds—designate and preserve a Recreation Management Zone prior to harvest.

IT IS SO ORDERED.

Dated this 18th day of September, 2019.


    s/Michael J. McShane

Michael McShane
United States District Judge